ROBERT B. CUMMINGS (#13186)
THE SALT LAKE LAWYERS
10 Exchange Place, Ste. 622
Salt Lake City, Utah 84111
T: (801) 590-7555
F: (801) 384-0825
E: Robert@thesaltlakelawyers.com

KELLY FOWLER (#13213)
KELLY A. FOWLER, ATTORNEY AT LAW
10 Exchange Place, Ste. 622
Salt Lake City, Utah 84111
T: (801) 520-6995
F: (801) 747-6849
E: fowlerlegal@live.com

MARK J. GERAGOS (Cal. SBN #108325)
BENJAMIN MEISELAS (Cal. SBN #277412)
GERAGOS & GERAGOS
644 S Figueroa St
Los Angeles, California 90017
T: (213) 625-3900
F: (213) 625-1600
E: geragos@geragos.com
[*Pro Hac Vice*]

Attorneys for THE ESTATE OF DILLON TAYLOR, CODY TAYLOR, JERRAIL TAYLOR,
TEESHA TAYLOR, and ADAM THAYNE

## IN THE UNITED STATES DISTRICT COURT,
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE ESTATE OF DILLON TAYLOR; *et al.*;<br><br>Plaintiffs,<br><br>vs.<br><br>SALT LAKE CITY, *et al.*,<br><br>Defendants. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(a)**<br><br>Case No. 2:15-cv-00769-DN-BCW<br><br>Judge David Nuffer<br><br>Magistrate Judge Brooke C. Wells<br><br>[ORAL ARGUMENT RREQUESTED] |

# TABLE OF CONTENTS

**SECTION**                                                                                    **PAGE**

TABLE OF CONTENTS                                                                                ii

TABLE OF AUTHORITIES                                                                             iv

GENERAL STATEMENT IN OPPOSITION AND RELIEF SOUGHT:                                               1
   "THE TALE OF TWO CRUZES"

RESPONSE TO STATEMENT OF ELEMENTS AND UNDISPUTED FACTS                                           4

I.     42 U.S.C. § 1983 Excessive Force Against Defendants Cruz,              5
       Sylleloglou and Downes – Qualified Immunity

    A. Plaintiffs' Response to Elements and Legal Authority                         5

       1.  Qualified Immunity                                                5

       2.  Excessive force against Defendant Cruz                            5

       3.  Failure to intervene to prevent the use of excessive force        6
           against Officers Sylleloglou and Downes

    B. Response to Defendants' Allegedly Undisputed Materials Facts                    6

       i.  Response to Defendants' Facts in Support of "Dispatch report      6
          and initial contact by officers."

       ii.  Response to Defendants' Facts in Support of "Dillon Taylor     20
          does not comply with Officers' Commands."

       iii. Response to Defendants' Facts in Support of "Mr. Taylor        33
          conceals his hands."

       iv. Response to Defendants' Facts in Support of "Mr. Taylor's       38
          sudden movement."

       v.  Response to Defendants' Facts in Support of "Interaction with    42
          Adam and Jerrail."

       vi. Response to Defendants' Facts in Support of "Medical            44
          examiner's report."

|  |  | vii. Response to Defendants' Facts in Support of "Mr. Taylor's mental state." | 44 |
| II. | | 42 U.S.C. § 1983 Deprivation of Familial Association Against Officers Cruz, Sylleloglou and Downes – Qualified Immunity | 47 |
| III. | | 42 U.S.C. § 1983 Supervisory Liability Against Chief Mike Brown – Qualified Immunity | 47 |
| IV. | | 42 U.S.C. § 1983 Municipal Liability Against Salt Lake City | 47 |
| V. | | Wrongful Death – Application of the Governmental Immunity Act of Utah | 47 |

PLAINTIFFS' STATEMENT OF THE COMPLETE FACTS   48

| I. | The Call is Dispatched | 49 |
| II. | The Alleged "Disturbance" Crossing the Street | 50 |
| III. | Dillon, Adam, and Jerrail Do Not Rob the 7-Eleven | 51 |
| IV. | Officer Downes Drives to the Rear of the 7-Eleven | 52 |
| V. | Neither Officers Downes nor Sylleloglou Engaged their Emergency Lights | 53 |
| VI. | The Officers Arrive at the 7-Eleven | 54 |
| VII. | Adam and Jerrail Immediately Raise their Hands which Scared Defendant Cruz | 55 |
| VIII. | Downes Detains Adam and Jerrail | 56 |
| IX. | Jerrail Sees Dillon Walk Away | 56 |
| X. | Dillon's Alleged "Look of Defiance" | 57 |
| XI. | Dillon Turns and Walks Away | 61 |
| XII. | Officer Downes' Perspective | 63 |
| XIII. | Dillon's White Earbuds | 64 |

| XIV. | Dillon Continues Walking | 65 |
| XV. | Dillon's Hands – Digging for a Gun, Holding Up his Pants, or Turning Down his Music? | 67 |
| XVI. | The Aftermath | 70 |

ARGUMENT — 71

| I. | The Summary Judgment Standard | 71 |
| II. | Defendant Cruz Is Not Entitled To Qualified Immunity As A Matter Of Law | 71 |
| | A. Dillon Was Seized, Thus Implicating The Fourth Amendment | 71 |
| | B. Defendant Cruz's Own Testimony, Among Other Things, Shows There Are Issues Of Fact As To Whether The Use Of Force Was Objectively Reasonable | 72 |
| | -The severity of the crime being committed. | 72 |
| | -The "threat" posed by Dillon. | 74 |
| | -Actively resisting arrest. | 81 |
| | C. Officer Sylleloglou Was The Objectively Reasonable Officer | 83 |
| | D. Dillon's Constitution Right Was Clearly Established | 85 |

CONCLUSION — 88

## TABLE OF AUTHORITIES

**Case**     **Page(s)**

| *Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997) | 88 |
| *Adams v. Williams*, 407 U.S. 143 (1972) | 74 |
| *Alabama v. White*, 496 U.S. 325 (1990) | 74 |
| *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) | 89-90 |
| *Anderson v. Creighton*, 483 U.S. 635 (1987) | 87 |
| *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) | 71 |
| *Cardall v. Thompson*, 845 F.Supp.2d 1182 (D. Utah 2012) | 75-76 |
| *Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011) | 80 |
| *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) | 71 |

*Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir.1991) — 81

*Dorato v. Smith*, 108 F.Supp.3d 1064 (D.N.M. 2015) — *Passim*

*Estate of Larsen es rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2009) — 82

*Figueroa v. Gates*, 207 F.Supp.2d 1085 (C.D. Cal. 2002) — 81

*Florida v. J.L.*, 529 U.S. 266 (1999) — 74

*Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008) — 81

*Graham v. Connor*, 490 U.S. 386 (1989) — 5-6, 72, 73, 85

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) — 72

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir.1997) — 81

*Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir.2001) — 73

*Hudspeth v. City of Shreveport*, No. CIVA 04-0587, 2006 WL 3747446 (W.D. La. Dec. 18, 2006), aff'd, 270 F. App'x 332 (5th Cir. 2008) — 80

*Lamont v. New Jersey*, 637 F.3d 177 (3rd Cir. 2011) — 79

*Lundstrom v. Romero*, 616 F.3d 1108 (10th Cir. 2010) — 70

*Martin v. City of Albuquerque*, 147 F.Supp.3d 1298 (D.N.M. 2015) — 90-91

*McDonald v. City of Tacoma*, No. 11-cv-5774-RBL, 2013 WL 1345349 (W.D. Wash. Apr. 2, 2013), *aff'd*, 578 Fed. App'x 686 (9th Cir. Apr. 2, 2013) — 79, 80

*Murphy v. Bitsoih*, 320 F.Supp.2d 1174 (D.N.M. 2004) — 88, 89-90

*O'Neal v. DeKalb County*, 850 F.2d 653 (11th Cir. 1988) — 88

*Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379 (5th Cir. 2009) — 79

*Pearson v. Callahan*, 555 U.S. 223 (2009) — 88

*Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016) — 81

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir.2004) — 87

*Pollard v. City of Columbus, Ohio*, 780 F.3d 395 (6th Cir. 2015) — 79

*Reynolds v. County of San Diego*, 84 F.3d 1162 (9th Cir. 1996) — 88

*Romero v. Board of County Comm'rs*, 60 F.3d 702 (10th Cir. 1995) — 88

*Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003) — 82-83

*Rossiter v. Robinson*, 716 F.Supp.2d 1018 (D. Colo. 2010) — 87

*Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691 (1st Cir. 1994) — 88

*Salazar-Limon v. City of Houston*, 97 F.Supp.3d 898 (S.D. Tex. 2015) — 79

*Saucier v. Katz*, 533 U.S. 194 (2001) — 88

*Teague v. Gallegos*, No. 06-cv-02005-REB-CBS, 2007 WL 3232082 (D. Colo. Oct. 30, 2017) — 78, 80

*Thompson v. Hubbard*, 257 F.3d 896 (8th Cir. 2001) — 75, 80

*United States v. Martinez*, 486 F.3d 855 (5th Cir. 2007) — 75

*United States v. Rodella*, No. CR 14-2783 JB, 2015 WL 711931 (D.N.M. Feb. 2, 2015) — 90

*V-1 Oil Co. v. Wyoming*, 902 F.2d 1482 (10th Cir. 1990) — 70

*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) — 72

*White v. York Int'l Corp.*, 45 F.3d 357 (10th Cir. 1995) — 71

*Wilson v. City of Des Moines*, 160 F.Supp.2d 1038 (S.D. Iowa 2001) — 81

*Wood v. City of Lakeland*, 203 F.3d 1288 (11th Cir. 2000) — 88

| **Statute or Rule** | **Page** |
|---|---|
| 42 U.S.C. § 1983 | *Passim* |
| FED. R. CIV. P. 56 | *Passim* |
| FED. R. EVID. 401 | 44, 45, 46 |
| FED. R. EVID. 403 | 44, 45, 46 |
| DUCivR 56-1 | 5-6 |
| UTAH CODE ANN. § 76-10-500 | 73 |
| UTAH CODE ANN. § 76-10-504 | 73-74 |
| UTAH CODE ANN. § 76-10-506 | 7, 16, 74 |

Plaintiffs, the ESTATE OF DILLON TAYLOR; CODY TAYLOR, JERRAIL TAYLOR, TEESHA TAILOR; and ADAM THAYNE (collectively, "Plaintiffs") hereby submit their opposition to Defendants Salt Lake City, Bron Cruz, Andrew Sylleloglou, Chief Mike Brown, and John and Jane Does 1-35, (collectively, "Defendants") Motion for Summary Judgment Pursuant to FED. R. CIV. P. 56(a).[1]

## <u>GENERAL STATEMENT IN OPPOSITION AND RELIEF SOUGHT</u>

### *"THE TALE OF TWO CRUZES"*

On August 11, 2014, Defendant Bron Cruz ("Defendant Cruz") shot Dillon Taylor to death with two rapid-fire shots at the 7-Eleven on 21st South and State Street.  Defendant Cruz and two other officers, Uppsen Downes and Andrew Sylleloglou, were responding to a 9-1-1 of someone potentially having a gun.  The 9-1-1 operator reported, though, that no shots were fired and no one was in danger.  Moreover, the 9-1-1 caller would not provide her name, was uncooperative, and hung up on the 9-1-1 operator.  While the caller appeared by most metrics to not be reliable, Defendant Cruz explained shortly after the shooting that at seemingly all points from taking the call until he pulled the trigger that he was going to die.

Two weeks after he shot Dillon Taylor to death, Defendant Cruz gave an interview as part of the District Attorney's investigation.  Defendant Cruz was tearful, with "sniffs" mentioned throughout the interview transcript.  Officer Downes, who was Defendant Cruz on the call, drove around back of the 7-Eleven, which perplexed and scared Defendant Cruz.  When

---

[1] As discussed herein, Officers Downes and Sylleloglou and Chief Brown were dismissed from this case with prejudice.  (Docket 33.)  Therefore, the only remaining defendants are Bron Cruz and Salt Lake City.

Dillon's cousin and brother, Adam Thayne and Jerrail Taylor, put their hands up, Cruz said "it scared the crap" out of him. And it "scared" him that Dillon was walking away. According to Cruz two weeks after the shooting, Dillon looked at Cruz "with complete, total defiance in his eyes." Everything that Dillon did, according to Defendant Cruz's interview two weeks after the shooting, proved in Defendant Cruz's mind that he was going to die. Likewise, Defendant Cruz was adamant that he never knew Dillon was wearing earbuds and never saw the white earbuds.

During discovery in this case, Defendant Cruz's tale changed. During his deposition, Defendant Cruz stated that during the call at 7-Eleven, his demeanor was "Normal. Alert. Aware." Indeed, Defendant Cruz said that he had responded "[o]ver 50 times" to a call involving a gun. At one point, he interrupted the attorney asking questions to clarify the attorney's use of the word "scared." As Defendant Cruz explained:

> You keep using the word "scared" as if it's a light switch. I'm not going to be able to tell you and identify some specific time on this – you know, being scared, I don't know, maybe it's like this for everybody, but it's – it's incremental. It's something that builds, just like this call did. It's not a light switch. There is no specific time where I'm going to be able to tell you, oh, this happened and I got scared, okay? So, I mean, I just feel that that is really important that I emphasize that.

> There is no one thing that you are going to be able to bring up that, you know, I can identify specifically, I was scared now.

In short, this case is a Tale of Two Cruzes. One tale involves a man petrified, knowing that he was going to his death, and everything that Dillon, Adam, and Jerrail did all reinforced his belief (an unreasonable belief) that he was facing certain death. Another tale details a calm, cool, collected officer, handling the encounter by the book, but was still nonetheless unreasonable in his perception and actions. Defendant Cruz is the keystone of his own Motion for Summary Judgment. If his testimony falls, so does his motion. Based upon Defendant

Cruz's already changing story, there is simply no way that there are no issues of material fact as Defendant Cruz's testimony – upon which the purported undisputed facts are based – is clearly in dispute with Defendant Cruz himself providing the dispute.

Aside from the changing story, Cruz's recollection and credibility is in doubt.  For example, he was adamant two weeks after the shooting that Dillon did not have headphones and that he "never saw any during the whole time when [he] was kneeling down by him[.]"  The bodycam video, however, shows a pair of white earbuds juxtaposed against the bright red blood on the dark pavement, there clear as day.  ***Indeed, the bodycam video shows that the earbuds were unplugged by Defendant Cruz after Defendant Cruz put on his black gloves, in a sequence that shows Defendant Cruz may have been trying to block his bodycam from capturing him unplugging the earbuds and not wanting to get any fingerprints on them***.  For around three minutes, Defendant Cruz did not have his gloves on.  But once he made the determination to unplug the earbuds, Defendant Cruz placed on his gloves before he touched the cord or Dillon's phone.  How Defendant Cruz could claim in his interview, and then in his deposition under oath, that he never saw earbuds simply strains credulity.

Likewise, Cruz claims that Dillon had a look of "defiance" in his eyes, but the bodycam raises serious doubts as to Defendant Cruz's claims.  Defendant Cruz was wearing a black pair of department-issued Oakleys with dark lenses; Dillon had only looked at Defendant Crus for a "split second"; and Dillon was at a considerable distance at the time Defendant Cruz claims to have seen this "defiance."

Defendant Cruz has tried to paint a simple, straight-forward case in his Motion for Summary Judgment that him shooting Dillon was justified as he acted as an objective reasonable

officer in doing so.  The record here, however, dispels Defendant Cruz's story.  Indeed, Cruz's own varied statements and changing story places seemingly all of the crucial material facts here in question.  Moreover, the shooting that took place here had an objectively reasonable officer involved:  Officer Sylleloglou.  Both Defendant Cruz and Officer Sylleloglou had their guns drawn.  Both had their guns trained on Dillon.  And both had their fingers on the trigger.  But one did not see anything when Dillon showed his hands to the officer and therefore did not fire, and one did fire.  While Officer Sylleloglou testified that he was moments away from shooting, that is exactly where we want officers: always moments away from firing, but only doing so when necessary and justified.  Based upon Officer Sylleloglou's actions, he did not perceive a threat, and did not find at that moment the use of deadly force justified or reasonable.

In sum, there are simply too many issues of material fact here to grant summary judgment for Defendant Cruz.  This case must be tried to a jury, to let them determine which of Defendant Cruz's story to believe, and to determine whether Defendant Cruz acted as an objectively reasonable officer would have done under the circumstances.  Therefore, the Court must deny Defendant Cruz's Motion for Summary Judgment.

## RESPONSE TO STATEMENT OF ELEMENTS AND UNDISPUTED FACTS

All references to "Defendant" Downes and Sylleloglou are included in the verbatim restatement of the moving party's facts as required under FED R. CIV. P.; however, the parties stipulated to dismissing all claims against Officers Downes and Sylleloglou with prejudice. (Docket 33.)  Likewise, after Defendants filed their Motion for Summary Judgment, the parties stipulated to phased discovery.  (Docket 49.)  Defendants only argument in regards to municipal liability is that if there is no underlying constitutional violation, then there can be no municipal

liability.  (Docket 44 at 39.)  Likewise, the parties agreed that other aspects of potential

municipal liability would be addressed in the second phase of discovery, if necessary.  (*Cf.*

Docket 49 (only authorizing depositions of officers).)  As Officers Downes and Sylleloglou have

been dismissed and due to the phasing of discovery stipulated to by the parties, the only

remaining moving Defendant is Officer Bron Cruz.  Therefore, all references to "Defendant" will

be in the singular and refer to Defendant Cruz.

I.   **42 U.S.C. § 1983** **Excessive Force Against Defendants Cruz, Sylleloglou and Downes  - Qualified Immunity**

A.  **Plaintiffs' Response to Elements and Legal Authority.**

| 1. Qualified immunity | Plaintiffs' Response |
|---|---|
| 1.   The officers violated Dillon Taylor's statutory or constitutional right;<br>2.   The officers were acting under color of authority of the State of Utah.<br>3.   The statutory or constitutional right the officers violated was clearly established at the time of the unlawful activity. | Pursuant to DUCivR 56-1(c)(2)(A), Plaintiffs agree with the elements for the qualified immunity defense as stated.  Plaintiffs, however, do not agree with the implications stated by Defendants in their Motion.  DUCivR 56-1(b)(2)(A) requires that the moving party state "[e]ach legal element required to prevail on the motion[.]"  The rule also requires "[c]itation to legal authority supporting each stated element" but such citations are to be "without argument."  DUCivR 56-1(b)(2)(B).  Plaintiffs will address Defendants' argument, including exposition on cases, below. |

| 2.  **Excessive force against Defendant Cruz** | Plaintiffs' Response |
|---|---|
| The *Graham* analysis applies to constitutional right claims involving excessive force in violation of the 4th Amendment.  Under this analysis, the | Pursuant to DUCivR 56-1(c)(2)(A), Plaintiffs agree with the elements for the qualified immunity defense as stated.  Plaintiffs, however, do not agree with the implications stated by |

| Court should consider the specific facts, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). | Defendants in their Motion. DUCivR 56-1(b)(2)(A) requires that the moving party state "[e]ach legal element required to prevail on the motion[.]"  The rule also requires "[c]itation to legal authority supporting each stated element" but such citations are to be "without argument." DUCivR 56-1(b)(2)(B).  Plaintiffs will address Defendants' argument, including exposition on cases, below. |

| 3.  Failure to intervene to prevent the use of excessive force against Officers Sylleloglou and Downes | Plaintiffs' Response |
| --- | --- |
| 1.  Officers Sylleloglou and Downes witnessed the use of excessive force;<br>2.  Officers Sylleloglou and Downes had a realistic opportunity to intervene to prevent the harm from occurring;<br>3.  Officers Sylleloglou and Downes failed to intervene to prevent the harm from occurring. | Officers Sylleloglou and Downes have been dismissed from this action with prejudice, so no response is necessary.  (Docket 33.) |

## B.  Response to Defendants' Allegedly Undisputed Material Facts

### i.  Response to Defendants' Facts in Support of "Dispatch report and initial contact by the officers."

| Defendants' Undisputed Fact[2] | Plaintiffs' Response |
| --- | --- |
| 1.      At approximately 7:00 p.m. on August 11, 2014, a 911 call was dispatched to Salt Lake City police officers by radio as a "report of a man with a gun" at 1900 South 200 East, | **Undisputed, but factually incomplete.**<br>Although the initial call was dispatched as described, dispatch also relayed verbally and through officers' laptops, "no shots fired;" "no one in danger;"[3] "comp[lainant] not |

---

[2] Defendant's citations to his factual record are omitted to conserve space, and the citations are contained in Plaintiff's motion.

[3] Plf's Ex. 1, Cad Call Log, p. 6 of 15; SLCC 001547.  All references to Plaintiffs' Exhibits are to the exhibits attached to the Declaration of Robert B. Cummings ISO Plaintiffs' Opposition to

| | |
|---|---|
| "suspect flashed a gun at the complainant but no threat was made," "male Hispanic wearing white shirt, red pants, red baseball cap; also another male Hispanic wearing a striped shirt; they were last seen southbound on 200 East." | coop[erative] refused her info;"[4] and that the "complainant hung up on the call taker."[5] The dispatcher then asked if "[a]ny unit coming clear to *handle a check*?"[6]<br><br>Officer Sylleloglou acknowledged receiving the dispatch in both written and verbal forms: As he stated in his deposition: "I can see it because they will type notes, and then I can see it coming into the computer."[7]<br><br>Defendant Cruz acknowledged reading the log notes as well, and remembered seeing that the caller was "uncooperative."[8]  Cruz did not believe he received information that no shots had been fired.[9]  Cruz did not believe he received information that no one was in danger.[10] |
| 2.      Defendant Bron Cruz was on patrol in the area and responded to the dispatch call to ensure that the suspects were not a threat to public safety and to determine whether any laws had been or were being violated, including a possible brandishing. | **Undisputed,** that Defendant Cruz was on patrol in the area and responded to the call to investigate; **Disputed** as to the rest. The jury can choose to believe or disbelieve whether Defendant Cruz's subjective belief that he was responding to a "possible brandishing," was reasonable.<br><br>Under UTAH CODE ANN. § 76-10-506(2), the crime of "brandishing" requires a weapon be displayed in a "threatening manner." It is undisputed that the call was dispatched as "no |

Defendant Cruz' Motion for Summary Judgment, filed concurrently herewith, unless otherwise noted.

[4] Plf's Ex. 1, Cad Call Log, p. 1 of 15; SLCC 001542
[5] Plf's Ex. 2, Dispatch Recording - Full version without edits (filed conventionally).
[6] Plf's Ex. 2, Dispatch Recording - Full version without edits (filed conventionally) (emphasis added).
[7] Plf's Ex. 7, Sylleloglou Depo. 21:5-7; 21:18-19.
[8] Plf's Ex. 3, Cruz Depo. 71:21-25; 72:1-2; 72:20-25.
[9] Plf's Ex. 3, Cruz Depo. 73:4-7.
[10] Plf's Ex. 3, Cruz Depo. 74:16-18.

| | |
|---|---|
| | threats made", "no shots fired," and "no one in danger."[11] |
| | Defendant Cruz may have believed he heard the call as a "brandishing" and therefore responded with an inordinately, and unreasonably, heightened level of concern.  In his "Initial Interview" conducted two weeks after the shooting on August 25, 2014, he recalled: "Dispatch said that it was a man with a gun and um, said that, ah, a group of males someone, one of them had a hand gun that he *brandished*. And a caller had called in and made this complaint."[12] |
| | Moreover, Officer Downes did not perceive the same level of threat as Defendant Cruz. In his deposition, Downes states, "… I don't remember anything about threats being made."[13] |
| 3.      Defendant Cruz requested backup, and Defendants Sylleloglou and Downes responded they were en route. | **Disputed.**  Officer Downes was the first of the three officers to respond to the call, approximately 10 seconds after it was dispatched.[14]  Cruz responded to the call approximately 47 seconds later.[15]  Moreover, Officer Downes had already responded "back 160," which is the number for Sergeant Charly Goodman, who was the first to respond.[16] Then, Officer Sylleloglou asked Defendant Cruz if Cruz wanted backup.[17] |
| 4.      Upon approaching the area in his police vehicle, Defendant Cruz saw three men walking together, two of them | **Disputed in part.**  When asked in his deposition whether two of the three men Defendant Cruz saw walking west on 2100 South matched the |

---

[11] Resp. to SOF, *supra*, ¶ 1.  *See also* Plf's Ex. 1, Cad Call Log; Ex. 2, Dispatch recording.

[12] Plf's Ex. 4, Bron Cruz Interview, SLCC 001367 (emphasis added); *see also* Plf's Ex. 7, Cruz Depo. 37:17-19 ("The plan was to investigate whether a crime of *brandishing* had or had not occurred." (emphasis added)).

[13] Plf's Ex. 8. Downes Depo. 20:1-9.

[14] Plf's Ex. 2, Dispatch Rec. at 00:30.

[15] *Id.* at 01:17.

[16] *Id.*

[17] *Id.*

| | |
|---|---|
| matching the descriptions provided by dispatch, and who were later identified as Dillon Taylor ("Mr. Taylor"), Jerrail Taylor ("Jerrail") and Adam Thayne ("Adam"), proceeding along 2100 South at approximately 150 East and heading west. | descriptions of the two men dispatch provided, Defendant Cruz stated "I was told a Hispanic male in a white T-shirt, red pants, and a red hat; and an additional Hispanic male with a striped shirt."[18]  Two weeks after the shooting, in Defendant Cruz's post-shooting interview, he recounted the three males' "very distinct descriptions."[19]  He remembered that, "[o]ne had striped pants …. [o]ne of them had striped pants. Um, and the other one had a red shirt."[20]  It is clear from the video that Adam Thayne is wearing a striped shirt, Jerrail Taylor is wearing a red jersey and red baseball hat, and the decedent, Dillon Taylor, is wearing a white T-shirt and dark pants.[21] |
| 5.      Defendant Cruz continued following the three men in his police vehicle while staying about a block away. He indicated to dispatch he would wait for the arrival of backup officers before approaching the three men. | **Undisputed, but factually incomplete.** Defendant Cruz was about four blocks away heading east on 2100 South when he got the call.[22]  He turned around and drove west until he saw Adam, Jerrail, and Dillon, walking west on 2100 South.[23]  He then continued past them and through the intersection at State Street, to wait.[24] Thus, for most of that time, Cruz was closer than a block away. |
| 6.      Defendant Cruz asked dispatch whether the report identified which of the three men flashed the gun, and was told by dispatch that the log did not indicate which one. | **Undisputed.** |

---

[18] Plf's Ex. 3, Cruz Depo. 23:4-6.
[19] Plf's Ex. 4, Cruz Interview, SLCC 001367.
[20] *Id.*
[21] Plf's Ex. 5, Cruz bodycam video.  As to the bodycam footage submitted by Defendant Cruz, Plaintiffs noticed that the footage seemed to be edited in some manner, appearing to be slower. Therefore, Plaintiffs have provided a copy of the bodycam, unedited, herewith.
[22] Plf's Ex. 3, Cruz Depo. 22:1-4.
[23] *Id.* at 22:10-24.
[24] *Id.* at 26:15-19.

| | |
|---|---|
| 7.     Defendant Cruz followed the three men as they continued to proceed west on 2100 South and across State Street. As the three men reached the west side of the intersection, Defendant Cruz observed the male in the white shirt, later identified as Dillon Taylor, walk up to a car stopped at the red light and interact with the driver, while the other two males were "throwing their hands in the air, kind of making a big scene." This interaction lasted five to ten seconds. | **Disputed in part and factually incomplete.** As Adam, Jerrail, and Dillon proceeded across State Street, Defendant Cruz was no longer following them, since he had already stopped in the Subway parking lot directly north of the 7-Eleven to wait for the other officers.[25]   At this point Cruz was about "50 to 75 yards" away.[26] Cruz continued to watch the three men as they walked toward him.[27]<br><br>"Disturbance" at light<br><br>In his Initial Interview, Defendant Cruz stated, "Um, but I thought it was kinda odd. I didn't know if it was a disturbance, if he was harassing the driver? Um, but the other two kinda were just throwing their hands in the air. Kinda making a big scene, talking, maybe yelling, just looked like a distraction or a scene."[28]  In his deposition, however, Cruz referred to this as "a little display in the crosswalk"; and "some kind of distraction or *disturbance.*  The male in the white shirt, Mr. Taylor, went up to the driver's side of a vehicle that was stopped at the red light, engaged in conversation, there was some kind of hand-to-hand contact, and the other two males were throwing their arms in the air."[29] When asked why he used the word, "disturbance," Defendant Cruz replied, "[b]ecause I'm a police officer …. Because if – because that's not typical and if it was unwanted contact, if they didn't know these people, then that's what it would have been, a disturbance. You don't just walk up to people in a crosswalk, somebody that maybe you don't know, and start |

---

[25] *Id.* at 26:18-19.
[26] Plf's Ex. 3, Cruz Depo. 27:14-17; *see also* Plf's Ex. 6 (Aerial View of Intersection at 2100 South State Street showing that 2100 South is six lanes wide at that point).
[27] Plf's Ex. 3, Cruz Depo. 27:1-7.
[28] Plf's Ex. 4, Cruz Initial Interview, SLCC 001368.
[29] Plf's Ex. 3, Cruz Depo. 26:1-14.

| | |
|---|---|
| | engaging them while they are sitting in their car while traffic may, or – it's unusual."[30]<br><br>This same interaction was witnessed by Salt Lake City Police Crime Scene Technician Benjamin Bender, who, in contrast to Defendant Cruz, saw it as a friendly or benign encounter.[31] |
| 8.      Thereafter, Defendant Cruz observed Mr. Taylor, Jerrail, and Adam as they entered the 7-Eleven convenience store on the corner of 2100 South and State Street, and he decided to wait until they exited the 7-Eleven before approaching them. | **<u>Undisputed.</u>** |
| 9.      Surveillance video from the 7-Eleven store shows the three men entering the store, making a purchase, and then exiting the store together a short time later. | **<u>Undisputed, but factually incomplete.</u>** The video also shows the three men completing their purchase and exiting the store *without incident*.[32]<br><br>Officer Downes noted that when the three were inside the 7-Eleven it was, "[b]usiness as normal it appeared for the store."[33]<br><br>Adam and Jerrail exited first, with Dillon about five feet behind.[34] |
| 10.      Officer Downes arrived and as Officer Sylleloglou was arriving, the three men exited the 7-Eleven together. | **<u>Disputed, misstates the facts.</u>**  Officers Downes and Cruz were staged together in the Subway parking lot north of the 7-Eleven waiting for Adam, Jerrail, and Dillon to exit. As they exited, Officers Cruz and Downes pulled across the street arriving at the same time; Downes car can |

---

[30] *Id.* at 28:7-17.

[31] *See* Pltf's Statement of the Complete Facts, at ¶ 13, *infra*.

[32] Docket 44-3 (Hermansen Decl.) Ex. 3(B), 7-Eleven video.  *See also* Plf's Ex. 5, Cruz body cam; Def's Ex. 8, 7-Eleven still photos).

[33] Plf's Ex. 8, Downes Depo. 25:6-7.

[34] Docket 44-3 (Hermansen Decl.), Ex. 3(B); Ex. 8, still photos, 7-Eleven; Plf's Ex. 5, Cruz body cam.

| | be seen pulling in front of Cruz's.[35]  Officer Sylleloglou arrived before Defendant Cruz.[36]<br><br>Adam, Jerrail, and Dillon did not exit the 7-Eleven together; Adam and Jerrail exited first; Dillon was approximately five feet behind.[37] |
|---|---|
| 11.     Officer Downes drove his vehicle to the rear of the 7-Eleven in case the three males ran away in that direction. | **<u>Disputed, and factually incomplete.</u>**  The jury should decide how Officer Downes' decision to drive to the rear of the 7-Eleven was interpreted by the officers, and whether the officers' interpretation was reasonable. Officer Sylleloglou testified Downes' move was "not unusual," and reasoned, "he wanted to make sure that we covered all possible exits, or in case maybe they decided to run … he would have the back covered"[38] and further noted that such action was consistent with his training.[39]<br><br>Defendant Cruz has been interviewed or given testimony three times in this matter. His testimony as to this issue has changed and is inconsistent. In his Initial Interview, Downes' decision to drive around back caused Cruz distress and heightened fear: "… Downes and I both went across the street. I anticipated I, I had the south position and for reasons I can't explain, Downes, he said, 'I'm going out back.' Um, as these three just walked straight out into the parking lot. Um, and so he just kept driving. He drove around the building, but I felt, felt good when I saw Glue (sic)."[40] |

---

[35] Plf's Ex. 5, Cruz body cam video.

[36] Plf's Ex. 7, Sylelloglou Depo. 25:7-10; Docket 44, Ex. 8 (Still photos, 7-Eleven).

[37] Docket 44-3 (Hermansen Decl.), Ex. 3 (7-Eleven video); Ex. 8 (7-Eleven still photos); Plf's Ex. 5, Cruz body cam.

[38] Plf's Ex. 7, Sylleloglou Depo., at 26:23-25; 27:1.

[39] *Id.* at 28:23-25.

[40] Plf's Ex. 4, Cruz Interview, SLCC 001369.

| | Then, in his declaration, Cruz testified that Downes' move was "in case the three males ran away in that direction."[41] |
|---|---|
| | Later, when questioned in his deposition, Cruz stated, "I – I don't remember hearing Downes express that he would go around back."[42]  When asked how he felt when Downes' drove to the back, Cruz stated, "It didn't make me feel – at the time, I don't know what it made me feel anything.  I was focused on the suspects in front of me"[43]; "I would not say it worried me; not at the time."[44] |
| | Officer Downes stated he and Cruz discussed their approach and that the decision for him to drive to the, of the store was "mutual:" "As a backing officer, my suggestion was, if you are making contact, let me get in a position to cover you, and get in a spot that if they run then I can help assist in that nature."[45] |
| 12.     Defendant Cruz and Officer Sylleloglou approached the men in their marked police vehicles from opposite directions with their overhead emergency lights flashing. Defendant Cruz approached from the east and Officer Sylleloglou approached from the west, forming a barricade blocking the path of the three men as they walked alongside each other from the 7-Eleven entrance into the parking lot. | **Disputed in part.** Defendant Cruz approached in his marked car with his overhead emergency lights flashing, but Officers Sylleloglou and Downes did not. In the photos taken at the scene, Defendant Cruz's emergency lights are clearly illuminated, while neither of the lights on the other officers' vehicles are.[46]  The direction of approach is **not disputed.** |
| | In his deposition, Officer Downes is asked whether he had his lights and siren on, to which he answers, "No."[47]  When asked why not, he states that they want to get to the scene quickly |

---

[41] Docket 44-2 (Cruz Decl.), Ex. 2, at ¶ 11.
[42] Plf's Ex. 3, Cruz Depo. 36: 19-20.
[43] *Id.* at 39:20-23.
[44] *Id.* at 40:4-5.
[45] Plf's Ex. 8, Downes Depo., at 26:2; 27:16-20.
[46] Docket 44-2 (Cruz Decl.), Ex. 2, at Ex. A, scene photos.
[47] Plf's Ex. 8, Downes Depo., at 21:3-7.

<table>
<tr><td></td><td>when there is a weapon involved, "[b]ut if it doesn't meet the circumstances to hit lights and sirens, we cannot."[48]  When asked if, in his mind, this incident didn't meet the circumstances, he responded: "It doesn't matter to my mind. It's policy."[49]<br><br>As discussed, <em>supra</em>, Plaintiffs <strong>dispute</strong> that Adam, Jerrail, and Dillon were walking "alongside" each other out of the 7-Eleven.</td></tr>
<tr><td>13.     Mr. Taylor appeared to look directly at Defendant Cruz's police vehicle approaching from the east with its lights flashing as it moved in front of the path of the three men.</td><td><strong><u>Disputed.</u></strong> The jury can choose to believe or disbelieve Defendant Cruz's testimony relating to his subjective belief that Dillon Taylor looked "directly at" either him or his vehicle.<br><br>Moreover, Defendants' use of the qualifier, "<em>appeared,</em>" belies the uncertainty inherent in this assertion of "fact." Defendant Cruz stated multiple times his fear began with the look Dillon allegedly gave him before he turned and walked away. In his deposition, when asked at what point he began to feel afraid, he answered, "When I looked into Mr. Taylor's eyes."[50]  When asked again to clarify what put him on the "spectrum of fear," he responds, "Mr. Taylor looks at me."[51]  Cruz was clear this "look" happened before Dillon turned and walked away. He state in his Initial Interview, "[h]e looked directly at me and ah, he turned around and walked off …"[52]<br><br>According to Cruz himself, this alleged "look" represents a critical turning point in this case and what led to him shooting Dillon Taylor. The tenor of the "look," whether or not it actually took place, and whether its impact to Cruz was</td></tr>
</table>

---

[48] *Id.* at 21:16-17.
[49] *Id.* at 21:18-21.
[50] Plf's Ex. 3, Cruz. Depo., at 35:9-12.
[51] *Id.* at 42:23-25.
[52] Plf's Ex. 4, Bron Cruz Interview, SLCC 001374.

| | reasonable are factual determinations, which must be left to the jury to decide. |
|---|---|
| 14.     Mr. Taylor also appeared to look at Officer Sylleloglou's police vehicle approaching from the west with its lights flashing as it moved in front of the three men. | **Disputed.** As discussed in ¶ 13, *supra*, the jury can choose to believe or disbelieve Officer Sylleloglou's testimony relating to his subjective belief that Dillon Taylor looked at his police vehicle, or whether that vehicle arrived with its lights flashing.<br><br>As discussed in ¶ 12, *supra*, Officer Sylleloglou's vehicle did not have its lights flashing when it approached.[53]  Defendants, however, allege his lights were on.  Whether Sylleloglou's lights were or were not on, goes to whether Dillon was aware of the officers, and aware of their interest in him. Both are factual determinations that must be left to the jury.<br><br>Further, immediately upon arrival, Officer Sylleloglou can be seen exiting his vehicle and running toward Dillon Taylor.[54]  Again, it is for the jury to decide whether there was time for Officer Sylleloglou to have seen Dillon look in his direction or whether Dillon was already walking west, away from the officers when they arrived. |
| 15.     Defendant Cruz and Officer Sylleloglou, wearing their patrol uniforms, exited their vehicles and gave commands to the three men to stop and show their hands. | **Disputed in part.** Plaintiffs **do not dispute** that Defendant Cruz and Officer Sylleloglou wore their patrol uniforms and exited their vehicles.  However, the jury can choose to believe or disbelieve the officers' testimony regarding portions of the encounter that were not captured on video or audio recording.  Plaintiffs **dispute** that the officers gave the command to "stop" throughout the encounter.  The only commands which are **undisputed** are those captured on Defendant Cruz's body cam, which were: "Get |

---

[53] Docket 44-2 (Cruz Decl.), Ex. 2, at Ex. A, scene photos.
[54] Docket 44-8 (Defs' Exs.) Ex. 8, 7-Eleven stills.

| | |
|---|---|
| | your hands out now. Get your hands out. Get your, get 'em out."[55]

Further, Officer Sylleloglou, when first interviewed the night of the shooting, only mentions using the word "stop" when he first encounters Dillon after he is already walking away with his back to the officers.  When asked what he recalls Defendant Cruz said, Officer Sylleloglou stated: "He was, I remember him yelling, get your hands… I think it was get your hands out of your pockets, or pants or something like that, get your hands out, I remember hearing that … something along those lines."[56] Sylleloglou then tells the interview, "[a]nd then I know I yelled at him too … "let me see your … I think I may have just said, 'Hands! Hands! Hands!'"[57]  When the interviewer asks whether he remembered anything else Defendant Cruz said, Officer Sylleloglou responded: "No, I couldn't, you know, I just … we were both kinda,  I was just listening to him, and then I would say something, I would say 'hands,' and he would yell 'hey, hey, get your hands! Get your hands out of your pocket' … I mean he was yelling at him to get his hands out of there."[58] |
| 16.     Because one of the men was reportedly armed and potentially brandishing a weapon, Officer Sylleloglou drew his gun in the low ready position, but did not aim at the suspects. | **Disputed in part and factually incomplete.** The jury can choose to believe or disbelieve Officer Sylleloglou relating to his subjective belief that this was a potential "brandishing."  At no time during the call was a "brandishing" dispatched. As discussed in Plaintiffs' response to Defendants' undisputed fact ¶ 2, *supra*, under UTAH CODE ANN. § 76-10-506(2), the crime of "brandishing" requires a weapon be displayed in a "threatening manner." It is undisputed the call |

---

[55] Plf's Ex. 5, Cruz body cam (unedited version).
[56] Plf's Ex. 9, Sylleloglou Initial Interview beginning at 2:34.
[57] *Id.*
[58] *Id.*

was dispatched as "no threats made,"[59] "no shots fired," "no one in danger."[60]

Plaintiffs **do not dispute** that Officer Sylleloglou drew his gun and initially maintained it in the low ready position, but **dispute** that he did not aim at the suspects.[61] Officer Sylleloglou aimed his gun at Dillon Taylor when he believes to have seen Dillon's hands go to his waist.[62]

"Low Ready"

When asked to explain "low ready," Officer Sylleloglou affirmed, "Low ready just means that there is a possible gun involved. Nobody has made a move to this gun. There is no immediate threat of a gun yet, but there is that possibility given the nature of the call. So I've been on several man-with-a-gun calls. I'm not going to just immediately start pointing a gun at you. You might be a concealed carry holder. Who knows. But at this point, I know that somebody *may have* flashed a gun at somebody.  I'm at the low ready. In case somebody reaches for a gun, it minimizes my action that I need to take …. So that's why I have it at a low ready. There is not an immediate threat of a gun at that moment."[63]

Officer Downes

While Fact 16 focuses on Officer Sylleloglou, Officer Downes' actions are also relevant to the determination as to whether Defendant Cruz acted reasonably.  Officer Downes did not initially aim his gun at the suspects, nor did the

---

[59] SOF, *supra*, ¶ 1.
[60] Plf's Response to SOF, *supra*, ¶ 1; *see also* Plf's Ex.'s 1, Cad Call Log; Plf's Ex. 2, Dispatch recording.
[61] Plf's Ex. 5, Cruz body cam; Ex. 7, Sylleloglou Depo. 43:9-12.
[62] Plf's Ex. 7, Sylleloglou Depo. 43:9-12.
[63] Plf's Ex. 7, Sylleloglou Depo. 34:9-25.

| | |
|---|---|
| | circumstances cause him undue alarm: "We were just investigating. So, at that point, it was not a threat."[64]  He noted further, "For me, the factors were we had information there was a *possible* weapon. The two that I was dealing with did not present as an initial threat … [s]till we know there was a *possible* weapon."[65]<br><br>When asked if the fact that Adam and Jerrail were noncompliant caused him to pull his weapon, Officer Downes responds, "No, sir."[66] |
| 17.    Two of the men, later identified as Adam and Jerrail, immediately stopped and raised their hands. | **Undisputed, but factually incomplete.** The reasonableness of the officers' differing views regarding Adam and Jerrail raising their hands is a critical determination; one which the jury must make.<br><br>In his initial interview, Cruz stated: "I got out of my car and, ah … the two; striped pants and red shirt, they both put their hands up.  When I got out of my car we said, "Stop." That's all we said. That's all I said was, "Stop." And it scared the crap out of me when those two raised their hands. Like, they knew a gun or weapon was involved, that's *the only time they do that*. They never put their hands up like that. Those two put their hands straight up in the air and that confirmed to me, even more, there was a gun involved."[67]<br><br>In contrast, Officer Downes was asked if he had told the boys to raise their hands, he responded that he had not, saying, "Those two individuals actually, I believe, had their hands raised initially." |

---

[64] Plf's Ex. 8, Downes Depo. 39:7-9.
[65] *Id.* at 59:17-18; 59:24-25.
[66] Plf's Ex. 8, Downes Depo. 44:19-21.
[67] Plf's Ex. 4, Cruz Interview, SLCC 001370.

| | |
|---|---|
| | *Q: "And that was in just response to seeing you or because you told them to do that?"*<br>*A: "Initially just from them seeing our presence, yes."*<br>*Q: Okay, is that unusual?"*<br>*A: "How so?"*<br>*Q: In your experience as a police officer, does your mere presence make people put their hands up?"*<br>*A: "A lot of the time, yes."*<br>*Q: "Does that – that happen often?"*<br>*A: "Yes, sir."*[68]<br><br>Whether it was reasonable for Cruz's fear to be heightened by the two men raising their arms in reaction to the officers' presence, is a determination of fact to be left to the jury. |
| 18.    Jerrail and Adam acknowledged that they both saw the marked police vehicles approaching from opposite directions and uniformed police officers approaching the three (3) men and giving commands to stop and show their hands. | **Disputed, improperly obtained.** Plaintiffs challenge this testimony as obtained in violation of the Utah and U.S. Constitutions' prohibitions against unreasonable search and seizure.  Both Adam and Jerrail were held at the Salt Lake City Police Station, in handcuffs, without charge, and without having been informed of their rights under *Miranda*, for more than five hours when they were interrogated and asked these questions. Their statements were not voluntary, but were coerced while Adam and Jerrail were in a compromised state: Their brother and cousin had just been shot by police and they did not yet know if he had died.[69]<br><br>To the extent the evidence is admissible, Plaintiffs' **do not dispute** that both Jerrail and Adam saw the marked police vehicles |

---

[68] Plf's Ex. 8, Downes Depo. 39:21-25; 40:1-13.
[69] *See* Docket 44-3 (Hermansen Decl.), Ex. 3(A), Adam Thayne Interview (at the end of the video, after Det. Hermansen finished questioning Adam, he asked if Adam has any questions. Adam responded, "Did Dillon die?" Hermansen answered, "Ah, yes" before placing Adam back in handcuffs and leaving the room.)

| | approaching them when they walked out of the 7-Eleven. |
|---|---|

### ii.    Response to Defendants' Facts in Support of "Dillon Taylor Does Not Comply With Officers' Commands."

| 19.    The third man, wearing a white shirt and later identified as Mr. Taylor, looked at the officers, but did not stop, and instead, turned and walked in the opposite direction away from the officers, and away from Adam and Jerrail, moving back towards the entrance of the 7-Eleven. | **Disputed.** The jury can choose to believe or disbelieve the officers' testimony relating to their subjective belief that Dillon Taylor "looked at the officers" prior to walking away. It is **undisputed** that Mr. Taylor turned and walked in the opposite direction away from Adam, Jerrail, and the officers, and back toward the entrance of the 7-Eleven. <br><br> The Cruz body cam video and still photos from it, and the 7-Eleven video and still photos all bear on whether Defendant Cruz's belief was reasonable. <br><br> According to Defendant Cruz, this "look" was an extremely significant factor in why he viewed Dillon in a menacing, fearful way, and therefore his ultimate decision to shoot him.  When asked at what point Defendant Cruz began to feel afraid, he answered, "When I looked into Mr. Taylor's eyes."[70]  When asked again to clarify what put him on the "spectrum of fear," he responds, "Mr. Taylor looks at me."[71] Cruz was clear this "look" happened before Dillon turned and walked away "[h]e looked directly at me and ah, he turned around and walked off …"[72] |
| 20.    Jerrail saw that Mr. Taylor was walking away and told him to "stop." | **Disputed, improperly obtained,[73] misstates testimony, and irrelevant.** |

---

[70] Plf's Ex. 3, Cruz. Depo., 35:9-12.
[71] *Id.* at 42:23-25.
[72] Plf's Ex. 4, Bron Cruz Interview, SLCC 001374.
[73] As stated in Plaintiffs dispute to Defendants' SOF ¶ 18, *supra*, Plaintiffs object to each of the comments made by Jerrail Taylor or Adam Thayne, which were obtained as a result of

|  | Jerrail's actual testimony about being approached by the officers with guns drawn was: "I was like, 'What the fuck,' and as I'm getting on the ground, I see my brother walking, I'm like, 'Oh fuck, here we go.' I'm like, "Dude, just fucking stop,' but he had his headphones in."[74]

When asked again about it, Jerrail responded:

*Q: You were talking about your brother as he was walking away, did I hear you say that you told him to stop? Or is that not accurate?*
*A: I believe so, I believe I was like, "Stop", but at that time I got a cop throwing me on the ground so I don't think he's really paying too much attention ..."*
*Q: No, I just want to make sure I heard you right that you were telling your brother to stop.*
*A: Yeah, but [unintelligible] his headphones, so I don't know if he actually heard that.*[75] |
|---|---|
| 21.    Jerrail said Mr. Taylor was "like f-- this" and put his head phones in and walked away from the officers. | **Disputed, improperly obtained, factually incomplete, and irrelevant.**

Jerrail's actual testimony was:

*Q:  "When you guys exited the 7-Eleven, just step-by-step, what did you see?"*
*A:  "I see three squad cars, one right here on the left in the beginning, then one on the right and one in the middle. With guns, they said get on the ground or some shit, I don't know exactly what they said."*
*Q:  "Okay."*
*A:  "In my head, I'm thinking, my, my head's, my adrenaline's running, I'm thinking, 'What* |

Defendants' illegal detention of them.  If they are admissible, the circumstances under which they were procured – an unlawful custodial interrogation – are relevant considerations that make the facts disputed.
[74] Docket 44-3 (Hermansen Decl.), Ex. 9(A), Jerrail Taylor Interview at 11:05:06.
[75] *Id.* at 11:18:50.

-21-

| | |
|---|---|
| | *the fuck did I just do? I can't walk in America and buy a goddamn drink and a beer?' like, 'What am I doing wrong here.' I'm all, 'What the hell?' And my little brother was like, 'Ah shit,' you know what I'm saying? Like, what the fuck did we do? So he was, 'alright, y'all, fuck this.' He put his headphones in, walked away, the next thing you know the cop was all, 'Hey, stop, stop.' But he's got his headphones in, he can't hear him. You know what I'm saying?"*[76] |
| 22.   When Jerrail was asked if he thought there was any possible way that Dillon couldn't have seen the three police vehicles and the officers approaching with their guns drawn, he stated: "I don't know how he didn't see them." | **Disputed, improperly obtained.**<br><br>Plaintiffs **do not dispute** that Jerrail said this when interrogated during his unlawful detention. But Plaintiffs do object to the statement and assert that the conditions under which the statements were procured are relevant considerations, rendering the material fact disputed. |
| 23.   When Jerrail saw that Mr. Taylor was walking away, he thought to himself, "ah f---, here we go." | **Disputed, improperly obtained, factually incomplete.**<br><br>Jerrail's comment speaks for itself:<br><br>*Q:  And they pulled their guns on you and told you all to get on the ground?*<br>*A:  To be honest they said some shit, I don't remember what they said.*<br>*Q:  What did you do?*<br>*A:  I was like, what the fuck, and as I'm getting on the ground, I see my brother walking, I'm like, 'Oh fuck, here we go.' I'm like, 'Dude, just fucking stop,' but he had his headphones in."*[77] |
| 24.   As. Mr. Taylor walked away, Officer Sylleloglou shouted: "Hey, you in | **Disputed.** Considering the totality of the circumstances and wealth of evidence already |

---

[76] Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Taylor Interview, at 11:03:55 - 11:04:34.
[77] Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Taylor Interview, at 11:05:06.

| | |
|---|---|
| the white shirt, stop" several times.  Mr. Taylor did not stop or show his hands. | available, including disputed and conflicting testimony from Defendant Cruz, the jury can choose to believe or disbelieve Officer Sylleloglou's testimony regarding portions of the encounter that were not captured on video or audio recording. The only commands which are **undisputed** are those captured on Defendant Cruz's body cam, which were: "Get your hands out now. Get your hands out. Get your, get 'em out."[78] |
| 25.     Mr. Taylor turned and faced Officer Sylleloglou directly, looking at him with a "mean mug" look on his face, meaning that it appeared that he heard Officer Sylleloglou and Defendant Cruz shouting commands and was deliberately ignoring their commands. The look on his face was hostile and defiant. | **Disputed, and without information to respond.**  Considering the totality of the circumstances and wealth of evidence already available, including disputed and conflicting testimony from Defendant Cruz, the jury can choose to believe or disbelieve Officer Sylleloglou's testimony regarding portions of the encounter that were not captured on video or audio recording.<br><br>It is unclear exactly when, in the sequence of events, Defendants allege Dillon "turned and faced Officer Sylleloglou directly, looking at him with a 'mean mug' look on his face." Do they assert, as Defendant Cruz does, this happened when officers first arrived, or later after Dillon turns around four seconds before he is shot?<br><br>If it is the former, Plaintiffs **dispute** this account. Defendant Cruz's body cam video, the 7-Eleven video, and the still photos from both, show Officer Sylleloglou arriving first and immediately running around the front of his car in pursuit of Dillon, who had already begun walking away.[79] |

---

[78] Plf's Ex. 5, Cruz body cam (unedited version).
[79] Plf's Ex. 5, Cruz Bodycam; Docket 44-3 (Hermansen Decl.), Ex. 3(B), 7-Eleven video; Def's Ex. 7, Cruz bodycam stills; Def's Ex. 8, 7-Eleven stills.

Moreover, Officer Sylleloglou states he couldn't really see Dillon: "The other guy was kinda covered by the red truck... cause he was kind of, sort of, behind it."[80]  Also, when asked if Dillon had anything in his hands, Sylleloglou responded, "That third guy -- I didn't, I don't remember seeing anything in his hands, Like I said, he was partially obstructed by the red truck."[81]

Based upon the video, Plaintiffs assert that Officer Sylleloglou did not have the opportunity to have seen a "mean mug," "hostile," or "defiant" look on Dillon's face when he first arrived at the 7-Eleven.  Or, at a minimum based upon the conflicting evidence, the issue is in dispute.

If this assertion refers to the four seconds after Dillon turned to face the officers before being shot, whether Dillon heard their commands, was deliberately ignoring those commands, and whether the look on Dillon's face was "mean," "hostile," or "defiant" is a question for the jury.[82]

Additionally, Officer Sylleloglou's use of the terms "hostile" and "defiant" to describe Dillon's "look" is questionable. He did not use these terms when he was first interviewed hours after the shooting,[83] nor in his deposition.[84] They only became part of Officer Sylleloglou's lexicon and were incorporated into his

---

[80] Plf's Ex. 7, second video, at 04:35.
[81] *Id.* at 5:18.
[82] *See* Plf's Ex. 5, Cruz body cam (unedited version) (showing Dillon Taylor's earbuds lying next to his head immediately after he was shot).  *See also* Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Taylor Interview, at 11:03:06 - 11:04:34) (Jerrail stated Dillon "put his headphones in, walked away, the next thing you know the cop was all, 'Hey, stop, stop.' But he's got his headphones in, he can't hear him.").
[83] *See generally* Plf's Ex. 9.
[84] *See generally* Plf's Ex. 7.

| | declaration after those exact terms were used by Defendant Cruz to describe Dillon. |
|---|---|
| 26.      Officer Sylleloglou saw that Mr. Taylor appeared to put his hands inside the front waistband of his pants and he began training this gun on Mr. Taylor. | **<u>Disputed.</u>**  Considering the totality of the circumstances and wealth of evidence already available, including disputed and conflicting testimony from Defendant Cruz, the jury can choose to believe or disbelieve Officer Sylleloglou's subjective representations as to what he saw. <br><br> Moreover, it appears from Defendant Cruz's body cam that Officer Sylleloglou had his gun trained on Dillon while Dillon's hands were still down at his sides.[85]  The reasonableness of Defendant Cruz's actions here depends, in part, on his perception that Dillon was "drawing a gun."  But the evidence shows many plausible inferences, including changing his music on his iPhone or holding up his pants.[86] <br><br> For example, Jerrail also commented when asked what he saw just before Dillon was shot: "…as I was going down on the ground, I seen *my brother grab his pants like this [he motions to his crotch area], and pull them up, you know pull his pants up, you know … we, we wear baggy ass clothes, you can see that. He's pullin' his pants up,* like, 'shit what's up nigga, what'd we do? Or something to that effect."[87] <br><br> Likewise, Adam commented: "We went to 7-Eleven. We went in, we came out, the cops pulled their guns and um, my cousin started walking away and I look over and I seen him get shot.  *I see him, I see him, I think he tried to pull up his shorts or something*, and they thought he was reaching for a gun and so, all I know is a |

---

[85] Plf's Ex. 5, Cruz body cam; Docket 44-8 (Defs' Exs.), Ex. 7, Cruz body cam still photos.
[86] Plf's Ex. 5, Cruz body cam; Docket 44-8 (Defs' Exs.), Ex. 7, Cruz body cam still photos.
[87] Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Taylor Interview, at 11:05:42 (emphasis added).

| | heard two gun shots and then the officer screaming at me to get down."[88] |
|---|---|
| 27.    Mr. Taylor stated to Officer Sylleloglou: "what are you going to do, mother-f-----, shoot me, mother-f-----,""come on, shoot me." | **Disputed, factually incomplete, possibly irrelevant.**  Considering the totality of the circumstances and wealth of evidence already available, including disputed and conflicting testimony from Defendant Cruz, the jury can choose to believe or disbelieve Officer Sylleloglou's testimony regarding portions of the encounter that were not captured on video or audio recording. None of the comments Defendants allege were captured on the audio of Cruz's body cam video.<br><br>Officer Sylleloglou's comment in his initial interview[89] done within hours of the shooting was:<br><br>*Q:  "And you said that he stated something about shooting him?"*<br>*A:  "Yes."*<br>*Q:  "Do you remember exactly what he said?"*<br>*A:  "He said, 'What are you gonna do, shh,' I think it was – this is as close to verbatim as I can get – 'What are you going to do, shoot me?  What are you gonna do? You gonna shoot me? You gonna shoot me?' Like that."[90]*<br><br>Moreover, while Officer Sylleloglou claims to have had the alleged expletive-laden exchange with Dillon, the time frame for such an exchange appears to have been rather narrow.  Officer |

[88] Docket 44-3 (Hermansen Decl.), Ex. 3(A), Adam Thayne Interview, at 11:38:30 (emphasis added).

[89] In his deposition, Officer Sylleloglou says that the comments he made in his initial interview are the most accurate:  "Well, I would like to refer back to my interview with the detectives because at that moment it's still fresh.  It's still – because we can sit here and discuss, right? …. But the best way to look at it or to judge is to see what I said immediately after the shooting because to me that is when the situation was more fresh. (Plfs' Ex. 7, Sylleloglou Depo. 72:17-20; 23-25; 73:1.)

[90] Plf's Ex. 7, Sylleloglou Interview, (Second video) starting at 6:00:00.

Sylleloglou can be seen arriving at the 7-Eleven and immediately running around the front of his car in pursuit of Dillon, who had already begun walking away.[91]

In his deposition, Officer Sylleloglou was asked to pinpoint this verbal exchange since it led him to believe Dillon had a gun:

> *Q: "...when he first looked at you, did he give you a mean mug or was that –*
> *A: Here, [drawing] he just turns around. He looked at me and he turned around, and he starts mean mugging me right about when he turns and looks at me. As he turns and looks at me, he starts mean mugging me.*
> *Q: Okay.*
> *A: Okay. And then I'm continuing to give him verbal commands to show me his hands. And to which his reply was something along the lines of, "what are you going to do? Come on, mother fucker, shoot me."[92]*

> *Q: Okay. So it's a quick exchange and it takes place as you guys are walking kind of past the truck –*
> *A: Yes.*
> *Q: -- with the truck between you?*
> *A: Yes.[93]*

He continues:

> *A: "I continued to give him commands and he continues to ignore me. And <u>then that is about the time that Defendant Cruz exits his vehicle.</u>[94]*

---

[91] Plf's Ex. 5, Cruz Bodycam; Docket 44-3 (Hermansen Decl.), Ex. 3(B), 7-Eleven video; Def's Ex. 7, Cruz body cam stills; Def's Ex. 8, 7-Eleven stills.
[92] Plf's Ex. 7, Sylleloglou Depo. 38:19-25; 39:1-4.
[93] *Id.* at 39:11-16.
[94] *Id.* at 40:8-10 (emphasis added).

*Q: Have you seen Cruz out of your peripheral yet or is that –*
*A: It's hard for me to say exactly.*
*Q: Okay.*
*A: I mean, that's pretty – this happened in a matter of, you know, seconds.*
*Q: Sure.*
*A: So this is going really fast at this moment. So I don't know exactly where we were standing. I'm pretty sure we had passed the truck by now, and he's looking at me, giving me the "mother fucker" this and that, "come on, shoot me." And that's when I heard Defendant Cruz give him commands to, "Let me see your hands..."[95]*

According to Officer Sylleloglou, just after he arrived, Dillon was either at or had just passed the red truck and is walking away when Dillon turned to face Officer Sylleloglou and Dillon purportedly gave him the "mean mug" and the expletive-laden verbal exchange. This happens either before Defendant Cruz exited his vehicle or before Defendant Cruz entered Officer Sylleloglou's peripheral vision. Officer Sylleloglou has testified that he was certain that Dillon was "looking at me" at the time of the exchange.[96]

On Defendant Cruz's body cam video, however, Dillon had turned around and was walking away from Adam and Jerrail with his back to both officers while the officers were still arriving.[97] Officer Sylleloglou can be seen in image No. 12 next to the driver's door of his cruiser. Dillon, meanwhile, had already turned around and had walked back almost to the front of the red truck; his back had been to Officer Sylleloglou and Defendant Cruz the entire time. The video

---

[95] *Id.* at 40:24-25; 41:1-13.
[96] *Id.*
[97] Docket 44-8 (Def's Exs.), 7-Eleven still photos; Ex. 7, Cruz body cam still photos, Nos. 11-13.

shows that at no time does Dillon face Officer Sylleloglou in order for the expletive-laden exchange to occur. Dillon does not actually face the officers until he turns around, four seconds before he is shot.  The sound comes on Cruz's body cam video *before* Dillon had turned around, and the exchange he actually had with the officers is captured on the video.  The comment is not perfectly clear, but sounds somewhat like "what, fool" or "nah, fool," which is the only audible statement heard made by Dillon.[98]

Defendant Cruz did not hear this exchange

Defendant Cruz was asked in his Initial Interview if Dillon had said anything to him, to which Cruz responds, "I, I think he said something. I don't remember what he was saying. He was yelling, 'You make me.' Or, 'You can't make me,' or some crap. I, I can't remember."[99]

When asked a second time about this, Cruz states: "Um, when I, the only (pause) – I remember him talking as he was facing me. I don't, I can't remember if he was face, I, when he was walking away um, I remember him saying, um, I don't remember exactly what he was saying. Something, though, to the effect of, 'You can't make me,' or 'make me.' Or, I was yelling at him this whole time. I wasn't terribly, um, you know. I was just yelling at him. You know, non-stop. 'Just show me your hands,' and 'Stop.'"[100]  In his deposition, Cruz states only that Dillon "responded verbally [with] something to the effect of that he was not going to comply."[101]

---

[98] Plf's Ex. 5, Cruz body cam.
[99] Plf's Ex. 4, Cruz Initial Interview, SLCC 001371.
[100] Plf's Ex. 4, Cruz Initial Interview, SLCC 001375.
[101] Pfls' Ex. 3, Cruz Depo, at 57:12-15.

|  | Cruz's focus was on what he was saying to Dillon, not what Dillon might have said to him. Further, Cruz never reported hearing the expletive-laden interaction Dillon allegedly had with Officer Sylleloglou, despite being equally present during the time Dillon would have been able to say those words, and the video shows no such expletive-laden exchange.<br><br>**What Jerrail heard**<br><br>When Jerrail was asked if he heard his brother saying anything to the officers, he commented: "I heard like, 'what up?' and him giving shit, like, 'what did we do?'"[102]<br><br>When asked again, Jerrail stated: "Just what I already told him, just him giving him shit, like, 'what the fuck?' Kinda like that, like, 'what the fuck did we do wrong now?'"[103]<br><br>To Officer Sylleloglou, Dillon's purported expletive-laden exchange was critical to his understanding of Dillon's intentions.[104] |
|---|---|
| 28.   At this point, Mr. Taylor was no more than 15 feet in front of Officer Sylleloglou facing him, but still walking away. | **Disputed in part.** Although it is **undisputed** that Dillon was no more than 15 feet in front of Officer Sylleloglou and still walking away, for the reasons outlined in response to SOF ¶ 27, *supra*, Dillon was not facing Officer Sylleloglou at the time the expletive-laden comments were allegedly made. |
| 29.   Officer Sylleloglou was 100% certain that Mr. Taylor saw him, heard his commands, and deliberately chose to ignore them. | **Disputed.** Considering the totality of the circumstances and wealth of evidence already available, including disputed and conflicting testimony from Defendant Cruz, the jury can choose to believe or disbelieve Officer Sylleloglou related to his subjective beliefs. |

---

[102] Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Interview at 11:05:42.
[103] Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Interview at 11:16:10.
[104] Plf's Ex. 9, Sylleloglou Interview, at 01:08:30.

Moreover, even if Officer Sylleloglou subjectively believed with 100% certainty that Mr. Taylor heard his commands and chose to ignore them, Plaintiffs dispute that Officer Sylleloglou's subjective belief was reasonable.

Moreover, whether Dillon deliberately chose to ignore some or all of the officers' commands, is a disputed fact. Based upon the disputed facts and contradicting evidence detailed herein, there is a question as to whether Dillon chose to ignore the command to stop or whether Dillon was in the process of complying, but was not given the time to comply, with the command – "show me your hands – before Defendant Cruz shot him.[105]

In his own body cam video, Officer Sylleloglou recounts the shooting immediately after it happened:

> *And uh, what happened was, we found these two guys there by the cars. And the dude in the white over here, he kept walking, and he ignored us. So Bron [Cruz] and I went up to him and kind of, kind of cornered him like this. And he starts doing this and he starts backing up like digging into his pock – like this, and then he, and then he's like, 'Get your hands out of your, get your hands out, get your hands out, get your hands out,' and then as soon as he made an <u>overt movement</u> to pull something we didn't see it, and <u>he just</u> -- he got a couple shots on him.[106]*

In other words, to Officer Syllelogou, as soon as Dillon made any movement to show the officers he did not have a weapon, Cruz "just" shot him.

---

[105] *See* Plf's Ex. 5, Cruz body cam.
[106] Plf's Ex. 10, Sylleloglou body cam video beginning at 3:09.

-31-

| | |
|---|---|
| | Defendant Cruz initially described Dillon's movement as being in concert with Dillon moving his shirt: "I mean, yeah, his shirt was, you know, eh, you know, his shirt was raising with his pants. You know? It was this, *this tugging motion*. This drawing motion, whatever – you know, I'm not sure what to call it."[107] <br><br> In other words, while Cruz first described seeing tugging in relation to Dillon's shirt, he appears to catch himself, and rephrase his comment to call it a "drawing motion." |
| 30.    Based on his understanding that one of the three men had a gun, Defendant Cruz concluded that the gun was very likely in the possession of Mr. Taylor, who was walking away, and unlike the other two men, was not complying with police commands to stop. | **Disputed.**  *See* Response to SOF ¶ 29, *supra*. |
| 31.    As Mr. Taylor continued walking along the sidewalk in front of the 7-Eleven, Defendant Cruz followed directly behind Mr. Taylor, and Officer Sylleloglou walked south and west towards Mr. Taylor, both shouting commands to "stop, you in the white shirt," and "get your hands out." | **Undisputed** that Dillon Taylor continued walking along the sidewalk in front of the 7-Eleven, that Cruz followed Dillon directly behind, and Sylleloglou followed by walking south and west towards him. **Disputed** that the officers shouted anything other than "get your hands out," once they were in pursuit. <br><br> The only commands which are **undisputed** are those captured on Defendant Cruz's body cam, which were: "Get your hands out now. Get your hands out. Get your, get 'em out."[108] <br><br> Further, Officer Sylleloglou, when first interviewed the night of the shooting, only mentioned using the word "stop" when he first encountered Dillon after he is already walking away with his back to the officers. When asked |

---

[107] Plfs' Ex. 4, Cruz Interview, SLCC 001380.
[108] Plf's Ex. 5, Cruz body cam (unedited version).

<table>
<tr><td></td><td>what he recalled Defendant Cruz saying, Officer Sylleloglou stated: "He was, I remember him yelling, get your hands… I think it was get your hands out of your pockets, or pants or something like that, get your hands out, I remember hearing that … something along those lines."[109]

Sylleloglou then tells the interviewer, "[a]nd then I know I yelled at him too … 'let me see your' … I think I may have just said, 'Hands! Hands! Hands!'"[110]  When the interviewer asks whether he remembered anything else Defendant Cruz said, Sylleloglou responded: "No, I couldn't, you know, I just … we were both kinda, I was just listening to him, and then I would say something, I would say 'hands,' and he would yell 'hey, hey, get your hands! Get your hands out of your pock' … I mean he was yelling at him to get his hands out of there."[111]

Officer Downes likewise only heard Defendant Cruz yell to Dillon about his hands: "The only thing I could hear was, 'Show me your hands.'"[112]</td></tr>
<tr><td>32.    Mr. Taylor did not stop, but continued walking west along the sidewalk.</td><td>**Undisputed.**</td></tr>
</table>

iii.    **Response to Defendants' Facts in Support of "Mr. Taylor conceals his hands."**

<table>
<tr><td>33.    Mr. Taylor then raised his hands to waist level, put his hands inside the front waistband of his pants, and made digging</td><td>**Undisputed** that at some point Defendant Cruz began to train his weapon on Dillon.</td></tr>
</table>

[109] Plf's Ex. 9, Sylleloglou Initial Interview, beginning at 2:34.
[110] *Id.*
[111] *Id.*
[112] Plf's Ex. 8, Downes Depo., at 46:18-19.

| | |
|---|---|
| motions with his hands, at which point both Defendant Cruz began training his weapon on Mr. Taylor. | Plaintiffs **dispute** the balance. While Dillon can be seen raising his hands to the sides of his pants as he is walking away from the officers, Dillon's back is to the officers.[113]  Based upon the facts detailed herein, and especially the bodycam video, the characterization that Dillon was making a "digging motion" is in dispute and not settled.<br><br>It is clear from the video, that Dillon is wearing a baggy shirt and baggy pants.[114]  One could easily characterize the evidence as showing that Dillon was pulling up his baggy pants when he raised his hands to the sides of his waist.[115]<br><br>Indeed, when Jerrail Taylor was asked what he saw just before Dillon was shot, he responded: "…as I was going down on the ground, I seen my brother grab his pants like this [he motions to his crotch area], and pull them up, you know pull his pants up, you know … we, we wear baggy ass clothes, you can see that. He's pullin' his pants up, like, 'shit what's up nigga, what'd we do?' Or something to that effect."[116]<br><br>Likewise, as Adam Thayne described: "We went to 7-Eleven. We went in, we came out, the cops pulled their guns and um, my cousin started walking away and I look over and I seen him get shot.  I see him, I see him, I think he tried to pull up his shorts or something, and they thought he was reaching for a gun and so, all I know is a heard two gun shots and then the officer screaming at me to get down."[117] |

---

[113] Plf's Ex. 5, Cruz body cam; Docket 44-8 (Defs. Exs.) 7-Eleven still photos; Docket 44-7 (Defs. Exs.), Cruz body cam still photos.
[114] Plfs' Ex. 5, Cruz body cam.
[115] *See* Plf's Ex. 5, Cruz body cam; Docket 44-8 (Defs. Exs.) 7-Eleven still photos; Docket 44-7 (Defs. Exs.), Cruz body cam still photos.
[116] Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Taylor Interview at 11:05:42.
[117] Docket 44-3 (Hermansen Decl.), Ex. 3(A), Adam Thayne Interview at 11:38:30.

| | See also Plfs' Statement of the Complete Facts, *infra*. |
|---|---|
| 34.      Defendant Cruz continued to yell repeated commands to Mr. Taylor: "get your hands out now, get your hands out, get your … get 'em out!" | **Undisputed.** |
| 35.      Officer Sylleloglou was north of Mr. Taylor in the 7-Eleven parking lot, and walked in Mr. Taylor's direction but staying perpendicular to Mr. Taylor as he walked westward, while shouting repeated commands to Mr. Taylor to stop and show his hands. | **Disputed in part.**  Plaintiffs do not dispute Officer Sylleloglou's physical position as described, however, Plaintiffs **Dispute** that Officer Sylleloglou shouted "stop" again after Dillon had turned around and begun walking west away from Adam, Jerrail, and the officers.  *See also* Resp. to SOF ¶ 15, *supra*. |
| 36.      Mr. Taylor did not respond and continued walking away from Defendant Cruz and Officer Sylleloglou with his hands remaining inside the front waistband of his pants. | **Undisputed** that Dillon did not respond and continued walking away from Defendant Cruz and Officer Sylleloglou. **Disputed** that Dillon's hands were "inside the front" of his waistband. As explained by Adam and Jerrail, one could easily characterize Dillon as pulling or holding up his pants as he walked away.[118]  *See also* Resp. to SOF ¶ 33, *supra*. |
| 37.      As Mr. Taylor reached the end of the sidewalk and began walking across the parking lot of the 7-Eleven, Mr. Taylor turned around to directly face Defendant Cruz, as Defendant Cruz trained his weapon directly at Mr. Taylor. | **Undisputed.** |
| 38.      As Mr. Taylor faced Defendant Cruz, he continued to walk backwards with both hands inside the loose waistband of | **Disputed in part.**  Plaintiffs **do not dispute** that Dillon continued to walk backward as he faced Defendant Cruz, but Plaintiffs maintain there are multiple factual disputes in this assertion: 1) |

---

[118] Plf's Ex. 2, Cruz body cam; Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Taylor Interview at 11:05:42; Docket 44-3 (Hermansen Decl.), Ex. 3(A), Adam Thayne Interview at 11:38:30.

-35-

| | |
|---|---|
| his pants, concealing his hands down to his wrists, and moving them in a digging motion. | whether *one or both* of Dillon's hands; 2) were *inside* the loose waistband of his pants or *holding them up*; 3) whether his hands were *concealed down to his wrists* or were *partially concealed by his baggy shirt*; and 4) whether he was moving his hands in a *digging motion* or *attempting to comply* with the officers' commands by *showing them his hands.  See* Resp. to SOF ¶ 33, *supra.*<br><br>Importantly, it is undisputed that *there was no weapon* Dillon could have been "digging" for.[119] As such, there must be another explanation for what the officers claim to have seen.<br><br>*See also* Pltf's Statement of the Complete Facts, *infra.* |
| 39.      While facing Defendant Cruz, as Defendant Cruz continued to shout repeated commands to "get your hands out." Mr. Taylor said something which sounded like "nah fool" on the body cam video. | **Disputed in part and factually incomplete.**<br>Plaintiffs do not dispute that Cruz shouted the command, "get your hands out," and that Dillon said: "something which sounded like 'nah fool.'" However, Dillon had turned around and was now facing the officers when he says it.[120]<br><br>When asked about the moment Dillon turned around, Defendant Cruz recounted:<br><br>Q:  *"So you continued to tell him – give him verbal commands, he's not listening, he's walking away. What happens next?"*<br>A:  *"He* <u>hears the commands</u> *and he turns around."*[121]<br><br>Defendants' reference to "something which sounded like" invites the jury to make a factual determination. More than that, however, Defendant Cruz, himself, recognizes in the above statement that perhaps Dillon hadn't heard |

[119] SOF, ¶ 50, *infra.*
[120] Plfs' Ex. 5, Cruz body cam.
[121] Plfs' Ex. 3, Cruz Depo., at 55:14-17.

| | |
|---|---|
| | him before he turned around. For example, Dillon may have had to move his hands to his waist, and put his right hand in his pocket to turn down his music before he could hear and comply with the officers' commands.[122] |
| 40.      Defendant Cruz recalled Mr. Taylor saying something at that moment along the lines of "come and make me." | **Disputed.** This statement is not contained on Defendant Cruz's bodycam.[123]<br><br>Moreover, Officer Sylleloglou who, unlike Defendant Cruz, was following Dillon throughout the entirety of their encounter, does not recall hearing Dillon make this comment.[124] |
| 41.      Jerrail heard Mr. Taylor say something along the lines of "what did we do" in response to the officers' commands. | **Disputed as incorrect, improperly obtained, and factually incomplete.** Plaintiffs re-allege their challenge to this testimony as discussed, *supra*.<br><br>Further, Jerrail's actual statement when asked if he remembered Dillon's comments was: "Just what I already told him, just him giving him shit, like, 'what the fuck?' Kinda like that, like, 'what the fuck did we do wrong now?'"[125] |
| 42.      Adam heard Mr. Taylor say something to the officers, but he was not sure exactly what he said. | **Disputed as incorrect, improperly obtained, and factually incomplete.** Plaintiffs re-allege their challenge to this testimony as discussed, *supra*.<br>Further, when asked if Dillon said anything back to the officers who were yelling at him, Adam's response was: "I don't know. I don't think so, no."[126] |

---

[122] Plfs' Ex. 3, Cruz Depo., at 55:14-17.

[123] Plfs' Ex. 5, Cruz body cam.

[124] *See generally* Plfs' Ex. 7, Sylleloglou Depo.; Plfs' Ex. 9 Sylleloglou Interview.

[125] Docket 44-9 (Sutera Decl.), Ex. 9(A), Jerrail Taylor Interview at 11:16:10.

[126] Docket 44-3 (Hermansen Decl.), Adam Thayne Interview at 11:47:55.

iv.     **Response to Defendants' Facts in Support of "Mr. Taylor's
sudden movement."**

| | |
|---|---|
| 43.     Suddenly and without warning, while facing Defendant Cruz, Mr. Taylor quickly raised his left hand from inside his loose waistband, lifting his shirt and exposing his lower torso. | <u>**Disputed.**</u>  The bodycam video speaks for itself. Any inferences or conclusions to be drawn therefrom – including whether the movement was "sudden" or "without warning" – are factual issues for the finder of fact.<br><br>It is undisputed that Dillon did not have a weapon.[127]  Plaintiffs do not dispute that Dillon's hands were at or near his waist when he turned around.[128]  The video indicates the same.[129]<br><br>*See also* Pltf's Statement of the Complete Facts, *infra*. |
| 44.     Mr. Taylor simultaneously brought his right hand out of his loose waistband but lower than his left hand. | <u>**Disputed, misstates the testimony.**</u>  The bodycam video speaks for itself.  Any inferences or conclusions to be drawn therefrom – including whether the movement was "simultaneous" – are factual issues for the finder of fact.<br><br>Indeed, in his deposition, when asked about this assertion in his declaration, Officer Sylleloglou stated:<br><br>*Okay, well, there might be a slight discrepancy there – I may have said that he had both hands at the time of the – you have to understand that after a shooting like – I mean, it's very stressful. I may have thought both hands were in his pants.  But the bottom like for me is that he had his hands in his pants. Whether it was two hands, was it one hand, was it two hands,* |

---

[127] SOF, ¶ 50, *infra*.
[128] *See* Resp. to SOF, ¶ 38, *supra*.
[129] Plfs' Ex. 5, Cruz body cam.

| | |
|---|---|
| | *to me, that still indicates a threat when we cannot see what is going on in there.*[130] |
| 45.     At that moment, Mr. Taylor was approximately ten to twelve feet away from Defendant Cruz and perhaps twelve to fifteen feet away from Officer Sylleloglou. | **<u>Undisputed.</u>** |
| 46.     Believing that Mr. Taylor's movements indicated he was "drawing" or reaching for a gun and that Mr. Taylor intended to fire on the officers, Cruz acted in self-defense by firing two shots in rapid succession, striking Mr. Taylor in the torso. | **<u>Disputed.</u>**  The jury can choose to believe or disbelieve Defendant Cruz relating to his subjective beliefs, impressions, and interpretations of the events he witnessed. Moreover, the jury need not believe Defendant Cruz when he indicates the reasons he fired on Dillon.  Even if Defendant Cruz subjectively believed that Mr. Taylor was "drawing," "reaching for a gun," or "intended to fire on the officers," Plaintiffs **<u>dispute</u>** that his beliefs were reasonable.<br><br>At the time Defendant Cruz fired on Dillon, killing him, the officer's ability to see whether Dillon was "drawing," "reaching for a gun," or indicated his intent to "fire on the officers" was compromised.  It is clear from the video, that the angle of the sun was low casting a glare on everything the officers could see and that Dillon was walking directly into that glare.[131] Defendant Cruz was wearing his dark "duty Oakl[ey]s" sunglasses the entire time he pursued Dillon Taylor.[132]<br>It is undisputed that there was no gun; Dillon was unarmed.[133]  Dillon could not have been drawing a gun that was not there, could not have |

---

[130] Plfs' Ex. 7, Sylleloglou Depo., at 69:11-21.
[131] Plfs' Ex. 5, Cruz body cam; *see also* Plfs' Ex. 12, Stills from Citizen Cell Phone Video.
[132] Plfs' Ex. 4, Cruz Interview SLCC001374; Ex. A. to Plfs' Ex. 4, Original Audio of Interview at 31:33 (the reference to having the Oakleys on was omitted from the transcript, so the audio is also provided); Plfs' Ex. 12, Stills from Citizen Cell Phone Video; Plfs' Ex. 13, Photo of Bron Cruz taken by investigators after the shooting.
[133] SOF, ¶ 50, *infra*.

| | |
|---|---|
| | been reaching for a gun that was not there, and could not have fired on the officers even if he had wanted to.<br><br>Moreover, one could conclude that Dillon was not looking to engage officers, but instead was walking away, in an obvious attempt to avoid contact with them.[134]<br><br>As supported in Plaintiffs' Statement of the Complete Facts, *infra*, the jury could conclude that Defendant Cruz viewed each event unfolding before him with such unreasonable fear that, in his mind, he was left only one possible solution: He had to kill Dillon Taylor in order to save his own life. However, as supported below, Defendant Cruz's body cam video, the actions and impressions of the other officers, and Defendant Cruz's own statements – including the changing nature of his testimony over time – puts all of those facts in dispute.<br><br>*See* Pltf's Statement of the Complete Facts, *infra*. |
| 47.     Officer Sylleloglou indicated that if Defendant Cruz had not fired his weapon, Officer Sylleloglou likely would have fired his weapon in self-defense under the circumstances. | **Undisputed, but factually incomplete.** Officer Sylleloglou indicated in his deposition that he "likely" would have fired, and in his initial interview that he "probably" would have, if Cruz had not.[135]  Nonetheless, even after hearing two shots in rapid succession, he did not fire his weapon.<br><br>Plaintiffs **dispute** that there was ever the need for Officer Sylleloglou to have fired his weapon for any reason, including in self-defense, and his |

---

[134] Plf's Ex. 5, Cruz body cam.  *See also* Resp. to SOF, ¶ 21, *supra*: Jerrail stating "And my little brother was like, *'Ah shit,'* you know what I'm saying? Like, what the fuck did we do? So he was, *'alright, y'all, fuck this.'* He put his headphones in, walked away, the next thing you know the cop was all, 'Hey, stop, stop.' But he's got his headphones in, he can't hear him." (emphasis added).

[135] Plf's Ex. 9, Sylleloglou Initial Interview (First video), at 1:07:25.

| | |
|---|---|
| | not firing is evidence that Defendant Cruz's using deadly force was unreasonable. |
| 48.     Defendant Cruz called "shots fired" over the radio and immediately requested medical attention. | **Undisputed, but factually incomplete.** Plaintiffs do not dispute that Defendant Cruz called "shots fired" or that he requested medical attention, but assert that he, himself, did not immediately render medical attention after he had shot Mr. Taylor.  Instead, Defendant Cruz handcuffed Dillon with his hands behind his back, searched Dillon's pockets looking for the "gun."  As the still shots show, Defendant Cruz did not have on any gloves when he began searching Dillon's body.<br><br>Around three minutes after Defendant Cruz shot Dillon, as shown in the still shots and on the video, Defendant Cruz awkwardly straddled Dillon's body.  His left foot was on the earbud's cord, and Defendant Cruz appeared to be reaching around his right leg towards Dillon's pocket.  Because of his position, Defendant Cruz's right arm, including reaching towards Dillon's pocket, is obscured.  Defendant Cruz unplugged the earbuds from Dillon's cell phone (with one imaging seemingly showing the earbuds in Defendant Cruz's hand), and then places the unplugged earbuds on the ground. [136]<br><br>Defendant Cruz did not locate the second bullet wound higher on Dillon's chest until after he had died.[137] |
| 49.     Defendant Cruz handcuffed Mr. Taylor, searched his pockets looking for a gun, and rendered first aid. | **Undisputed, but factually incomplete.**  *See* Resp. to SOF ¶ 48, *supra*. |
| 50.     No gun was found. | **Undisputed.** |

[136] Plf's Ex. 5, Cruz body cam; Ex. 14 (stills from bodycam), at Nos. 8-25.
[137] Plf's Ex. 5, Cruz body cam.

| | |
|---|---|
| 51.      Mr. Taylor died at the scene. | **Undisputed.** |

### v.      Response to Defendants' Facts in Support of "Interaction with Adam and Jerrail."

| | |
|---|---|
| 52.      As Officer Downes arrived on the east side of the 7-Eleven parking lot, he saw Adam and Jerrail standing by the police vehicle and saw that Defendant Cruz and Officer Sylleloglou were pursuing a third male as he walked away along the sidewalk next to the 7-Eleven. | **Undisputed, but factually incomplete.** Officer Downes arrived at the 7-Eleven at the same time as Defendant Cruz and pulled into its parking lot in front of Cruz.[138] |
| 53.      Officer Downes approached Adam and Jerrail where they were stopped, detained them and ordered them to lay on the ground in front of the 7-Eleven. | **Disputed in part and incomplete.**<br><br>Officer Downes did not order them to lay on the ground in front of the 7-Eleven until he drew his gun after he heard the sound of Defendant Cruz's gun firing.[139]  Despite Adam and Jerrail arguing with him and being non-compliant to his demand that they sit on the curb, Officer Downes did not draw his own gun until after Defendant Cruz had fired.[140]<br><br>At this point, the officers still did not know which of Dillon, Adam, or Jerrail allegedly had a gun.[141] |
| 54.      From his position, Officer Downes heard gunshots but he did not see who fired the shots.  Officer Downes was more than | **Undisputed.** |

---

[138] *See* Pltf's Statement of the Complete Facts, *infra.*
[139] Plf's Ex. 8, Downes Depo., at 36:20-24.
[140] *Id.*
[141] SOF, ¶ 6.

| | |
|---|---|
| (50) feet away from Defendant Cruz and Officer Sylleloglou at that moment. | |
| 55.      Jerrail was already on the ground when he heard the two gunshots and did not see what happened. | **Disputed, misstates the testimony.**  *See* Resp. to SOF ¶ 15 (objecting to admissibility of evidence).  If the evidence is admissible, the circumstances under which the statements were procured is relevant in assessing the statements, including that the statements were made while handcuffed, after being unconstitutionally seized for hours, and during a custodial interrogation.<br><br>When asked about the moment his brother was shot, Jerrail's actual response was:<br><br>*Q:  So once you were down on the ground, you didn't know what happened?*<br>*A:  No, but as I was going down on the ground, I seen my brother grab his pants like this [he motions to his crotch area], and pull them up, you know pull his pants up, you know … we, we wear baggy ass clothes, you can see that. He's pullin' his pants up, like, 'shit what's up nigga, what'd we do? Or something to that effect.*[142] |
| 56.      Adam stated to officers later that based on Dillon's movements he could see why the officers thought that he might have had a gun. | **Disputed and irrelevant.**  *See* Resp. to SOF ¶¶ 15, 55 (objection to admissibility, and entire context of statements is relevant and must be considered).<br><br>Adam did not make this comment to officers. Instead, after having been held in handcuffs for more than five hours and interrogated regarding the shooting, one of the detectives asks Adam to try to see it from the officers' perspective and asks him if he can see why |

---

[142] Docket 44-9 (Sutera Decl.), Jerrail Taylor Interview at 11:05:42).

| | the officers might think Dillon had a gun. Adam solemnly answers in the affirmative.[143] |
|---|---|

### vi.   Response to Defendants' Facts in Support of "Medical examiner's report."

| | |
|---|---|
| 57.      According to the medical examiner, two rounds hit Mr. Taylor: one in his "upper central chest" and a second one in the "right upper quadrant of abdomen" which also grazed the third and fourth fingers of his left hand. | **Undisputed.** |
| 58.      Although Mr. Taylor was only 20 years old, the toxicology report showed Mr. Taylor's blood alcohol content at the time of his death to be 0.18%, or more than twice the legal limit of 0.08% to operate a motor vehicle in the state of Utah. | **Disputed as irrelevant.** FED. R. EVID. 401, 403.  Dillon's blood alcohol content at the time Defendant Cruz shot him has no bearing on the reasonableness of Defendant Cruz's actions.  Defendant Cruz did not know Dillon's blood alcohol content, did not suspect Dillon may have been impaired, and Dillon was never close enough to the officers for them to have suspected he had been drinking.[144]  Moreover, even if Defendant Cruz had known Dillon was impaired, underage drinking is not a capital offense. The reasonableness of Defendant Cruz's decision to shoot Dillon is in no way dependent on whether or not Dillon had been drinking. |

### vii.   Response to Defendants' Facts in Support of "Mr. Taylor's mental state."

| | |
|---|---|
| 59.      Adam reported that earlier in the day, Mr. Taylor indicated to him that he expected | **Inadmissible, disputed, irrelevant, and improperly obtained.**  *See* Resp. to SOF ¶¶ |

---

[143] Docket 44-3 (Hermansen Decl.), Ex. 3(A), Adam Interview at 11:58.
[144] *See generally* Plfs' Ex. 5, Cruz body cam; Plfs' Ex. 3, Cruz Depo; Plfs' Ex. 4, Cruz Interview; Docket 44-2 (Cruz Decl.).

| | |
|---|---|
| "to be violated" shortly by his parole officer, meaning that he was in violation of his parole and would be arrested and jailed as a result. | 15, 55 (objection to admissibility, and entire context of statements is relevant and must be considered).  FED. R. EVID. 401, 403.<br><br>Whether or not Dillon "expected to be violated" by his parole officer has no bearing on the reasonableness of Defendant Cruz's decision to shoot Dillon Taylor. While Defendants may believe it supports their theory that Dillon actively sought "suicide by cop," it is nevertheless the purview of the jury to determine whether Dillon sought his own death, and whether each of Defendant Cruz's decisions which led him to kill Dillon Taylor were reasonable.<br><br>The accuracy of the officers' testimony must be determined by the jury considering that officers' memories, and their interpretations of those memories, are now tainted by the theory that Dillon invited his own death and relevant, material testimony has changed, has detailed herein.[145] |
| 60.      Mr. Taylor reportedly had been affiliated with the "FPS" (Familia Por Siempre), which is a set of the Norteno gang, since he was 14 years old. | **Inadmissible, disputed, irrelevant, prejudicial, and improperly obtained.**  *See* Resp. to SOF ¶¶ 15, 55 (objection to admissibility, and entire context of statements is relevant and must be considered).  FED. R. EVID. 401, 403.<br><br>Any insinuation of a gang affiliation is extremely prejudicial, especially considering that Defendant Cruz is basing his defense on a reasonable belief that Dillon posed a serious threat.  Considering that Defendant Cruz did not know this – and that the alleged fact is stated in the passive voice, nonetheless – shows there is no probative value in the fact. |

---

[145] Plfs' Ex. 3, Cruz Depo. 60:4-5; *see also* Plfs' Ex. 3, Cruz Depo. 59:19-23 ("And my split second of my gun trained directly at Mr. Taylor as he's staring at me, not complying, walking away, continually digging inside of his waistband *trying to make me believe that he's drawing a weapon.*" (emphasis added)).

| | |
|---|---|
| 61.      On August 7, Mr. Taylor posted the following on his Facebook page:<br><br>SHITS GETTING HEATED EVERYWHERE, I feel m time is coming soon, my nightmears are telling me. I'm gonna have warrants out for my arrest soon. ALL my family has turned and snitched on me. Ill die before I go do a lot of time in a cell. Im trying to strive and live but Im done I latterly cant stand breating and dealing with shit. I feel like god cant even save me on this one. At my fiance' house in delta my lovely sister and my fiancé saved me but this time coming its me and the demons im fighting. | **Disputed, irrelevant, and prejudicial.** FED. R. EVID. 401, 403.  Defendant Cruz was not aware of this fact at the time he shot Dillon Taylor since it was obtained after-the-fact by a detective investigating the shooting.[146]<br><br>Whether or not Dillon was fighting any demons or was despondent, as this Facebook post suggests, has no bearing on whether Defendant Cruz acted reasonably when he shot Dillon. Moreover, the state of being despondent does not excuse unreasonable police action after the fact.  Further, Dillon's own comment, "Ill (sic) die before I go do *a lot of time* in a cell," does not indicate an absolute intention to avoid any and all time in jail.  Indeed, it suggests a willingness by Dillon to face the consequences coming his way.<br><br>Further, this fact is irrelevant and its inclusion would be far more prejudicial than probative under Rule 403. As such, it should be stricken by the Court. |
| 62.      On August 9, Mr. Taylor posted the following on his Facebook page:<br><br>*I finely realize I hit rock bottem. I'm homeless I havnt slept in two days, yesterday all I ate was a bag of chips and today a penute butter an jelly sanwitch. I cant go to my brothers witch I know he cares cuz of drama and got kicked out, I aint welcomed att any family members house or they call the cops. Ill kick it with a friend until they go to bed and I have to leave. As I walk thrw this vally of shadow* | **Disputed, irrelevant, and prejudicial.** FED. R. EVID. 401, 403.  Defendant Cruz was not aware of this fact at the time he shot Dillon Taylor since it was obtained after-the-fact by a detective investigating the shooting.[147]  *See also* Resp. to SOF ¶ 61, *supra*. |

---

[146] Docket 44-3 (Hermansen Decl.), at ¶ 5.
[147] Docket 44-3 (Hermansen Decl.), at ¶ 5.

| *of death I am freeing evil. Its about my time soon* | |

## II.   42 U.S.C. § 1983 Deprivation of Familial Association Against Officers Cruz, Sylleloglou and Downes - Qualified Immunity

While Plaintiffs had a good faith basis for asserting this claim, discovery has shown that Plaintiffs have not uncovered the necessary facts to satisfy this claim.  Plaintiffs have therefore offered to Defendants to dismiss this claim with prejudice.  As of the time of filing this opposition, Plaintiffs have not received a response.

## III.   42 U.S.C. § 1983 Supervisory Liability Against Chief Mike Brown - Qualified Immunity

Chief Mike Brown has been dismissed from this lawsuit.  (Docket 33.)  Therefore, no response is necessary.

## IV.   42 U.S.C. § 1983 Municipal Liability Against Salt Lake City

The parties have agreed to phased discovery.  The first phase of discovery was to address Defendant Cruz's assertion of the qualified immunity defense.  If Plaintiffs' prevail on this Motion for Summary Judgment, the parties will engage in discovery related to municipal liability as well as damages.  Moreover, Defendants' only argument as to municipal liability is that if there is no constitutional violation, then there is no municipal liability.  Therefore, based upon the argument below, the Court should deny this aspect of the Motion for Summary Judgment without prejudice or otherwise reserve ruling on it until a later date, and after the second phase of discovery has been completed.

## V.   Wrongful Death – Application of the Governmental Immunity Act of Utah

While Plaintiffs had a good faith basis for asserting this claim, discovery has shown that

Plaintiffs have not uncovered the necessary facts to satisfy this claim.  Plaintiffs have therefore

offered to Defendants to dismiss this claim with prejudice.  As of the time of filing this

opposition, Plaintiffs have not received a response.

<u>**PLAINTIFFS' STATEMENT OF THE COMPLETE FACTS**</u>

As detailed above, Defendant Cruz's Undisputed Facts are incomplete, pithy statements

that fail to adequately convey the events which lead to Defendant Cruz shooting Dillon to death.

Put simply, Defendant Cruz's story has changed as time has passed.  Defendant Cruz has now

provided testimony three times – his initial interview two-weeks after Dillon's death, his

declaration in support of the Motion for Summary Judgment, and his deposition.  An analysis of

Defendant Cruz's testimony shows that his story has changed, and changed in important,

material ways.

Moreover, Defendant Cruz stated repeatedly that everything he encountered that day

contributed to his decision to shoot:  "Everything that I observed, everything that I heard and

didn't hear, from the time I made contact increased my suspicion and my belief that Mr. Taylor

had a gun on him."[148]  Therefore, relevant and material to Defendant Cruz's Motion for

Summary Judgment is exactly what happened on the day of the shooting, including the

discrepancies in Defendant Cruz's testimony over time.  Therefore, below is a detailed

description of the events, based upon the evidentiary record to date, including the discrepancies

in Defendant Cruz's testimony:

---

[148]  Plf's Ex. 3, Cruz Depo. 74:2-5; *see also* 57:19-24 ("So again, this happened in the context of
a call with a lot of moving parts. You cannot just isolate one fact and me accurately say that's
what I thought what I thought. It's a combination of building up of all of the facts that have
transpired since I very first got that call.")

I.       **The Call is Dispatched**

1.       When the call was dispatched, in addition to a description of the suspects and information that one had "flashed a gun at the complainant but no threat was made," officers were told that no shots had been fired, no one was in danger, the complainant was not cooperative and had hung up on the call taker, and the complainant had refused her information.[149]

2.       The dispatcher asked officers if there was "any unit coming clear to *handle a check*."[150]

3.       Defendant Cruz did not notice the comment "no shots fired."[151]

4.       Defendant Cruz did not notice the comment "no one in danger."[152]

5.       Defendant Cruz believed the call was dispatched as a group of men, one of whom had "brandished" a weapon.[153]

6.       The call, however, was not dispatched as a "brandishing" call.[154]

7.       Officer Downes never used the term "brandish" to describe the call.[155]

8.       Officer Sylleloglou never used the term "brandish" to describe the call.[156]

---

[149] Plf's Ex. 1, Cad Call Log, p. 6 of 15 (SLCC 001547); p. 1 of 15 (SLCC 001542); Pfl's Ex. 2, Dispatch Recording (unedited version).
[150] Plf's Ex. 2, Dispatch Recording (emphasis added).
[151] Plf's Ex. 3, Cruz Depo. at 73:4-7.
[152] Plf's Ex. 3, Cruz Depo. 74:16-18.
[153] Plf's Ex. 4, Cruz Interview, SLCC 001367; Plf's Ex. 7, Cruz Depo. 37:17-19.
[154] Plf's Ex. 1, Cad Call Log, (SLCC 001542-47); Pfl's Ex. 2, Dispatch Recording.
[155] *See generally* Plf's Ex. 11, Officer Downes' Initial Interview; Plf's Ex. 8, Downes Depo.; Def's Ex. 5, Downes Decl.
[156] *See generally* Plf's Ex. 7, Sylleloglou's Depo.; Plf's Ex. 9, Sylleloglou Interview; Plf's Ex. 10, Body Cam; Def's Ex. 4, Sylleloglou Decl.

9.      Officer Downes was the first between Officers Sylleloglou, Cruz, and Downes to respond to the call.[157]

10.      While Defendant Cruz claims to have called for back-up, the actual evidence suggests a different set of facts.  Officer Downes was the first of the three officers to respond to the call, approximately 10 seconds after it was dispatched.[158]  Cruz responded to the call approximately 47 seconds later.[159]  Moreover, Officer Downes had already responded "back 160," which is the number for Sergeant Charly Goodman, who was the first to respond.[160]  Then, Officer Sylleloglou asked Defendant Cruz if Cruz wanted help or backup.[161]

## II.    The Alleged "Disturbance" Crossing the Street

11.      Defendant Cruz was 50 to 75 feet away from Adam, Jerrail, and Dillon, and facing them, when he watched them walked west toward him and cross State Street at 2100 South.[162]

12.      Defendant Cruz saw Dillon Taylor creating what he thought was a "disturbance" with the driver of a car at the intersection of 2100 South and State Street and possibly "harassing the driver."[163]  Defendant Cruz viewed this exchange as "not typical" and "unusual," since "you

---

[157] Plf's Ex. 2, Dispatch recording, at 00:30.
[158] Plf's Ex. 2, Dispatch Rec. at 00:30.
[159] *Id.* at 01:17.
[160] *Id.*
[161] *Id.*
[162] Plf's Ex. 3, Cruz Depo. 27:14-17; *see also* Plf's Ex. 6, Aerial view of Intersection at 2100 South State Street showing that 2100 South is six lanes wide at that point.
[163] Plf's Ex. 4, Cruz Initial Interview, SLCC 001368.

don't just walk up to people in a crosswalk, somebody that maybe you don't know, and start

engaging them while they are sitting in their car in traffic."[164]

13.     Salt Lake City Police Crime Scene Technician Benjamin Bender, however,

framed the situation differently.  He was stopped at the intersection of 2100 South State Street

and also witnessed the exchange Defendant Cruz described. Technician Bender saw the same

interaction without suspicion: "A male in a white t-shirt and blue jeans approached a red sedan

that was waiting at the northbound red light. This Technician's view of the male was obstructed

by passing vehicles, but the male appeared to high-five the driver of the vehicle and then jogged

across the remainder of the intersection where he joined the other two males at the southwest

corner.[165]

### III.   Dillon, Adam, and Jerrail Do Not Rob the 7-Eleven

14.     While watching from across the street, Defendant Cruz expressed to Officer

Downes he really hoped "those guys don't rob the store,"[166] and that he "hope[d] nothing bad is

going to happen in the store."[167]  When asked what he meant, Cruz stated:

> *Well, it was a – it was a more personal conversation between Officer Downes and*
> *I. You go to – one of the first things you learn as an officer – you know, man with*
> *a gun calls, they are not uncommon.  And when you are prepared, you run as many*
> *scenarios through your head as possible, just to be as prepared as possible. And*
> *one of those scenarios that had crossed my mind ever so briefly was something –*
> *you know, a convenience store robbery. They are very common.  It's just something*
> *that crossed my mind, just another scenario.[168]*

---

[164] Plf's Ex. 3, Cruz Depo. 28:7-17.
[165] Plf's Ex. 12, Bender Statement, SLCC 001396.
[166] Plfs' Ex. 4, Cruz Interview, SLCC 001360.
[167] Plfs' Ex. 3, Cruz Depo. 31:23-24.
[168] Plfs' Ex. 3, Cruz Depo. 33:8-22.

15.    Downes noted at that time it was "[b]usiness as normal it appeared for the store."[169]

16.    In the one or two minutes Adam, Jerrail, and Dillon were inside the 7-Eleven, they completed their purchases without incident and exited in a normal manner without having robbed the store, harassing any customers, or causing any disturbance.[170]

17.    Adam and Jerrail exited the 7-Eleven together with Dillon exiting a few feet behind.[171]

18.    Defendant Cruz called out over the air that Adam, Jerrail, and Dillon were leaving the 7-Eleven as Officers Downes and Cruz were already on their way across the street from where they were staged at the Subway parking lot.[172]

**IV.    Officer Downes Drives to the Rear of the 7-Eleven**

19.    As relayed in his initial interview just two-weeks after the shooting, Defendant Cruz became distressed and felt he could not explain Officer Downes' actions when Downes drove his vehicle to the rear of the 7-Eleven: "… Downes and I both went across the street. I anticipated I, I had the south position and for reasons I can't explain, Downes, he said, 'I'm going out back.' Um, as these three just walked straight out into the parking lot. Um, and so he just kept driving."[173]

---

[169] Plf's Ex. 8, Downes Depo. 25:6-7.
[170] Docket 44-3 (Hermansen Decl.) Ex. B, 7-Eleven video; Ex. 8, 7-Eleven still photos; Plf's Ex. 5, Cruz body cam.
[171] Docket 44-3 (Hermansen Decl.), Ex. B, 7-Eleven video; Def's Ex. 8, 7-Eleven still photos; Plf's Ex. 5, Cruz body cam.
[172] Plf's Ex. 2, Call dispatch audio, at 08:00.
[173] Plf's Ex. 4, Cruz Interview, SLCC 001369.

20.     As described in that interview, after Officer Downes drove around the building, Defendant Cruz began to feel better when he saw Officer Sylleloglou: "He drove around the building, but I felt, felt good when I saw Glue (sic)."[174]

21.     Neither Officers Sylleloglou nor Downes were concerned by Downes' decision to drive to the rear of the 7-Eleven, but rather saw it as a necessary move and standard procedure.[175]

22.     And, in an about face from his prior interview, at his deposition, Defendant Cruz recounted that he was not concerned when Officer Downes went at to the back of 7-Eleven:  "I – I don't remember hearing Downes express that he would go around back."[176]  When asked how he felt when Downes' drove to the back, Cruz stated, "It didn't make me feel – at the time, I don't know what it made me feel anything.  I was focused on the suspects in front of me"[177]; "I would not say it worried me; not at the time."[178]

23.     Likewise, in his declaration, Defendant Cruz testified contrary to his prior interview.  As stated in the declaration:  Downes' move was "in case the three males ran away in that direction."[179]

**V.     Neither Officers Downes nor Sylleloglou Engaged their Emergency Lights**

24.     After possibly having been upset by Downes' driving around back of the 7-Eleven, when Defendant Cruz initiated his red and blue emergency lights, he said "for a split

---

[174] Plf's Ex. 4, Cruz Interview, SLCC 001369.
[175] Plf's Ex. 8, Downes Depo. 26:2; 27:16-20; Plf's Ex. 7, Sylelloglou Depo. 26:23-25; 27:1; 28:21-25.
[176] Plf's Ex. 3, Cruz Depo. 36: 19-20.
[177] *Id.* at 39:20-23.
[178] *Id.* at 40:4-5.
[179] Docket 44-2 (Cruz Decl.), at ¶ 11.

second, I felt a little bit better about the situation."[180]

25.      Although Defendant Cruz had engaged the lights on his own vehicle, neither Officer Sylleloglou nor Officer Downes turned their lights on at any time during the encounter.[181]

26.      Officer Downes did not believe the call warranted his lights, nor was it allowed under department policy, for him to engage his lights or siren.[182]

## VI.    __The Officers Arrive at the 7-Eleven__

27.      Officer Sylleloglou was the first to arrive on scene at the 7-Eleven, pulling directly in front of Adam and Jerrail as they exited the 7-Eleven.[183]

28.      Officer Downes arrived at the 7-Eleven just ahead of Defendant Cruz and drove past the front of the store to cover the rear.[184]

29.      Defendant Cruz arrived from the east of Dillon, Adam, and Jerrail and placed his vehicle in a "V" position relative to Officer Sylleloglou's vehicle.[185]

30.      As Dillon, Adam, and Jerrail exited the 7-Eleven, Defendant Cruz believed all three of them looked at him and the other officers, which caused Cruz concern again, however:

> *But what eased tensions in my mind, slightly, because they all lined up perfectly for us. They were all perfectly lined up and that just made me feel so good inside. All their hands were just down at their sides. I could see their hands and the tensions just, I just felt it go down for a split second.[186]*

---

[180] Plf's Ex. 4, Cruz Interview, SLCC 001369.
[181] Docket 44-2 (Cruz Decl.), Ex. A, Scene photos.
[182] Plf's Ex. 8, Downes Depo. 21:3-7; 21:16-21.
[183] Docket 44-8 (Def's Exs.) Ex. 8, 7-Eleven stills.
[184] Plf's Ex. 5, Cruz body cam.
[185] Plf's Ex. 4, Cruz Interview, SLCC 001369.
[186] Plf's Ex. 4, Cruz Interview, SLCC 001369.

31.     Immediately upon arrival, Officer Sylleloglou can be seen exiting his vehicle and running around the front of it toward Dillon, who was walking away.[187]

32.     Officer Sylleloglou and/or Defendant Cruz yelled either "stop," and/or "show me your hands" to Dillon, Adam, and Jerrail.[188]

## VII.     Adam and Jerrail Immediately Raise their Hands which Scared Defendant Cruz

33.     Adam and Jerrail quickly raised their hands above their heads when they told to by Officer Sylleloglou.[189]

34.     When Defendant Cruz saw Adam and Jerrail with their hands in the air, rather than their compliance easing his fears, Defendant Cruz explained in his initial interview that it "scared the crap out of" him:

> *And it scared the crap out of me when those two raised their hands. Like they knew there was a gun or weapon was involved, that's the only time they do that. They never put their hands up like that. Those two put their hands straight up in the air and that confirmed to me, even more, there was a gun involved.*[190]

35.     When given a second opportunity to explain his concern over Adam and Jerrail complying with their order to raise their hands, Cruz confirms again:

> *So, the other two put their hands out, just like this. Um, and, and without any, without any prompting, that, this is what they did. Which, again, was very, it was even more concerning. Uh, because people don't do this when we contact them unless we believe they have a gun. Or they're armed.*[191]

---

[187] Docket 44-8 (Def's Exs.), Ex. 8, 7-Eleven stills; Ex. 7, Cruz body cam stills, Nos. 11-13.
[188] Plfs' Ex. 7, Sylleloglou Depo. 33:16-1; Plfs' Ex. 4, Cruz Interview, SLCC 001370.
[189] Plf's Ex. 5, Cruz body cam; Plfs' Ex. 4, Cruz Interview, SLCC 001370; Plfs' Ex. 7, Sylleloglou Depo. 29:20-23.
[190] Plf's Ex. 4, Cruz Interview, SLCC 001370.
[191] Plfs' Ex. 4, Cruz Interview, SLCC 001375.

36.     On the other hand, Officer Downes was not surprised or concerned at all that Adam and Jerrail raised their arms in reaction to seeing the officers; rather, Downes said it was not unusual for people to raise their hands when officers arrive and that it happens, "a lot of the time."[192]

## VIII.   Downes Detains Adam and Jerrail

37.     Adam and Jerrail began arguing with Officer Downes, asking him what was happening and why police were "hassling" them; this "back and forth" continued until Downes heard Defendant Cruz fire his weapon.[193]

38.     Officer Downes did not draw his gun, nor did the circumstances cause him alarm: "We were just investigating.  So, at that point, it was not a threat."[194]  He noted further, "For me, the factors were we had information there was a *possible* weapon. The two that I was dealing with did not present as an initial threat …"[195]

39.     When asked if the fact that Adam and Jerrail were noncompliant caused him to draw his weapon, Officer Downes responded, "No, sir."[196]

## IX.   Jerrail Sees Dillon Walk Away

40.     Jerrail saw "three squad cars, one right here on the left in the beginning, then one on the right and one in the middle.  With guns – they said, *'Get on the ground'* or some shit. I don't know exactly what they said."[197]

---

[192] Plf's Ex. 8, Downes Depo. 39:21-25; 40:1-13.
[193] Plf's Ex. 8, Downes Depo. 41:24-25; 42:1-7.
[194] Plf's Ex. 8, Downes Depo. 39:7-9.
[195] *Id.* at 59:17-20.
[196] Plf's Ex. 8, Downes Depo. 44:19-21.
[197] Docket 44-9 (Sutera Decl.), Ex. A, Jerrail Taylor Interview at 11:03:55.

41.     Jerrail was surprised by the officers' presence and did not know why they had been targeted with such a show of force: "In my head, I'm thinking, my, my head's, my adrenaline's running, I'm thinking, *What the fuck did I just do? I can't walk in America and buy a goddamn drink and a beer?'* like, *'What am I doing wrong here.'* I'm all, *'What the he--?'* And my little brother was like, *'Ah shit,'* you know what I'm saying? Like, *'What the f--- did we do?'* So he was, *'alright, y'all, fuck this.'* He put his headphones in, walked away, the next thing you know the cop was all, *'Hey, stop, stop.'* But he's got his headphones in, he can't hear him."[198]

42.     When Jerrail saw his brother walking away, he figured Dillon was avoiding contact with the officers: "I don't know if he was ignoring the cops, like, *"Fuck it, I'm gonna cut through here and walk to the Trax."*[199]

43.     Jerrail saw Dillon's headphones were in and was concerned Dillon could not hear what officers were saying behind him as he walked away: "I was like, *'What the fuck,'* and as I'm getting on the ground, I see my brother walking, I'm like, *'Oh fuck, here we go.'* I'm like, *"Dude, just fuck stop,'* but he had his headphones in."[200]

**X.     Dillon's Alleged "Look of Defiance"**

44.     Dillon likely saw one or more of the officers' vehicles before he turned to walk back toward the front of the 7-Eleven.[201]

---

[198] *Id.* at 11:03:55 - 11:04:34.
[199] *Id.* at 11:04:20.
[200] *Id.* at 11:05:06.
[201] *Id.*; Plf's Ex. 5, Cruz body cam; Def's Ex. 8, 7-Eleven still photos.

45.     Although Dillon may have looked in the general direction of Officers Cruz and Sylleloglou, Dillon did not have the opportunity to make eye contact with Defendant Cruz when Defendant Cruz first arrived at the 7-Eleven.[202]

46.     Nevertheless, Defendant Cruz began to feel afraid again, "When[he] looked into Mr. Taylor's eyes."[203]

47.     When asked to clarify when this "look" occurred, Cruz said it occurred *before* Dillon turned around and walked away:

> *That was when I knew something was gonna go bad. Um, cause he looked right at me, um with complete, total defiance in his eyes. Um, and when his hands disappeared that's when I drew my gun. Because I knew his hands, they were like this through his waistband. And the way he looked at me? And then turned around? There was no doubt in my mind what he was doing with his hands.[204]*

48.     Given a second opportunity when asked by detectives to explain when he saw what he believed to be Dillon's "defiant" look, Cruz was clear:

> *Q:     Um, you said on first contact two of them complied. Put their hands up just when you said the word, "Stop"?*
> *A:     Yes.*
> *Q:     But the third one looked at you – in the white shirt?*
> *A:     In the white shirt.*
> *Q:     And kept walking?*
> *A:     He looked directly at me and ah, he turned around and walked off with – and his hands, his hands is what, his hands it what did it.*
> *Q:     You said that he, ah, looked at you with defiance?*
> *A:     Yeah. He looked at me like, ah, he, I mean I don't know how to explain it. Um you know but you can tell when you look into somebody's eyes when you're working with them. Um that's when you know it's it's, it's ah, it's one of the clues that we have when we're dealing with people.*

---

[202] Plf's Ex. 5, Cruz body cam; Docket 44-8 (Defs' Exs.), Docket 44-7, Cruz body cam stills.
[203] Plfs' Ex. 3, Cruz. Depo., 35:9-12.
[204] Plfs' Ex. 4, Cruz Interview, SLCC 001370.

> *Um their eyes can tell you a lot. Um, and his eyes were just complete just 100% defiance. He had this, this, this look on his face like you know? Like I, ah, hate?  Um, um, and ah, like he was, he was not going to do anything that I said. Um, and it was just a horrible feeling.  Um, looking at him. Having him, you know just the, it was just horrible. Just hate, defiance, that he had in his eyes.*
>
> Q:     *And you've seen this kinda look before you're saying with, with work-related circumstances?*
>
> A:     *I've seen, ah, I don't know that I've seen it like that. I mean, I've seen a type of it before. I've seen it when people aren't gonna comply and they look at you like, "I'll fight you first."*
>
> Q:     *Umm, Hmm.*
>
> A:     *"I'll do whatever I need to do but you're not, you're not taking me down."*
>
> Q:     *Okay.*
>
> A:     *Um, and, and that's yeah, it was an extreme version of that.*[205]

49.     When given a third opportunity to explain when "the look" happened, again, Cruz maintained: "Um, and as soon as they [Adam and Jerrail] did that [raise their hands] it was pretty much simultaneous in my mind. *They did this and again, he looked dead at me and I looked dead at him and as soon as they did that, he turns around and this is what I see."*[206]

50.     More recently, in his deposition, Cruz confirmed a fourth time: "I exited my police car and all I did was tell the individuals to stop. *I had already gotten that look of defiance from Mr. Taylor.*  The other two immediately put their hands in the air … Right when I'm stopping my car.[207]

51.     The video taken from Defendant Cruz's body camera captured his arrival at the 7-Eleven, including the moment Dillon glanced in Defendant Cruz's general direction.[208]

---

[205] Plfs' Ex. 4, Cruz Interview, SLCC 001374-75.
[206] *Id.* at SLCC 001375.
[207] Plfs' Ex. 3, Cruz Depo. 45:4-7; 13.
[208] Plfs' Ex. 5, Cruz body cam; Plfs' Ex. 7, Cruz stills.

Defendant Cruz described that moment as, "He looks right at me for a *split second* he turned around and he starts walking off."[209]

52.     Defendant Cruz was wearing his dark tinted, department-issued, "duty Oakleys" throughout his encounter with Dillon, Adam, and Jerrail.[210]

53.     The entirety of the *extreme version* of Dillon's look of "100% defiance," "hate," "I'll fight you first," and "I'll do whatever I need to do but you're not taking me down," which Defendant Cruz saw, happened in that "split second" as he pulled into the 7-Eleven before he exited his car.[211]

54.      Dillon's "look," combined with Dillon turning around and walking away allegedly led Defendant Cruz to conclude that when Dillon's hands went to his waistband: "I was 100%, 100% convinced when I saw him turn around that it was gonna be a gunfight. I knew he had that gun that he'd be trying to kill us there was nothing else he could be doing than going for a gun."[212]

55.     Nonetheless, as detailed more fully below, Officer Sylleloglou, while watching the same sequence occur, had the wherewithal based upon the circumstances and after listening to Defendant Cruz's repeated commands to Dillon to "show me your hands," confirmed that he "didn't see" a gun when Dillon moved his hands.[213]

---

[209] Plfs' Ex. 4, Cruz Interview, SLCC 001370.
[210] Plfs' Ex.4(A), Cruz Interview, Audio of Interview, at 31:33; Plfs' Ex. 3, Cruz Depo., at 45:20-21; Plfs' Ex. 12, Citizen cell video still; Plfs' Ex. 13, Photo of Bron Cruz taken that day by investigators.
[211] *See generally* Plfs' Ex. 5, Cruz body cam; Plfs' Ex. 7, Cruz body cam stills.
[212] Plfs' Ex. 4, Cruz Interview, SLCC 001370, 71.
[213] Plfs' Ex. 10, Sylleloglou body cam video beginning at 3:09.

XI.   **Dillon Turns and Walks Away**

56.   Dillon was already walking away from Defendant Cruz before Cruz had fully exited his vehicle and cleared its door.[214]

57.   Dillon can be seen on the 7-Eleven surveillance video and still photos walking back toward the 7-Eleven, and around the front of a red truck before heading west along the front of the store.[215]

58.   Officer Sylleloglou can be seen on the same video and photos having run around the front of his vehicle in a south/west diagonal in pursuit of Dillon; Defendant Cruz initially follows some distance behind Dillon and Officer Sylleloglou.[216]

59.   Dillon "calmly walk[ing] away" and "creating distance" again allegedly heightened Defendant Cruz's distress at the situation, and he quickly closed the distance between himself and Dillon:

> *Um, and it scared me even more that he wasn't running away. He was buying time. He was buying time and he was creating distance. That's all he was doing. Very calmly walked away. With his hands right in his waist band.*[217]

60.   While Defendant Cruz initially claimed to be trying to close the distance with Dillon, Defendant Cruz later claimed the exact opposite when asked whether he was trying to

---

[214] Plfs' Ex. 5, Cruz body cam; Plfs' Ex. 7, Cruz body cam stills.

[215] Docket 44-3 (Hermansen Decl.), Ex B, 7-Eleven video; Docket 44-8 (Defs' Exs.), 7-Eleven video stills.

[216] Docket 44-3 (Hermansen Decl.), Ex B, 7-Eleven video; Docket 44-8 (Defs' Exs.), 7-Eleven video stills.

[217] Plfs' Ex. 4, Cruz Interview, SLCC 001370; Docket 44-3 (Hermansen Decl.), Ex. B, 7-Eleven video; Docket 44-8 (Defs' Exs.), 7-Eleven video stills.

close the distance: "No. I was maintaining distance at that – yeah, I was not trying to close on somebody that I believed had a gun."[218]

61.     Indeed, Defendant Cruz stated that closing the distance would not "make any sense."[219]

62.     At some point during this interaction, Officer Sylleloglou said Dillon said something to him about "shooting him."  When asked if he remembered exactly what Dillon said, Sylleloglou responded: "He said, 'What are you gonna do, shh, I think it was – this is as close to verbatim as I can get – 'What are you gonna do, shoot me?  What are you gonna do?  You gonna shoot me? You gonna shoot me?"[220]

63.     Defendant Cruz never reported hearing this exchange – in any of his three sets of testimonies – instead, he only reports hearing Dillon saying something about, "Make me," after he turns around just before he is shot.[221]

64.     On Defendant Cruz's body cam, the only time Dillon can be heard saying something is after he has turned around and is facing the officers where he appears to say, "what, fool?" or "nah, fool?" approximately four seconds before he is shot.[222]

65.     Jerrail heard a different set of statements from Dillon: "I heard, like, 'What up?' and him [Dillon] giving shit, like, 'What did we do?';"[223] as well as, "What the fuck did we do

---

[218] Plfs' Ex. 3, Cruz Depo. 55:8-13.
[219] *Id.*
[220] Plfs' Ex. 7, Sylleloglou Interview, (Second video) at 6:00:00.
[221] Plfs' Ex. 4, Cruz Interview, SLCC 001371.
[222] Plfs' Ex. 5, Cruz body cam.
[223] Docket 44-9 (Sutera Decl.), Ex. A, Jerrail Interview at 11:05:42.

wrong now?"[224]

## XII.   **Officer Downes' Perspective**

66.      As Dillon walked away with Defendant Cruz and Officer Sylleloglou in pursuit, Officer Downes remained with Adam and Jerrail; as the "backing officer," he directed 20% of his attention toward Defendant Cruz and 80% of his attention toward Adam and Jerrail.[225]

67.      Although Adam and Jerrail argued with Officer Downes, he did not pull his gun because he did not view them that much of a threat.[226]

68.      After turning his attention to Dillon, Defendant Cruz, "wish[ed] I had another couple guys to watch those other two [Adam and Jerrail]" except that "their eyes looked harmless."[227]

69.      Officer Downes continued to bounce back and forth between Adam and Jerrail and looking in the direction of Defendant Cruz, but with his focus on Dillon.[228]

70.      Officer Downes heard Defendant Cruz give Dillon the command, "Show me your hands" and saw Dillon continuing to walk backward.[229]

71.      When Downes looked back again, he saw Dillon lifting up his shirt, but couldn't make out anything there.[230]

---

[224] *Id.* at 11:16:10.
[225] Plfs' Ex. 8, Downes Depo., 45:5-9.
[226] *Id.* at 39:5-9.
[227] Plfs' Ex. 4, Cruz Interview, at SLCC 001370.
[228] Plfs' Ex. 8, Downes Depo., at 45:5-6; 45:17-18; 46:12-13.
[229] *Id.* at 49:1-6.
[230] *Id.* at 49:7-11.

### XIII.   **Dillon's White Earbuds**

72.     When asked by investigators why Dillon failed to respond and what he might have been doing with his hands, Jerrail responded that Dillon had a cell phone he used to listen to music, and that: "maybe [his hands were] in his pockets to get his d--- phone, to change the song on his phone." When asked if Dillon had headphones, Jerrail answered, "Yeah, that's what he had when the cops were pulling their guns out and shot him."[231]

73.     After Dillon was shot, he initially fell to the ground on his left side and back.  The earbuds themselves are still in Dillon's ears. After Defendant Cruz had handcuffed Dillon and rolled him to his back, the earbuds were clearly visible in the pool of blood next to Dillon's head.[232]

74.     During this entire process, for the first three minutes or so after Defendant Cruz shot Dillon, Defendant Cruz did not place on or otherwise wear any gloves.[233]

75.     Defendant Cruz then straddles Dillon's body, with Defendant Cruz looking north. In this position, Defendant Cruz bent his right knee forward, and reached his right arm behind his knee.  His right arm and hand appears to manipulate Dillon's right pocket, where Dillon's phone and the earbuds cord was plugged in.[234]

76.     In this awkward position that somewhat blocked the view of Defendant Cruz's right arm reaching and manipulating Dillon's right pocket from the view of the bodycam,

---

[231] Docket 44-9 (Sutera Decl.), Ex. A, Jerrail Interview, at 11:03:06.
[232] Plfs' Ex. 5, Cruz body cam.
[233] Plfs' Ex. 5, Cruz body cam.
[234] Plfs' Ex. 5, Cruz body cam; Plfs' Ex. 14, Bodycam still photos.

Defendant Cruz unplugged the earbuds from the cellphone in Dillon's right front pocket, then appears to have laid or thrown the earbuds onto the ground next to Dillon's body.[235]

77.     When Defendant Cruz was asked during the initial interview if he saw the headphones, he stated: "I never saw any during the whole time when I was kneeling down by him I never once saw any kind of headphones."[236]

78.     Cruz had the opportunity to correct himself in his deposition, under oath, but did not:

> Q:     *When you first pulled up, had you seen the white cord, the earphones anywhere on him?*
> A:     *No.*
> Q:     *And maybe I can limit the number of questions. At any point –*
> A:     *No. I did not.*[237]

79.     Defendant Cruz's recollection regarding the claimed look of "defiance" must be considered in light of Defendant Cruz wearing his dark "duty Oakl[ey]s" sunglasses which he wore the entire time he pursued Dillon.[238]

80.     Dillon's cell phone can be seen protruding from his pocket in a photo taken during the investigation following the shooting.[239]

## XIV.   Dillon Continues Walking

81.     As Dillon walked along the side of the 7-Eleven away from Officers Cruz and

---

[235] Plfs' Ex. 5, Cruz body cam; Plfs' Ex. 14, Bodycam still photos.
[236] Plfs' Ex. 4, Cruz Interview, SLCC 001379.
[237] Plfs' Ex. 3, Cruz Depo., at 50:6-17.
[238] Plfs' Ex. 4, Cruz Interview, SLCC001374; Ex. A. to Plfs' Ex. 4, Original Audio of Interview at 31:33 (since Cruz's comment "I had my duty, my Oakl[ey]s on" is missing from the transcript cited, the audio is also provided); *see also* Plfs' Ex. 12, Stills from Citizen Cell Phone Video; Plfs' Ex. 13, Photo of Bron Cruz taken by investigators after the shooting.
[239] Plfs' Ex. 15, Still photo from investigation.

Sylleloglou with his back to them, he can be seen raising his hands to the sides of his waist.[240]

82.     It is clear from Defendant Cruz's body cam that Dillon is wearing a baggy t-shirt and baggy pants.[241]

83.     Defendant Cruz believes Dillon's hands are concealed in his waistband area due to the position of his elbows when viewed from behind.[242]

84.     Officer Sylleloglou recalls Cruz saying: "He was, I remember him yelling, get your hands… I think it was get your hands out of your *pockets, or pants* or something like that, get your hands out, I remember hearing that … something along those lines."[243]

85.     Officer Sylleloglou stated, "[a]nd then I know I yelled at him too … "let me see your … I think I may have just said, "'Hands! Hands! Hands!'"[244]  When the interviewer asks whether he remembered anything else Defendant Cruz said, Sylleloglou responded, "No, I couldn't, you know, I just … we were both kinda, I was just listening to him, and then I would say something, I would say "hands," and he would yell "hey, hey, get your hands! *Get your hands out of your pock …* I mean he was yelling at him to get his hands out of there."[245]

86.     Defendant Cruz follows close behind Dillon telling him to, "Get your hands out," but Dillon continues to walk away; when asked what happened after that, Cruz responds, "He hears the commands and he turns around."[246]

---

[240] Plfs' Ex. 5, Cruz body cam.
[241] Plfs' Ex. 5, Cruz body cam; Docket 44-8 (Defs' Exs.), Cruz body cam stills.
[242] Plfs' Ex. 3, Cruz Depo., at 49:7-14.
[243] Plf's Ex. 9, Sylleloglou Initial Interview, beginning at 2:34.
[244] *Id.*
[245] *Id.*
[246] Plfs' Ex. 3, Cruz Depo., at 55:14-17.

87.     When later asked in his deposition how Dillon responded to his commands, Defendant Cruz recounted, "He didn't, He responded by continually showing me that he was manipulating or retrieving something from his pants, from his waistband. That is how he responded …. And he – sorry. He also responded with the look of defiance."[247]

88.     Officer Sylleloglou could not see Dillon clearly at first: "The other guy was kinda covered by the red truck … cause he was kind of, sort of, behind it."[248]  And: "That third guy – I didn't, I don't remember seeing anything in his hands. Like I said, he was partially obstructed by the red truck."[249]

## XV.     Dillon's Hands – Digging for a Gun, Holding Up his Pants, or Turning Down his Music?

89.     Defendant Cruz drew his gun as soon as he saw Dillon's hands move to his waist.[250]  Defendant Cruz recalled to investigators:

> I heard Glu, five to seven feet off to my right, I could see him in my peripheral. He was yelling at him too.  "Show us your hands. Stop. Show us your hands."
>
> Um, and he turned around. He didn't stop. He never stopped. He turned around. Um, and it was only worse because his hands they were dove in his pants. They were just completely wrist-deep in his pants. He wasn't pulling up his pants. He wasn't in his pockets. He was completely wrist-deep in his pants and he wasn't just warming up his pants, his hands on a cold day. It wasn't even cold.
>
> Um, he wasn't just hiding his hands. He was, he was digging at something. He was manipulating something. I knew there was a gun in those pants. And, ah, at that point I mean, my gun I've had it center-massed, trained on him and I was yelling at him and he was looking directly at me, directly at my eyes. And I looked directly in his eyes. And he looked at me like, "You're not gonna. You're not gonna stop me." Um, and, "I'm gonna kill you guys."

---

[247] *Id.* at 57:4-8, 11-12.
[248] Plfs' Ex. 7, Sylleloglou Interview (Second video), at 04:35.
[249] *Id.* at 5:18.
[250] Plfs' Ex. 4, Cruz Interview, SLCC 001370.

*And I think he said something. I don't remember what he was saying. He was yelling, "You make me." Or, "You can't make me," or some crap. I, I can't remember. But we yelled at him. I yelled at him with every, as loud as I could. "Let me see your hands. Let me see your hands" And he looked down the barrel of my gun. It just felt like an eternity. Um, and he, he didn't. He kept digging. He kept digging. Digging. Manipulating something in his pants.*

*And I knew he, he was ju – he'd already made up his mind and he just – I was just giving him time to jut kill one of us. I, don't know if the gun was caught or it if was falling down? Or I, I don't know. He was taking off the safety? I don't know what he was manipulating, something.[251]*

*And I knew it was a deadly force situation. No doubt in my mind, no doubt in my mind. I needed to see his damn hands. I couldn't take the chance of him shooting my officer or shooting me.*

*And, ah, and after I yelled at him for what felt like an eternity with my gun trained right on him he did nothing but keep digging at that gun in his pants or whatever the hell it was. Without any hesitation. Without any reservation in the world I fired at him. And I would have kept firing until that deadly threat had stopped.[252]*

90.    As Cruz Continued, the investigator asked if he recalled what Dillon had said to him, Cruz responded that he could not remember what Dillon said, but it was something to the effect of "You can't make me," or "make me."[253]

91.    When asked to describe the action of Dillon's hands, Cruz remarks about Dillon's "baggy" pants. The investigator asks, "Baggy?" Cruz responds:

*Like they usually are with people that we deal with when they're concealing things. But, ah, his hands were buried like this in his pants. Buried …. And when they're buried way, wrists deep and his sh – you know, he's clawing at something then he's this. This is what I see. This is what I see in his baggy pants. This.[254]*

---

[251] *Id.* at SLCC 001371.
[252] Plfs' Ex. 4, Cruz Interview, SLCC 001371-72.
[253] *Id.* at SLCC 001375.
[254] *Id.* at SLCC 001376.

*They're not just sitting there. They're just digging, digging and he has this look on his face like, you know, "Come and get me. I'm gonna fricken kill you."[255]*

92.     The investigator asked whether Dillon had manipulated his shirt during this, Cruz responded: "I mean yeah, his shirt was you know eh, you know, his shirt was raising with his pants. You know? It was this, *this tugging motion*. This drawing motion, whatever … you know, I'm not sure what to call it."[256]

93.     When the investigator asked Defendant Cruz if he thought Dillon might have had a gun that could have cause harm to him or others around, Cruz responded:

*I was convinced, 100% there was nothing else he was doing. Nothing else he could have been doing than getting a gun t-t-to try and kill one of us. To try and kill somebody. Nothing else. There was zero; nothing else made sense. Nothing else.[257]*

94.     The investigator then wanted to know how that made Cruz feel:

*I was scared to death. The last thought I had go through my mind when I pulled the trigger; and I'll never forget this. Was uh, was that "I was too late. I was too late." And because of that I was gonna get killed. Worse, my officer was gonna get killed …. And that was the shittiest feeling … And I was like, "I'm gonna get us killed."[258]*

95.     From the time Dillon turned around and came face-to-face with the officers until he was shot is approximately four seconds.[259]

96.     When asked about the moment he fired his gun and shot Dillon Taylor, Defendant Cruz stated: "Mr. Taylor made a drawing stroke and I shot him."[260]

---

[255] *Id.* at SLCC 001376-77.
[256] *Id.* at SLCC 001379-80.
[257] *Id.* at SLCC 001377.
[258] *Id.* at SLCC 001377.
[259] Plfs' Ex. 5, Cruz body cam.
[260] Plfs' Ex. 3, Cruz Depo., at 60:12-17.

97.     When asked if Dillon's hand ever came toward him, Defendant Cruz responded,

"I could not – no, it didn't because I could not wait that long.[261]

98.     Minutes after Dillon was killed, Officer Sylleloglou explained to another officer

what had happened:

> And uh, what happened was, we found these two guys there by the cars. And the
> dude in the white over here, he kept walking, and he ignored us. So Bron [Cruz]
> and I went up to him and kind of, kind of cornered him like this. And he starts doing
> this and he starts backing up like digging into his pock – like this, and then he, and
> then he's like, 'Get your hands out of your, get your hands out, get your hands out,
> get your hands out,' and then as soon as he made an overt movement to pull
> something we didn't see it, and he just -- he got a couple shots on him.[262]

## XVI.  The Aftermath

99.     When Jerrail was asked what he saw just before Dillon was shot, he commented:

"…as I was going down on the ground, I seen my brother grab his pants like this [he motions to

his crotch area], and pull them up, you know pull his pants up, you know … we, we wear baggy

ass clothes, you can see that. He's pullin' his pants up, like, 'sh-- what's up nigga, what'd we do?

Or something to that effect."[263]

100.    When Adam was asked the same, he stated: "We went to 7-Eleven. We went in,

we came out, the cops pulled their guns and um, my cousin started walking away and I look over

and I seen him get shot.  I see him, I see him, I think he tried to pull up his shorts or something,

and they thought he was reaching for a gun and so, all I know is a heard two gun shots and then

the officer screaming at me to get down.[264]

---

[261] *Id.* at 60:1-3; 7-8.
[262] Plfs' Ex. 10, Sylleloglou body cam video, beginning at 3:09.
[263] Docket 44-9 (Sutera Decl.), Ex. A, Jerrail Taylor Interview, at 11:05:42.
[264] Docket 44-3 (Hermansen Decl.), Ex. A, Adam Thayne Interview at 11:38:30.

## ARGUMENT

### I.    Summary Judgment Standard

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.*  If the initial burden is met, then the non-moving party has the burden of showing there are genuine issues of material fact to be determined.  *See id.* at 322.  It is not enough that the evidence be merely colorable; the non-moving party must come forward with specific facts showing a genuine issue for trial.  *See id.*

A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  Thus, on a motion for summary judgment, the Court is to view the evidence "through the prism of the substantive evidentiary burden." *Id.* at 254.  The inquiry is based on "the quality and quantity of evidence required by the governing law" and "the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant." *Id.*

### II.    Defendant Cruz Is Not Entitled To Qualified Immunity As A Matter Of Law

Qualified immunity insulates government officials from personal civil liability as long as "their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  After

the defendant contends that qualified immunity applies, the plaintiff must prove that the

defendant violated his rights, as protected by clearly established law.  *V-1 Oil Co. v. Wyoming*,

902 F.2d 1482 (10th Cir. 1990). Although the burden shifts to the plaintiff, the court must

continue to view the facts in the light most favorable to the non-moving party.  *Lundstrom v.*

*Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010).

When police officers are sued for using excessive force, the constitutionality of their

conduct under the Fourth Amendment is evaluated under the *Graham* analysis.  Under this

analysis, the inquiry is whether the officers' actions were objectively reasonable as judged from

the perspective of a reasonable officer on the scene, recognizing that officers are often forced to

make split-second decisions and should not be held to the exacting scrutiny of hindsight.

*Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  When making this determination, the Court

should only examine the information which was known to the officers at the time is examined in

making this determination.  *See Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008).

Under Graham, the court should assess the "nature and quality of the intrusion on the

individual's Fourth Amendment interests" and the "countervailing governmental interests at

stake."  *Graham*, 490 U.S. 396.  This is an inquiry which involves consideration of the specific

facts, including "the severity of the crime at issue, whether the suspect poses an immediate threat

to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

evade arrest by flight."  *Id.*

**A.  Dillon Was Seized, Thus Implicating The Fourth Amendment**

As the Tenth Circuit has observed,

> *The Fourth Amendment's guarantee that people shall "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" has been part of our Constitution since 1791. The Fourth Amendment reasonableness standard "is 'clearly established' in the context of § 1983 actions" involving claims of excessive force.... Indeed, "there is no doubt that Graham v. Connor ... clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."*

*Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir.2001) (citation omitted).

*See also id.* at 1192 ("The display of weapons, and the pointing of firearms at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk on injury to the officers and others, based upon what the officers know at that time."). Thus, Defendant Cruz's use of deadly force was a violation of Dillon's constitution rights, if Defendant Cruz's actions were unreasonable.

### B. Defendant Cruz's Own Testimony, Among Other Things Shows There Are Issues Of Fact As To Whether The Use Of Force Was Objectively Reasonable

In determining the reasonableness of Defendant Cruz's use of deadly force, the Court must consider the *Graham* factors. Each will be discussed in turn.

**The severity of the crime being committed.** The severity of the alleged crime here was, at most, a misdemeanor. The call involved someone possibly having a gun. The 9-1-1 dispatcher did not say "brandishing." It is undisputed that the call was dispatched as "no threats made", "no shots fired," and "no one in danger."[265]  Under Utah law, an individual may openly carry an unloaded weapon. UTAH CODE ANN. § 76-10-500(1). If a person carries a gun without

---

[265] Resp. to SOF, *supra*, ¶ 1.  *See also* Plf's Ex. 1, Cad Call Log; Ex. 2, Dispatch recording.

a concealed carry permit, the person may be guilty of a class A misdemeanor.  UTAH CODE ANN.

§ 76-10-504(2).

Nonetheless, even if the call was for a possible "brandishing," under UTAH CODE ANN. §

76-10-506, the crime of "brandishing" requires a weapon be displayed in a "threatening

manner."  UTAH CODE ANN. § 76-10-506(1)(b).  The potential penalty for a "brandishing" is also

a class A misdemeanor.  UTAH CODE ANN. § 76-10-506(2).  As noted, the call specifically stated

that there were "no threats made," "no shots fired," and that "no one [was] in danger."

While Defendant Cruz fabricated in his mind that the call involved a "brandishing,"

Officer Downes did not view the call as seriously.  In his deposition, Downes states, "… I don't

remember anything about threats being made."[266]

It also bears emphasis that the 9-1-1 caller was anonymous.  In *Florida v. J.L.*, 529 U.S.

266 (1999), the Supreme Court made clear that anonymous tips, standing alone, are to be given

little credence and should not be relied upon by police as grounds for undertaking actions with

Fourth Amendment implications. "Unlike a tip from a known informant whose reputation can be

assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams*

*v. Williams*, 407 U.S. 143, 146 (1972), 'an anonymous tip alone seldom demonstrates the

informant's basis of knowledge or veracity[.]'" *J.L.*, 529 U.S. at 270 (quoting *Alabama v. White*,

496 U.S. 325, 329 (1990)).  The *J.L.* Court unanimously held that an anonymous report that a

black male standing at a particular corner wearing a plaid shirt had a gun did not give police

reasonable suspicion to stop and frisk J.L., even though he was black, was standing at the

---

[266] Plf's Ex. 8. Downes Depo. 20:1-9.

reported place and was wearing a plaid shirt.  As the Fifth Circuit has remarked, "[t]he Supreme Court has evinced a strong distrust of anonymous tips." *United States v. Martinez*, 486 F.3d 855, 862 (5th Cir. 2007).  Crucially, Defendant Cruz knew that the 9-1-1 caller was uncooperative.[267] Therefore, with Defendant Cruz knowing that the caller was uncooperative and refused to identify themselves, and based upon clear Supreme Court precedent, Defendant Cruz relying upon an anonymous caller was objectively unreasonable.[268]

In sum, the call was not a call for a "brandishing"; the call had no indication that threats were made or any other suggestion of potential violence; Defendant Cruz failed to adequately read the call log prior to using deadly force; the caller was a not credible anonymous caller that failed to give her contact information and hung up; and Dillon was not armed.  Indeed, Officer Downes did not view the call as a serious call.  Thus, the severity of the crime militates toward Defendant Cruz's being unreasonable.

**The "threat" posed by Dillon.**  In *Cardall v. Thompson*, Judge Waddoups analyzed a scenario involving a suspect possibly having psychological issues and whether an officer was

---

[267] Plf's Ex. 3, Cruz Depo., at 72:22-25 (Q: "Do you remember whether you were told that the reporting witness was uncooperative, was not being uncooperative?"  A: "Yes. I remember that in the log.").
[268] The 9-1-1 call here makes *Thompson v. Hubbard*, 257 F.3d 896 (8th Cir. 2001) inapposite. There, the call was a "shots fired" call.  Here, the 9-1-1 relay specifically stated that there was no danger and no shots fired.  Moreover, while *Hubbard* does not contain much information about the circumstances of the call there, the facts here raise serious constitutional concerns regarding Defendant Cruz's reliance on an anonymous and suspect caller.

Likewise, Defendant Cruz's arguments regarding the reasonableness of "use of firearms in connection with an investigative or '*Terry*' stop is permissible where the officer ***reasonably believes*** that a weapon is necessary for protection" is wrong as Defendant Cruz's belief was not reasonable, in part, based upon the erroneous, faulty, and otherwise factually and constitutionally problematic anonymous 9-1-1 call.

reasonable in Tasing the suspect twice.  845 F.Supp.2d 1182, 1192 (D. Utah 2012).  Ultimately,

Judge Waddoups denied the motion for summary judgment based upon qualified immunity

because the determination was "heavily dependent on disputed facts."  *Id.*  As Judge Waddoups

explained:

> *If Brian suddenly charged at Officer Thompson in a violent manner, then he may*
> *have posed a threat to the police and there would be considerable justification for*
> *the tasing. If, on the other hand, Brian simply turned towards Thompson, or was*
> *taking a few steps in various directions as he had been since the officers arrived on*
> *the scene, then he was not a threat. Brian was a considerable distance from the*
> *road, and did not verbally threaten the police, himself, or his family. He was naked*
> *and clearly unarmed, and outnumbered by the officers on the scene, who*
> *significantly outweighed him and were about to be joined by additional backup. If*
> *the facts are viewed in the light most favorable to Anna's claim, then Brian did not*
> *pose a threat.*

*Id.*

The determination of what threat, if any, posed by Dillon is likewise heavily dependent

on disputed facts.  Defendant Cruz has maintained that Dillon had "defiance" in his eyes.  Yet

Defendant Cruz had his dark, department-issued Oakley sunglasses on.  Furthermore, Defendant

Cruz was staring in the direction of the sun as Dillon walked west at around 7:00 pm at night.

Moreover, whether Defendant Cruz even had enough time to get a good look at Dillon's eyes is

seriously in doubt.  The bodycam begins when Defendant Cruz is pulling up to the 7-Eleven.  As

the video shows, Dillon almost immediately turned around and began walking away from

Defendant Cruz.

While Defendant Cruz has claimed he saw the purported "defiance" in Dillon's eyes from

the outset, even if one considers the time between when Dillon turned around and Defendant

Cruz killed him, there was simply not enough time for Defendant Cruz to see the alleged

"defiance," let alone make a determination of what it meant.  That lapse of time was a mere four seconds.

What Dillon said during the encounter is also in dispute.  Officer Sylleloglou recounts in his declaration that Dillon said "'what are you going to do, mother-fucker, shoot me, mother-fucker, come on, shoot me.'"  But in his interview after the shooting, Officer Sylleloglou recounted that Dillon said: "'What are you going to do, shoot me?  What are you gonna do? You gonna shoot me? You gonna shoot me?'"[269]  Moreover, this statement is not on the bodycam video.  Likewise, Defendant Cruz apparently did not hear this statement.  Defendant Cruz only heard Dillon say "what, fool" or "nah, fool," which is the only audible statement heard on the bodycam made by Dillon.[270]

On the other hand, Adam and Jerrail have said they heard something entirely different. Jerrail believed that his brother essentially said: "'Ah shit,' you know what I'm saying? Like, 'What the fuck did we do?' So he was, 'alright, y'all, fuck this.' He put his headphones in, walked away, the next thing you know the cop was all, 'Hey, stop, stop.' But he's got his headphones in, he can't hear him."[271]  And Adam is uncertain what Dillon said, if anything.[272]

Importantly, Defendant Cruz's testimony as to what led him to believe Dillon posed a threat has changed over time.  In his initial interview, Defendant Cruz claimed that when Adam and Jerrail raised their hands, that made him scared because, according to Defendant Cruz,

---

[269] Plf's Ex. 7, Sylleloglou Interview, (Second video) starting at 6:00:00.
[270] Plf's Ex. 5, Cruz body cam.
[271] *Id.* at 11:03:55 - 11:04:34.
[272] Docket 44-3 (Hermansen Decl.), Adam Thayne Interview at 11:47:55).

suspects only do that when they have a weapon.[273]  On the other hand, Adam and Jerrail raising their hands was not "unusual" to Downes, and something that happens quite a bit.[274]

Likewise, Defendant Cruz initially had a heightened sense of concern when Officer Cruz went around to the back of 7-Eleven, noting that he had no idea why Officer Downes would do so.[275]  In his declaration filed in support of his Motion for Summary Judgment, Defendant Cruz explained that Officer Downes going around back was "in case the three males ran away in that direction."[276]  Then, during his deposition, Defendant Cruz stated, "I – I don't remember hearing Downes express that he would go around back."[277]  When asked how he felt when Downes' drove to the back, Cruz stated, "It didn't make me feel – at the time, I don't know what it made me feel anything.  I was focused on the suspects in front of me"[278]; "I would not say it worried me; not at the time."[279]

Even at the moment that Defendant Cruz shot Dillon, there are questions of fact as to whether Dillon posed a threat.  On the one hand, Defendant Cruz immediately pulled the trigger – twice – when Dillon complied with Defendant Cruz's commands and showed his hands.  On the other hand, even with his gun pulled and finger on the trigger, Officer Sylleloglou waited to determine whether Dillon did, in fact, have anything in his waistband.[280]  While Officer Sylleloglou has stated that he may have shot or it was possible that he would have shot, his

---

[273] Plf's Ex. 4, Cruz Interview, SLCC 001370.
[274] Plf's Ex. 8, Downes Depo. 39:21-25; 40:1-13.
[275] Plf's Ex. 4, Cruz Interview, SLCC 001369.
[276] Docket 44-2 (Cruz Decl.), Ex. 2, at ¶ 11.
[277] Plf's Ex. 3, Cruz Depo., at 36: 19-20.
[278] *Id.* at 39:20-23.
[279] *Id.* at 40:4-5.
[280] Plfs' Ex. 10, Sylleloglou body cam video, beginning at 3:09.

actions at the time belie his testimony: he was waiting to see if Dillon had anything in his waistband.  And, because Officer Sylleloglou did not fire, there was time to make that determination.  Whether Officer Sylleloglou would have fired or whether he was, in fact, waiting and did not see Dillon as an immediate threat is an issue for the jury to determine.

The fact that Officer Sylleloglou did not fire, and in fact waited to assess whether Dillon did, in fact, have anything in his waistband and that the only command heard was "show me your hands", makes all of Defendant Cruz's cases involving guns inapposite.  For example, in *Salazar-Limon v. City of Houston*, 97 F.Supp.3d 898 (S.D. Tex. 2015), there was only one officer and he said "stop and ***once ordered him to show his hands***." *Id.* at 907 (emphasis added).  *See also Lamont v. New Jersey*, 637 F.3d 177, 183 (3rd Cir. 2011) (commands included "freeze", which did not occur here); *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379 (5th Cir. 2009) (involving only one officer and a threat by the suspect that he was going to kill someone.) Indeed, *Salazar* involved a situation where the officer and suspect had already fought, with the victim walking away.  *Salazar-Limon*, 97 F.Supp.3d at 905.  There was no prior altercation here. Likewise, in *Pollard v. City of Columbus, Ohio*, 780 F.3d 395 (6th Cir. 2015), the suspect did not simply show his hands, as Dillon did.  Rather, the suspect "extended his arms and clasped his hands into a shooting posture, pointed at the officers." *Id.* at 400.  *See also McDonald v. City of Tacoma*, No. 11-cv-5774-RBL, 2013 WL 1345349, at *4 (W.D. Wash. Apr. 2, 2013), *aff'd*, 578 Fed. App'x 686 (9th Cir. Apr. 2, 2013) (as Defendant Cruz acknowledges in his Motion for Summary Judgment, in *McDonald:* "suspect extended his hands in front of his body in what appeared to be a shooting stance").  In sum, these cases all turn on their particular facts.  And

the particular facts here are well in dispute, and therefore should not be determined as a matter of law.

On the other hand, *Dorato v. Smith*, 108 F.Supp.3d 1064 (D.N.M. 2015) is instructive.[281] There, in a rather lengthy, detailed opinion, the defendant argued that the suspect had "a black object in his right hand in a manner that he described as 'gangster style.'" *Dorato*, 108 F.Supp.3d at 1148.  There, like here, it was undisputed that the suspect was unarmed.  In denying defendant's motion for summary judgment on qualified immunity, *Dorato* court addressed several cases where "courts have granted summary judgment in excessive force cases when officers shoot suspects who have unidentified objects in their hands." *Id.* at 1150-51. The *Dorato* court distinguished those cases "because the officers could not have known what the suspects were holding in their hands [as] [m]any cases concern situations that involve low lighting and decreased visibility." *Id.* at 1151.  Included within the cases distinguished by the *Dorato* court are Defendant Cruz's cases, including *Teague*, *Thompson*, *McDonald*, *Carnaby*, and *Hudspeth*. *Id.*

In short, *Dorato* stands for, among other things, the simple proposition that case such as this are highly fact intensive.  And, as the *Dorato* court persuasively explains, the cases relied upon by Defendant Cruz are simply inapposite.  *Dorato*, however, is factually on point.  There, like here, the shooting took place "in the middle of the afternoon, in an open parking lot." *Id.* at 1152.  On that basis, the court concluded that "[a] reasonable jury could conclude that a

---

[281] *Dorato* distinguishes *Teague v. Gallegos*, No. 06-cv-02005-REB-CBS, 2007 WL 3232082 (D. Colo. Oct. 30, 2017) (relied upon by Defendant Cruz) as the shooting in *Teague* occurred at 10:40 pm.  Thus, the circumstances of the shooting, including time of day and surroundings, is relevant.

reasonable officer should have had sufficient light to see what the object was in Tillison's hand."

*Id.*  As Defendant Cruz has testified, he had sufficient visibility to see "defiance" in Dillon's eyes

from at least ten feet if not a longer distance.  Moreover, Officer Sylleloglou did not shoot

because he had sufficient time to determine whether Dillon had a gun, and arguably sufficient

doubt as to whether Dillon posed any kind of threat at all.[282]  Thus, the situation here is "not a

case where the officers ***clearly*** saw that the suspect had a weapon."  *Figueroa*, 207 F.Supp.2d at

1093 (citing *Wilson*, 160 F.Supp.2d at 1042) (emphasis in original).

Finally, Defendant Cruz's actions in pursuing Dillon, rather than taking cover or creating

distant, only exacerbated the issue.  The bodycam video shows that rather than maintaining

distance, Defendant Cruz was actively trying to close the distance between him and Dillon.  As

Defendant Cruz explained in his initial interview:

---

[282] While Defendant Cruz provides a string cite of cases granting or affirming qualified
immunity, a myriad of other cases, along with *Dorato*, have rejected qualified immunity under
similar circumstances to those here.  *See, e.g., Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th
Cir. 2008) (even with a prior report of a gun, firing weapon was not justified); *Perez v.
Suszczynski*, 809 F.3d 1213, 1219 (11th Cir. 2016) (noting that although officer "believed deadly
force was warranted under the circumstances" the officer's "argument misunderst[ood] the
relevant standard" which is an objective standard); *Figueroa v. Gates*, 207 F.Supp.2d 1085, 1092
(C.D. Cal. 2002) (denying qualified immunity when, although on call of armed robbery suspects
and hands concealed in waistbands, officers never saw gun); *Harris v. Roderick*, 126 F.3d 1189,
1203 (9th Cir.1997) (finding that shooting the plaintiff was not objectively reasonable where he
had "made no aggressive move of any kind"); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325
(9th Cir.1991) (finding that the defendants were not entitled to qualified immunity where, in one
witness' version of the shooting, "Curnow did not point the gun at the officers and apparently
was not facing them when they shot him the first time"); *Wilson v. City of Des Moines*, 160
F.Supp.2d 1038, 1040 (S.D. Iowa 2001) (finding that the defendants were not entitled to
qualified immunity where they shot an unarmed man running across the field because "they
thought they saw a firearm").

> *Um, and it scared me even more that he wasn't running away. He was buying time.*
> *He was buying time and he was creating distance. That's all he was doing. Very*
> *calmly walked away. With his hands right in his waist band.[283]*

Thus, Defendant Cruz's actions in the video, including him actively pursuing Dillon, was to inexplicably decrease the distance between himself and Dillon.

Defendant Cruz tacitly acknowledges his mistake in pursuing Dillon, essentially admitting that doing so was unreasonable. During his deposition, however, Defendant Cruz stated that closing the distance would not "make any sense."[284] Indeed, when asked whether he was trying to close the distance: "No. I was maintaining distance at that – yeah, I was not trying to close on somebody that I believed had a gun."[285] Put simply, Defendant Cruz's most recent testimony directly contradicts Defendant Cruz's actions as evidenced by the bodycam video.

Defendant Cruz relies upon *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2009) in regards to the analysis required for assessing the threat posed by the decedent. Based upon the facts detailed above, each of those factors are, at best, in dispute. The only command made on the bodycam is "show me your hands," and Dillon complied. No other commands are heard on the bodycam. As Dillon was unarmed, there were no hostile motions made towards the officers. As to the distance, Dillon was moving away from Defendant Cruz, and Defendant Cruz was inexplicably trying to close the distance. And, finally, Dillon's manifest intentions are in dispute. The video shows that Dillon was complying with Defendant Cruz's commands to "show me your hands." Based upon the varied stories from Defendant Cruz

---

[283] Plfs' Ex. 4, Cruz Interview, SLCC 001370; Docket 44-3 (Hermansen Decl.), Ex. B, 7-Eleven video; Docket 44-8 (Defs' Exs.), 7-Eleven video stills.
[284] *Id.*
[285] Plfs' Ex. 3, Cruz Depo. 55:8-13.

and Officer Sylleloglou's testimony that Dillon's death warrant was signed regardless what he did, *Estate of Larsen* dictates that the Court should deny Defendant Cruz's motion.  *See also Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (where the material facts are not in dispute, the objective legal reasonableness of the officer's use of force is a question of law).

**Actively resisting arrest.**  Whether Dillon was "actively resisting arrest" is clearly in dispute.  First, there is serious doubt as to whether Dillon even heard the initial commands. Defendant Cruz has claimed that he did not see Dillon's white earbuds at any point during the incident.[286]  Defendant Cruz's claim, however, is in stark contrast to the record.  The white earbuds can be seen in Defendant Cruz's bodycam juxtaposed to Dillon's red blood on the dark pavement.[287]  Indeed, not only did Defendant Cruz see the earbuds, Defendant Cruz **unplugged the earbuds and set or threw them to the side of Dillon's body**.[288]  In fact, it appears that Defendant Cruz specifically positioned himself over Dillon's body in a way to obscure the view of his bodycam as to attempt to not have the bodycam **not capture Defendant Cruz unplugging the earbuds**.  While Defendant Cruz may try to claim that he was under stress and simply did not remember, Defendant Cruz has never corrected his false claim, and has failed to correct the false claim under oath during his deposition.

Second, there are questions as to what commands Dillon heard.  Defendant Cruz and Sylleloglou claim that they said "stop" at some point to Dillon.  This command, however, cannot

---

[286] Plfs' Ex. 4, Cruz Interview, SLCC 001379.
[287] Plfs' Ex. 5, Cruz body cam.
[288] Plf's Ex. 5, Cruz body cam.

be heard on the bodycam.  The only command heard on the bodycam is some derivation of "show me your hands."  For most of the time on the bodycam, Dillon was slowly walking away from Defendant Cruz.  When Dillon turned around, Defendant Cruz repeated "show me your hands."  In the four seconds that elapsed between Dillon turning around and Defendant Cruz shooting him, Dillon took only a few steps while Defendant Cruz repeated "show me your hands."  Complying with Defendant Cruz's demands, Dillon showed his hands Defendant Cruz. And Dillon's compliance with the very command given by Defendant Cruz resulted in Dillon dying.

Third, even Defendant Cruz acknowledges that Dillon was not "actively resisting arrest." As Defendant Cruz explained in his initial interview:

> *Um, and it scared me even more that he wasn't running away. He was buying time. He was buying time and he was creating distance. That's all he was doing. Very calmly walked away. With his hands right in his waist band.[289]*

In other words, regardless of what Dillon did, Dillon's actions would have been suggestive of a criminally threatening act.  If Dillon would have run, then he would have been clearly "actively resisting arrest."  But when Dillon was slowly walking, Defendant Cruz interpreted Dillon's actions as threatening.

The overall issue of reasonableness is further complicated by Officer Sylleloglou's testimony.  When asked if Dillon had move his hands slower, would Officer Sylleloglou still state that he would have fired.  Officer Sylleloglou responded:

> *The problem is we're not shooting just because he's doing one single thing.  Like you said, the totality of the circumstances dictates.  So it's hard for me to day, well,*

---

[289] Plfs' Ex. 4, Cruz Interview, SLCC 001370; Docket 44-3 (Hermansen Decl.), Ex. B, 7-Eleven video; Docket 44-8 (Defs' Exs.), 7-Eleven video stills.

> *yeah, I would have then or, no, I would not have then because you're talking about one variable when there's a lot of variables involved in shooting.*
>
> *You're asking if he would moved his hands like slower in the drawing motion or slower like this or – I mean, I don't know.  I can't tell you because that is not what happened.[290]*

In other words, when Dillon turned around, his death warrant was already signed.  There was nothing that Dillon could have done at that time, based upon Defendant Cruz and Officer Sylleloglou's testimony, to save his life.  Whether that is a reasonable position is for the jury to determine.

## C.  <u>Officer Sylleloglou Was The Objectively Reasonable Officer</u>

The *Graham* standard requires the Court to analyze Defendant Cruz's use of deadly force from "the perspective of a reasonable officer on the scene, recognizing that officers are often forced to make split-second decisions and should not be held to the exacting scrutiny of hindsight."  *Graham*, 490 U.S. at 396–97.  The Court need not venture guesses or hypothesize what a reasonable officer on the scene would do, including what split-second decision such reasonable officer would make, as there was such a reasonable officer on the scene here.  And that officer did not use deadly force.

Officer Sylleloglou did not shoot Dillon.  Indeed, Officer Sylleloglou did not fire his service revolver, even though he had it drawn, trained on Dillon, and his finger on the trigger.  Leading up to Defendant Cruz shooting Dillon to death, Officer Sylleloglou was listening to Defendant Cruz make the repeated command "show me your hands" or something similar.  When Dillon pulled his hands up to show Defendant Cruz that he did not have a weapon – and

---

[290] Plf's Ex. 7, Sylleloglou Depo., at 60:8-18.

-85-

was in fact entirely unarmed – Officer Sylleloglou was focusing on Dillon's waistband.  As

Officer Sylleloglou stated on his bodycam, showing he was focused on Dillon's waistband:  "we

didn't see it."  In other words, Officer Sylleloglou was keenly focused on Dillon's waistband to

determine whether Dillon actually posed a threat.  And Officer Sylleloglou had enough time to

watch Dillon pull his hands up to determine whether Dillon posed a threat; when Officer

Sylleloglou determined Dillon did not pose a threat, he did not pull the trigger.

Officer Sylleloglou and Defendant Cruz stand in direct juxtaposition to each other.  On

the one hand, Defendant Cruz has recounted that he was petrified from the outset of the call until

he pulled the trigger.  Later, he detailed the call as being rather a normal call involving a gun.

While Defendant Cruz's testimony has varied over time, either story can be compared to the

actual events that occurred vis-à-vis Officer Sylleloglou.  And Defendant Cruz's changing story

can also be compared to Officer Sylleloglou's contemporaneous statements at the scene along

with his interview thereafter and his deposition.  When Defendant Cruz's varied stories are

compared to Officer Sylleloglou's testimony and evidence, there are serious questions as to not

only Defendant Cruz's veracity and perception (including his apparent lie about never seeing the

earbuds), but more importantly the claimed objective reasonableness of Defendant Cruz's use of

deadly force.  Put simply, Officer Sylleloglou acted reasonably, was ready to shoot, but did not

pull the trigger.  Whether Defendant Cruz acted reasonably must be determined by a jury that has

had the opportunity to hear all of Defendant Cruz's characterizations of his actions, including his

changing story, along with Officer Sylleloglou's actions and testimony.[291]

---

[291] Importantly, the jury must decide, based upon the actions as contained on the bodycam
footage, whether Officer Sylleloglou was the reasonable officer vis-à-vis.  While Plaintiffs

-86-

### D. **Dillon's Constitutional Right Was Clearly Established**

"The determination of whether a right was clearly established within a sufficiently analogous factual setting must be made within the specific context of the case, not as a broad general proposition." *Rossiter v. Robinson*, 716 F.Supp.2d 1018, 1022 (D. Colo. 2010) (citations omitted). "'Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Id.* at 1023 (citation omitted). "This does not mean the prior case law must have precisely the same facts, however, but rather requires a particularized inquiry to determine whether the contours of the right were sufficiently defined by prior case law such that 'a reasonable official would understand what he is doing violates that right.'" *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Id.* (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir.2004)).

It is undisputed that Dillon was unarmed.[292]  Defendant Cruz immediately approached Dillon's bloodied body after Defendant Cruz shot him, searching Dillon's body to find a gun. And there was none.  Therefore, the question here is whether Dillon walking backwards away from the officers and then complying with Defendant Cruz's repeated commands to "show me

---

submit that Officer Sylleloglou was the objectively reasonable officer at the time of the shooting, Plaintiffs' are not stipulating that all of Officer Sylleloglou's statements since then are valid or correct.  Indeed, as Officer Sylleloglou has testified, the events and testimony in closer proximity to the shooting are more accurate than his recounting months and years after.
[292] SOF ¶ 50, *supra*.

your hands" was sufficient to form a reasonable belief in Defendant Cruz's mind that Dillon

posed a serious, lethal threat to Defendant Cruz or someone else.  In *Murphy v. Bitsoih*, 320

F.Supp.2d 1174, 1193 (D.N.M. 2004), the District of New Mexico provided a line of cases,

summarizing that in those cases "the suspect were either immediately upon, or one to two feet

from, the officers, and the suspects actively lunged toward, swung at, or struck the officers."

*Murphy,* 320 F.Supp.2d at 1193.[293]  While *Murphy* involved a knife, the same analysis applies.

There are questions of fact regarding whether Dillon's actions were sufficient to make Defendant

Cruz reasonably believe that his life or another's life was in danger.

And the facts on this point are in no way clear.  In Defendant Cruz's initial interview, he

explained that from the outset of the call, he feared for his life.  He believed that he was

essentially going to his death when he took the call.  Then, in his deposition, his story markedly

changed.  Defendant Cruz then, trying to appear as a reasonable officer, explained that there was

no one specific moment when he was scared.

---

[293] *Citing Romero v. Board of County Comm'rs*, 60 F.3d 702, 704 (10th Cir. 1995) (suspect
punched officer in the nose, ran a knife across the officer's stomach, with knife in hand pursued
the officer as he retreated, and continued toward the officer even after being fired upon once),
*cert. denied*, 516 U.S. 1073 (1996); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th
Cir. 1996) (suspect armed with a knife suddenly swung with knife in hand at an officer who was
standing immediately behind the suspect), *overruled in part on other grounds by Acri v. Varian
Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997); *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d
691, 693, 694 (1st Cir. 1994) (suspect armed with a steak knife in each hand lunged at officers
standing two feet away); *O'Neal v. DeKalb County*, 850 F.2d 653, 655, 657–58 (11th Cir. 1988)
(extremely dangerous suspect had just stabbed and seriously injured several people and charged
with a knife over his head toward officers standing six feet away); *Wood v. City of Lakeland*, 203
F.3d 1288, 1292–93 (11th Cir. 2000) (suicidal suspect armed with a box cutter shouting
profanity directly at officers, while seated on top of a dresser, slid off the dresser "real quick"
with forward momentum toward an officer who was six to eight feet away).

Likewise, Officer Sylleloglou never fired.  As Plaintiffs will argue at trial, Officer
Sylleloglou, a trained and reasonable officer, was listening to Defendant Cruz's repeated
commands to Dillon to "show me your hands."  When Dillon raised his hands and lifted his shirt,
Officer Sylleloglou looked to see whether there was any gun present.  When Officer Sylleloglou
determined that there was no gun, he did not pull the trigger.[294]

Put simply, in order to determine whether Defendant Cruz violated Dillon's clearly
established constitutional right of Dillon's, the jury must determine whether Defendant Cruz's
belief that Dillon posed a lethal threat is reasonable and believable.  This is because, "[i]t … is
well-settled and long-standing principle that the use of deadly force on an unarmed and
unthreatening suspect constitutes unreasonable excessive force under the Fourth Amendment."
*Murphy*, 320 F.Supp.2d at 1193 (citing *Saucier v. Katz*, 533 U.S. 194, 208 (2001) *receded on
other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).

Likewise, "[c]learly established law in this Circuit … holds that an officer is responsible
for his … reckless conduct that precipitates the need to use force."  *Murphy*, 320 F.Supp.2d at
1193.  In making this statement, the New Mexico District Court relied upon *Allen v. Muskogee*,
119 F.3d 837 (10th Cir. 1997).  There, "the Tenth Circuit denied summary judgment to officers
using deadly force against a suicidal suspect who point a gun at two officers."  *Murphy*, 320
F.Supp.2d at 1193 (citing *Allen*, 119 F.3d at 841).  "The Tenth Circuit held that a reasonable jury
could have found that the officers' conduct in approaching the suspect was objectively

[294] Plf's Ex. 10, Sylleloglou body cam video beginning at 3:09.

-89-

unreasonable, reckless, and could have precipitated the need to use deadly force." *Id.* (citing *Allen*, 119 F.3d at 841).

As discussed above, Defendant Cruz actively pursued Dillon as shown by the bodycam footage.  Then, during his deposition, Defendant Cruz ostensibly contradicted his actions by saying that actively pursuing Dillon would "not make any sense."[295]  Thus, a jury must determine whether Defendant Cruz acted reasonably in pursuing Dillon, especially considering that even before pulling into 7-Eleven, Defendant Cruz believed that his life was in danger.

## CONCLUSION

The importance of having juries make factual findings, especially in cases involving constitutional rights, cannot be understated.  "This practice furthers the perception of justice that our society has of the judicial system." *Dorato*, 108 F.Supp.3d at 1154.  Indeed, "society is not well served if an unelected judge makes the final determination behind closed doors." *Id.* "Allowing a single judge to resolve factual questions that are best answered by a jury undermines the appearance of justice, which is often "as important as dispensing justice." *Martin v. City of Albuquerque*, 147 F.Supp.3d 1298, 1334 (D.N.M. 2015) (citing *United States v. Rodella*, No. CR 14-2783 JB, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)). "Particularly now, when scenes of violence flood the news, courts should be reluctant to resolve factual issues.  When a police offer seriously injures an unarmed person, and there is a factual question …, 'society's faith in the justice system is undermined when an unelected judge declares – a s matter of law – that no reasonable jury could find'" that constitutional rights were

---

[295] *Id.*

violated.  *Id.* (citing *Dorato*, 108 F.Supp.3d at 1154).  "For these factual issues, the question should be presented – in open court – to a panel of jurors, ordinary citizens who can make the important factual determination."  *Id.* (citing *Dorato*, 108 F.Supp.3d at 1154).

Defendant Cruz has testified that everything that happened added to the reasonableness of his actions.  As to that claimed objective reasonableness, the facts here are in dispute.  For example, among other disputes:

1) *Cruz heard the call as a "brandishing"; Officers Downes and Sylleloglou did not;*

2) *Cruz saw a "disturbance" at the light between Dillon and the driver of a stopped vehicle; another officer described the same encounter as a "high five";*

3) *Cruz approached with his lights on; Officers Downes and Sylleloglou did not;*

4) *Cruz could not understand why Officer Downes would leave him and drive to the back of the 7-Eleven; Officers Downes and Sylleloglou viewed it as standard procedure[296];*

5) *It "scared the crap out of [Cruz]" when Adam and Jerrail raised their hands; Officer Downes said it was normal;*

6) *Cruz saw a "defiant," look of "hate," in Dillon's eyes unlike any he had seen before that expressed "come and get me, I'm gonna fricken kill you"; but then describes the time in which he saw such a detailed description as a "split second;"*

7) *Cruz quickly closed the distance between himself and Dillon; but then said later that doing so "would make absolutely no sense;"*

8) *Cruz claimed under oath that he did not see Dillon's earbuds even when he knelt next to Dillon's body; but the video shows Cruz put on his gloves before unplugging the earbuds from the phone he found in Dillon's pocket, and tossing the cord next to Dillon's body; and*

---

[296] Which, in his deposition, Defendant Cruz agreed with, thereby changing his story again.

9) *Cruz repeatedly commanded "show me your hands," and when Dillon did, "without any hesitation,""without any reservation at all," Cruz fired and would have kept firing until Dillon was dead; but Officer Sylleloglou did not.*

Defendant Cruz has already given varied testimony as to what he perceived and the purported justifications of his actions.  Moreover, this case presents the incredible circumstance where one officer filed two kills shots while another officer, with his finger on the trigger, refused to shoot.  Whether Defendant Cruz reasonably feared for his life or the life of another is clearly in dispute.  The gravity of this case, involving the death of Dillon Taylor, should not be resolved on the papers submitted by the parties.  A jury needs to hear Defendant Cruz's testimony, watch the bodycam, and render the crucial and important decision as to his reasonableness in pulling the trigger.  The Motion for Summary Judgment should be denied.


RESPECTFULLY SUBMITTED this 22nd day of May, 2017


THE SALT LAKE LAWYERS

*/s/* Robert B. Cummings
Robert B. Cummings


GERAGOS & GERAGOS, APC

Mark Geragos
Ben Meiselas


KELLY FOWLER, ATTORNEY AT LAW

Kelly A. Fowler

*Attorneys for Plaintiffs*

-92-

**<u>CERTIFICATE OF SERVICE</u>**

I certify that the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT PURSUANT TO FRCP 56(a)** was served on the

following individuals by the Court's CM/ECF electronic notification system:

      Catherine L. Brabson, Esq.
      John Delaney, Esq.
      Mark E. Kittrell, Esq.
      Salt Lake City Attorney's Office
      451 S. State St., Rm 505a
      Salt Lake City, Utah 84114
      E: [Catherine.Brabson@slcgov.com](mailto:Catherine.Brabson@slcgov.com)


DATED this 22nd day of May, 2017.

                        THE SALT LAKE LAWYERS

                        */s/* Robert B. Cummings
                        Robert B. Cummings
                        *Attorneys for Plaintiffs*