IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE ESTATE OF DILLON TAYLOR, CODY TAYLOR, JERRAIL TAYLOR, TEESHA TAYLOR, and ADAM THAYNE, <br><br> Plaintiffs, <br><br> v. <br><br> SALT LAKE CITY, CITY OF SOUTH SALT LAKE, SALT LAKE COUNTY, BRON CRUZ, ANDREW SYLLELOGLOU; UPPSEN DOWNES, CHRIS KOTRODIMOS, JAMES SPANGENBERG, CHIEF MIKE BROWN, VAUGHN DELAHUNTY, CRAIG HICKEN, CHASE HERMANSEN, JOE SUTERA, CHIEF JACK CARRUTH, and JOHN and JANE DOES 1-35, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** <br><br><br><br><br><br> Case No. 2:15-cv-00769-DN-BCW <br><br> District Judge David Nuffer |

This case arises from a police encounter with Dillon Taylor ("Mr. Taylor"), Jerrail Taylor ("Jerrail"), and Adam Thayne ("Adam") on August 11, 2014.[1] The encounter resulted in the shooting death of Mr. Taylor and the detention of Jerrail and Adam.[2]

These events are a tragedy to everyone involved and to the community. The resulting impact undoubtedly remains deeply felt and weighs heavy on the hearts and minds of the parties and their families now several years later. On a broader scale, this case presents important issues to the community as a whole. The qualified immunity doctrine can lead to results that some may

---

[1] Complaint for Damages (Violation of Civil Rights) ("Complaint") ¶¶ 1-4, 10, docket no. 2, filed Oct. 28, 2015.

[2] *Id*. ¶¶ 1-4, 10, 36-37, 41-42, 53-54, 65.

view as harsh or unjust, regardless of the outcome. But the law necessitates the doctrine's application to the facts of this case. There is no way to reset or change the past. Yet being mindful of the past can guide future decisions and conduct to avoid similar unfortunate consequences.

Plaintiffs' Complaint asserts several claims for violation of civil rights and wrongful death against multiple government entities and law enforcement officers.[3] Through a series of stipulations,[4] the only remaining claims are Plaintiffs' first cause of action against Officer Bron Cruz for use of excessive force[5] and Plaintiffs' fourth cause of action against Salt Lake City for deliberate indifference in its policies, training, and investigation relating to Officer Cruz's conduct.[6] Officer Cruz and Salt Lake City seek summary judgment on these claims, arguing that Officer Cruz is entitled to qualified immunity, and that Salt Lake City cannot be held liable because Officer Cruz's conduct did not violate a statutory or constitutional right.[7] Plaintiffs argue that genuine issues of material fact preclude summary judgment.[8]

Because the undisputed material facts demonstrate that Officer Cruz's use of deadly force in the August 11, 2014 encounter with Mr. Taylor was objectively reasonable under the circumstances, Officer Cruz did not violate a statutory or constitutional right and is entitled to qualified immunity as a matter of law. And because Officer Cruz's conduct did not violate a

---

[3] *Id*. ¶¶ 105-170.

[4] Order Granting Stipulated Motion to Dismiss Certain Claims and Certain Defendants, docket no. 33, filed Apr. 28, 2016; Order Granting Stipulated Motion to Dismiss Defendants Andrew Sylleloglou, Uppsen Downes and Chief Mike Brown With Prejudice, docket no. 51, filed Feb. 10, 2017; Order Granting Stipulated Motion to Dismiss Certain Claims, docket no. 61, filed Aug. 7, 2017.

[5] Complaint ¶¶ 105-113.

[6] *Id*. ¶¶ 129-137.

[7] Motion for Summary Judgment and Memorandum in Support ("Motion for Summary Judgement") at 21-34, 39, docket no. 44, filed Nov. 28, 2016.

[8] Plaintiffs' Opposition to Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(a) ("Response") at 71-90, docket no. 54, filed May 22, 2017.

statutory or constitutional right, Salt Lake City cannot, as a matter of law, be held liable for

Officer Cruz's conduct. Therefore, the Motion for Summary Judgment[9] is GRANTED.

## Contents

EVIDENTIARY ISSUE ............................................................................................ 4
UNDISPUTED FACTS ........................................................................................... 5
STANDARD OF REVIEW ..................................................................................... 30
DISCUSSION ........................................................................................................ 31
 Officer Cruz is entitled to qualified immunity on Plaintiffs' excessive force claim because his use of deadly force in the August 11, 2014 encounter with Mr. Taylor did not violate a statutory or constitutional right ............................................................. 31
 Officer Cruz's use of deadly force was objectively reasonable in light of the dispatch report of a man with a gun and the unknown motivations of the suspects ........................................................................................................... 33
 Officer Cruz's use of deadly force was objectively reasonable in light of the potential threat of serious physical harm posed by Mr. Taylor ............... 37
  *Mr. Taylor refused to comply with the officers' repeated commands that he stop and show his hands*.......................................................... 38
  *Mr. Taylor made a sudden and hostile "draw stroke motion" with his hands while refusing to comply with the officers' commands, and while directly facing Officer Cruz*................................................ 41
  *Mr. Taylor and Officers Cruz and Sylleloglou were in close proximity during the encounter* ................................................................... 47
  *Mr. Taylor manifested hostile and defiant intentions in relation to the officers*.......................................................................................... 48
  *Conclusion: Mr. Taylor posed a potential threat of serious physical harm to the officers or others* .............................................................. 49
 Officer Cruz's use of deadly force was objectively reasonable in light of Mr. Taylor's attempts to resist or evade arrest ................................................ 50
 Officer Cruz's use of deadly force was objectively reasonable under the totality of the circumstances ................................................................................. 51
 Salt Lake City cannot be held liable on Plaintiffs' municipal liability claim relating to Officer Cruz's conduct ........................................................................... 54
ORDER .................................................................................................................. 55

[9] Docket no. 44, filed Nov. 28, 2016.

# EVIDENTIARY ISSUE

As a preliminary matter, Plaintiffs object to the admissibility of statements made by Jerrail and Adam while they were detained and interviewed by law enforcement officers on August 11, 2014.[10] Plaintiffs argue that because the statements were obtained in violation of Jerrail and Adam's Fourth Amendment right against unreasonable searches and seizures, the statements are inadmissible.[11]

"Although the Tenth Circuit has not weighed in on this precise issue, 'federal courts of appeals have widely held that the exclusionary rule does not apply in § 1983 cases.'"[12] These "[c]ourts have been reluctant to extend the exclusionary rule beyond the criminal context because its purpose is to deter police misconduct and safeguard Fourth Amendment rights, rather than serve as [a] personal constitutional right of those aggrieved."[13] "Application of the exclusionary rule in the civil context [also] comes at a significant cost: 'officers could be forced to pay damages based on an overly truncated version of the evidence.'"[14] Indeed, "[r]ecognizing these substantial costs, the U.S. Supreme Court has 'repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials.'"[15]

These authorities are persuasive. Moreover, Plaintiffs repeatedly rely on Jerrail and Adam's statements to officers in support of their arguments and in attempting to establish

---

[10] Response ¶18 at 19-20, ¶¶ 20-23 at 20-22, ¶¶ 41-42 at 37, ¶ 55-56 at 43-44, ¶ 59-60 at 44-46.

[11] *Id*.

[12] *Wolfe v. Gray*, Case No. 13-CV-286-JED-JFJ, 2018 WL 4964364, *5 (N.D. Okla. Oct. 15, 2018) (quoting *Lingo v. City of Salem*, 832 F.3d 953, 959 (9th Cir. 2016)); *see also Vaughn v. Chapman*, 662 Fed. App'x 464, 467 (7th Cir. 2016); *Black v. Wigington*, 811 F.3d 1259, 1268 (11th Cir. 2016); *Machado v. Weare Police Dep't*, 494 Fed. App'x 102, 106 (1st Cir. 2012); *Townes v. City of New York*, 176 F.3d 138, 149 (2d Cir. 1999); *Wren v. Towe*, 130 F.3d 1154 (5th Cir. 1997).

[13] *Howl v. Alvarado*, Case No. 2:17-cv-00380-PJK-SMV, 2017 WL 4142588, *2.

[14] *Id*. (quoting *Black*, 811 F.3d at 1268).

[15] *Wolfe*, 2018 WL 4964364, *6 (quoting *Pennsylvania Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 363 (1998)).

genuine issues of material fact.[16] It would be improper to invoke the exclusionary rule to shield statements that Plaintiffs believe are unfavorable, while disregarding the rule for statements that Plaintiffs believe favorable. The exclusionary rule will not apply to the statements made by Jerrail and Adam while they were detained and interviewed by law enforcement officers on August 11, 2014. The statements are admissible.

## UNDISPUTED FACTS[17]

1.     At approximately 7:00 p.m. on August 11, 2014, a 911 call was dispatched to Salt Lake City police officers by radio as a "report of a man with a gun" at 1900 South 200 East; "suspect flashed a gun at the complainant but no threat was made;" "male Hispanic wearing white shirt, red pants, red baseball cap; also another male Hispanic wearing a striped shirt; they were last seen southbound on 200 East."[18]

2.     The dispatcher also informed officers that no shots had been fired; no one was in danger; the complainant was not cooperative and hung up on the call taker; and the complainant refused to provide her identifying information.[19]

3.     The dispatcher asked officers if there was "any unit coming clear to handle a check?"[20]

---

[16] Response at 5-70.

[17] The following Undisputed Facts are taken from the parties briefing on the Motion for Summary Judgment. Motion for Summary Judgment ¶¶ 1-62 at 5-16; Response ¶¶ 1-100 at 49-70. Those facts, or portions thereof, identified in the parties' briefing that do not appear in these Undisputed Facts are either disputed; not supported by the cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument. Additionally, these Undisputed Facts contain facts that are not material, but nevertheless provide a more complete background of the events and circumstances and give context to the parties' arguments.

[18] Motion for Summary Judgment ¶ 1 at 5-6 (citing Dispatch Recording, docket no. 55, filed conventionally May 22, 2017, attached as Ex. 2 to Declaration of Robert B. Cummings in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(a) ("Cummings Declaration"), docket no. 54-1, filed May 22, 2017).

[19] Response ¶ 1 at 49 (citing Dispatch Recording; Salt Lake Police Department CAD Call Hardcopy ("SLPD CAD Call") at 6, attached as Ex. 1 to Cummings Declaration).

[20] Id. ¶ 2 at 49 (citing Dispatch Recording).

4.    The call was not dispatched as a "brandishing" call.[21]

5.    Officer Cruz was on patrol in the area and responded to the dispatch report to ensure that the suspects were not a threat to public safety and to determine whether any laws had been or were being violated, including a possible brandishing.[22]

6.    Officer Cruz did not notice the comments "no shots fired" or "no one in danger."[23]

7.    Officer Uppsen Downes was the first (between Officers Andrew Sylleloglou, Cruz, and Downes) to respond to the dispatch call.[24]

8.    The first officer to respond was Sergeant Charly Goodman. Officer Downes responded to the call approximately 10 seconds after it was dispatched and responded, "back 160," which is the number for Sergeant Goodman. Officer Cruz responded approximately 47 seconds later. Then Officer Sylleloglou asked Officer Cruz if he wanted help or backup.[25]

9.    Officer Cruz indicated that he wanted backup, and Officers Sylleloglou and Downes responded that they were en route.[26]

10.    Officer Cruz believed the call was dispatched as to a group of men, one of whom had "brandished" a weapon.[27]

---

[21] *Id*. ¶ 6 at 49 (citing SLCC CAD Call; Dispatch Recording).

[22] Motion for Summary Judgment ¶ 2 at 6 (citing Dispatch Recording; Declaration of Bron Cruz ("Cruz Declaration") ¶ 3, docket no. 44-2, filed Nov. 28, 2016).

[23] Response ¶ 3 at 49 (citing Deposition of Bron Cruz ("Cruz Deposition") at 73:4-7, attached as Ex. 3 to Cummings Declaration), ¶ 4 at 49 (citing Cruz Deposition at 74:16-18).

[24] *Id*. ¶ 9 at 50 (citing Dispatch Recording).

[25] *Id*. ¶ 10 at 50 (citing Dispatch Recording).

[26] Motion for Summary Judgment ¶ 3 at 6 (citing Dispatch Recording; Cruz Declaration ¶ 4).

[27] Response ¶ 5 at 49 (citing Cruz Deposition at 37:17-19; Interview of Officer Bron Cruz ("Cruz Interview") at SLCC 001367, attached as Ex. 4 to Cummings Declaration)

11.     Neither Officers Downes nor Sylleloglou ever used the term "brandish" to describe the call.[28]

12.     Officer Downes did not believe the call warranted his emergency lights or siren when traveling to the area under department policy.[29]

13.     Upon approaching the area in his police vehicle, Officer Cruz saw three men walking together, who were later identified as Mr. Taylor, Jerrail, and Adam. Two of the men generally matched the descriptions provided by the dispatcher. The three men were proceeding along 2100 South at approximately 150 East and heading west.[30]

14.     Officer Cruz continued following the three men in his police vehicle while staying approximately a block away. He indicated to dispatch that he would wait for the arrival of backup officers before approaching the three men.[31]

15.     Officer Cruz asked the dispatcher whether the report identified which of the three men flashed the gun, and was told that the log did not indicate which one.[32]

16.     Officer Cruz was 50 to 75 feet away from the three men, and facing them, when he observed them walk west toward him and cross State Street at 2100 South.[33]

---

[28] *Id*. ¶ 7 at 49 (citing Interview of Officer Uppsen Downes ("Downes Interview"), docket no. 55, filed conventionally May 22, 2017, attached as Ex. 11 to Cummings Declaration; Deposition of Uppsen Downes ("Downes Deposition"), attached as Ex. 8 to Cummings Declaration; Declaration of Uppsen Downes ("Downes Declaration"), docket no. 44-5, filed Nov. 28, 2016), ¶ 8 at 49 (citing Deposition of Andrew Sylleloglou ("Sylleloglou Deposition"), attached as Ex. 7 to Cummings Declaration; Interview of Officer Andrew Sylleloglou ("Sylleloglou Interview"), docket no. 55, filed conventionally May 22, 2017, attached as Ex. 9 to Cummings Declaration; Officer Sylleloglou's Bodycam Video ("Sylleloglou Bodycam Video"), docket no. 55, filed conventionally May 22, 2017, attached as Ex. 10 to Cummings Declaration; Declaration of Andrew Sylleloglou ("Sylleloglou Declaration"), docket no. 44-4, filed Nov. 28, 2016).

[29] *Id*. ¶ 26 at 54 (citing Downes Deposition at 21:3-7,16-21).

[30] Motion for Summary Judgment ¶ 4 at 6 (citing Dispatch Recording; Cruz Declaration ¶ 5).

[31] *Id*. ¶ 5 at 6 (citing Dispatch Recording; Cruz Declaration ¶ 6).

[32] *Id*. ¶ 6 at 6 (citing Dispatch Recording; Cruz Declaration ¶ 7).

[33] Response ¶ 11 at 50 (citing Cruz Deposition 27:14-17; Aerial View of Intersection at 2100 South State Street, attached as Ex. 6 to Cummings Declaration).

17.     As the three men reached the west side of the intersection, Officer Cruz observed the male in the white shirt, later identified as Mr. Taylor, walk up to a car stopped at the red light and interact with the driver, while the other two males were "throwing their hands in the air, kind of making a big scene." This interaction lasted five to 10 seconds.[34]

18.     Officer Cruz described the exchange as "some kind of distraction or disturbance" and possibly "harassing the driver."[35] Officer Cruz stated the exchange was "not typical" and "unusual," since "you don't just walk up to people in a crosswalk, somebody that maybe you don't know, and start engaging them while they are sitting in their car in traffic."[36]

19.     Salt Lake City Police Crime Scene Technician Benjamin Bender also witnessed the exchange and described it as:

> A male in a white t-shirt and blue jeans approached a red sedan that was waiting at the northbound red light. This Technician's view of the male was obstructed by passing vehicles, but the male appeared to high-five the driver of the vehicle and then jogged across the remainder of the intersection where he joined the other two males at the southwest corner.[37]

20.     Officer Cruz then observed the three men as they entered the 7-Eleven convenience store on the corner of 2100 South and State Street, and decided to wait until they exited the 7-Eleven before approaching them.[38]

---

[34] Motion for Summary Judgment ¶ 7 at 6-7 (citing Cruz Declaration ¶ 8).

[35] Response ¶ 12 at 50-51 (citing Cruz Interview at SLCC 001368).

[36] *Id.* (citing Cruz Deposition at 28:7-17).

[37] *Id.* ¶ 13 at 51 (citing Bender Statement at SLCC 001396). Though cited by Plaintiffs, the Bender Statement was not attached as an exhibit to the parties' briefing. However, Officer Cruz and Salt Lake City did not dispute the content of the Bender Statement. Reply Memorandum in Support of Motion for Summary Judgment ("Reply") at 70-71, docket no. 59, filed Aug. 2, 2017.

[38] Motion for Summary Judgment ¶ 8 at 7 (citing Cruz Declaration ¶ 9).

21.     While watching from across the street in a Subway parking lot, Officer Cruz expressed to Officer Downes that he really hoped "those guys don't rob the store,"[39] and that he "hope[d] nothing bad is going to happen in the store."[40] When asked what he meant by this, Officer Cruz stated in his deposition:

> Well, it was a – it was a more personal conversation between Officer Downes and I. You go to – one of the first things you learn as an officer – you know, man with a gun calls, they are not uncommon. And when you are prepared, you run as many scenarios through your head as possible, just to be as prepared as possible. And one of those scenarios that had crossed my mind ever so briefly was something – you know, a convenience store robbery. They are very common. It's just something that crossed my mind, just another scenario.[41]

22.     Officer Downes noted at that time it was "[b]usiness as normal it appeared for the store."[42]

23.     Surveillance video from the 7-Eleven shows the three men entering the store, making a purchase, and then exiting the store a short time later.[43]

24.     In the one or two minutes the three men were inside the 7-Eleven, they completed their purchases without incident and exited in a normal manner without having robbed the store, harassed any customers, or caused any disturbance.[44]

---

[39] Response ¶ 14 at 51 (citing Cruz Interview at SLCC 001360).

[40] *Id*. (citing Cruz Deposition at 31:23-24).

[41] *Id*. (citing Cruz Deposition at 33:8-22).

[42] *Id*. ¶ 15 at 52 (citing Downes Deposition at 25:6-7).

[43] Motion for Summary Judgment ¶ 9 at 7 (citing 7-Eleven Surveillance Video ("7-Eleven Video"), docket no. 45, filed conventionally Nov. 28, 2017, attached as Exhibit B to Declaration of Chase Hermansen ("Hermansen Declaration"), docket no. 44-3, filed Nov. 28, 2016).

[44] Response ¶ 16 at 52 (citing 7-Eleven Video; Still Photos from 7-Eleven Surveillance Video ("7-Eleven Photos"), docket no. 44-8, filed Nov. 28, 2016; Officer Cruz's Bodycam Video ("Cruz Bodycam Video"), docket no. 56, filed conventionally May 23, 2017, attached as Ex. 5 to Cummings Declaration).

25.    The three men exited the 7-Eleven after Officer Downes arrived and as Officer Sylleloglou was arriving.[45]

26.    Mr. Taylor exited the 7-Eleven a few feet behind Jerrail and Adam.[46]

27.    Officer Cruz called out over the radio that the three men were leaving the 7-Eleven as Officers Downes and Cruz were already on their way across the street from where they were staged at the Subway parking lot.[47]

28.    Officer Downes arrived at the 7-Eleven just ahead of Officer Cruz and drove his vehicle past the front of the store to cover the rear in case the three men ran away in that direction.[48]

29.    In his interview, Officer Cruz stated:

> [Officer] Downes and I both went across the street. I anticipated I, I had the south position and for reasons I can't explain, [Officer] Downes, he said, "I'm going out back." Um, as these three just walked straight out into the parking lot. Um, and so he just kept driving. He drove around the building but I felt, felt good when I saw [Officer Sylleloglou].[49]

30.    At his deposition, Officer Cruz stated: "I – I don't remember hearing [Officer] Downes express that he would go around back."[50] And when asked how he felt when Officer Downes drove to the back, Officer Cruz stated: "It didn't make me feel – at the time, I don't

---

[45] Motion for Summary Judgment ¶ 10 at 7 (citing Cruz Declaration ¶ 10; Sylleloglou Declaration ¶ 6).

[46] Response ¶ 17 at 52 (citing 7-Eleven Video; 7-Eleven Photos; Cruz Bodycam Video).

[47] *Id*. ¶ 18 at 52 (citing Dispatch Recording).

[48] Motion for Summary Judgment ¶ 11 at 7 (citing Cruz Declaration ¶ 11; Sylleloglou Declaration ¶ 7; Downes Declaration ¶ 6); *see also* Response ¶ 23 at 53 (citing Cruz Declaration ¶ 11), ¶ 28 at 54 (citing Cruz Bodycam Video).

[49] Response ¶¶ 19-20 at 52-53 (citing Cruz Interview at SLCC 001369).

[50] *Id*. ¶ 22 at 53 (citing Cruz Deposition at 36:19-20).

know that it made me feel anything. I was focused on the suspects in front of me;"[51] "I would not say it worried me; not at the time."[52]

31. Neither Officers Sylleloglou nor Downes were concerned by Officer Downes's decision to drive to the rear of the 7-Eleven, but rather saw it as a necessary move and standard procedure.[53]

32. In his interview, Officer Cruz stated that when he initiated his red and blue emergency lights, "for a split second, I felt a little bit better about the situation."[54]

33. Although Officer Cruz had engaged the lights on his own vehicle, Officer Downes did not turn on his vehicle's red and blue emergency lights at any time during the encounter.[55]

34. Officer Sylleloglou was the first to arrive on the scene at the 7-Eleven, pulling directly in front of Jerrail and Adam as they exited the store.[56]

35. Officers Cruz and Sylleloglou approached the men in their marked police vehicles from opposite directions. Officer Cruz approached from the east and Officer Sylleloglou approached from the west, forming a barricade or "V" blocking the path of the three men as they walked alongside each other in the 7-Eleven's parking lot.[57]

---

[51] *Id*. (citing Cruz Deposition at 39:20-23).

[52] *Id*. (citing Cruz Deposition at 40:4-5).

[53] *Id*. ¶ 21 at 53 (citing Downes Deposition at 26:2, 27:16-20; Sylleloglou Deposition at 26:23-25, 27:1, 28:21-25).

[54] *Id*. ¶ 24 at 53-54 (citing Cruz Interview at SLCC 001369).

[55] *Id*. ¶ 25 at 54 (citing Scene Photos, docket no. 45, filed conventionally Nov. 28, 2016, attached as Exhibit A to Cruz Declaration).

[56] *Id*. ¶ 27 at 54 (citing 7-Eleven Photos).

[57] Motion for Summary Judgment ¶ 12 at 7-8 (citing Cruz Bodycam Video; Still Photos from Officer Cruz's Bodycam Video ("Cruz Bodycam Photos"), docket no. 45, filed conventionally Nov. 28, 2016, attached as Ex. 7 to Motion for Summary Judgment, docket no. 44-7; 7-Eleven Video; 7-Eleven Photos; Cruz Declaration ¶ 12; Sylleloglou Declaration ¶ 8); *see also* Response ¶ 29 at 54 (citing Cruz Interview at SLCC 001369).

36.     Officer Cruz was wearing his dark tinted, department-issued, "duty Oakleys" throughout the encounter with the three men.[58]

37.     As the three men exited the 7-Eleven, Officer Cruz believed that all three of them looked at him and the other officers, and he stated in his interview:

> But what eased tensions in my mind, slightly, because they all lined up perfectly for us. They were all perfectly lined up and that just made me feel so good inside. All their hands were just down at their sides. I could see their hands and the tensions just, I just felt it go down for a split second.[59]

38.     Mr. Taylor appeared to look directly at Officer Cruz's police vehicle approaching from the east with its lights flashing as it moved in front of the path of the three men.[60]

39.     Officer Cruz described that moment as: "He looks right at me for a split second he turned around and he starts walking off."[61]

40.     Officer Cruz also stated in his interview:

> Um, and as soon as [the two men raised their hands] it was pretty much simultaneous in my mind. They did this and again, he looked dead at me and I looked dead at him and as soon as they did that, he turns around and this is what I see.[62]

41.     Officer Cruz stated in his deposition that the first time he felt somewhere on the "spectrum of fear" was "when [he] looked into [Mr. Taylor]'s eyes."[63]

---

[58] Response ¶ 52 at 60 (citing Cruz Interview; Cruz Deposition at 45:20-21; Citizen Cell Video Still, docket no. 55, filed conventionally May 22, 2017, attached as Ex. 12 to Cummings Declaration; Photos of Bron Cruz, attached as Ex. 13 to Cummings Declaration).

[59] *Id*. ¶ 30 at 54 (citing Cruz Interview at SLCC 001369).

[60] Motion for Summary Judgment ¶ 13 at 8 (citing Cruz Bodycam Video; Cruz Bodycam Photos); *see also* Response ¶ 51 at 59-60 (citing Cruz Bodycam Video; Cruz Bodycam Photos).

[61] Response ¶ 51 at 59-60 (citing Cruz Interview at SLCC 001370), *see also id*. ¶ 53 at 60 (citing Cruz Bodycam Video; Cruz Bodycam Photos).

[62] *Id*. ¶ 49 at 59 (citing Cruz Interview at SLCC 001375).

[63] *Id*. ¶ 46 at 58 (citing Cruz Deposition at 35:9-12).

42.     In his interview, Officer Cruz explained:

Q:      Um, you said on first contact two of them complied. Put their hands up just when you said the word, "Stop"?

A:      Yes.

Q:      But the third one looked at you – in the white shirt?

A:      In the white shirt.

Q:      And kept walking?

A:      He looked directly at me and ah, he turned around and walked off with – and his hands, his hands is what, his hands is what did it.

Q:      You said that he, ah, looked at you with defiance?

A:      Yeah. He looked at me like, ah, he, I mean I don't know how to explain it. Um, you know but you can tell when you look into somebody's eyes when you're working with them. Um, that's when you know it's, it's, it's ah, it's one of the clues that we have when we're dealing with people. Um their eyes can tell you a lot. Um, and his eyes were just complete just 100% defiance. He had this, this, this look on his face like you know? Like I, ah, hate? Um, um, and ah, like he was, he was not going to do anything that I said. Um, and it was just a horrible feeling. Um, looking at him. Having him, you know just the, it was just horrible. Just hate, defiance, that he had in his eyes.

Q:      And you've seen this kinda look before you're saying with, with work-related circumstances?

A;      I've seen, ah, I don't know that I've seen it like that. I mean, I've seen a type of it before. I've seen it when people aren't gonna comply and they look at you like, "I'll fight you first."

Q:      Umm, hmm.

A:      "I'll do whatever I need to do but you're not, you're not taking me down."

Q:      Okay.

A:      Um, and, and that's yeah, it was an extreme version of that.[64]

43.     Mr. Taylor also appeared to look at Officer Sylleloglou's police vehicle approaching from the west as it moved in front of the three men.[65]

---

[64] *Id*. ¶ 48 at 58-59 (citing Cruz Interview at SLCC 001374-75).

[65] Motion for Summary Judgment ¶ 14 at 8 (citing 7-Eleven Video; 7-Eleven Photos).

44.     Officers Cruz and Sylleloglou, wearing their patrol uniforms, exited their vehicles and gave commands to the three men to stop and show their hands.[66]

45.     Because one of the men was reportedly armed, Officer Sylleloglou drew his gun in a low ready position, but did not aim at the three men.[67]

46.     Two of the men, later identified as Jerrail and Adam, immediately stopped and raised their hands.[68]

47.     In his deposition, Officer Cruz described the initial encounter:

> I exited my police car and all I did was tell the individuals to stop. I had already gotten that look of defiance from [Mr. Taylor]. The other two immediately put their hands in the air. . . . Right when I'm stopping my car.[69]

48.     Officer Cruz explained in his interview that when he saw the two men with their hands in the air:

> [I]t scared the crap out of me when those two raised their hands. Like they knew there was a gun or weapon was involved, that's the only time they do that. They never put their hands up like that. Those two put their hands straight up in the air and that confirmed to me, even more, there was a gun involved.[70]
>
> ***
>
> So, the other two put their hands out, just like this. Um, and, and without any, without any prompting that, this is what they did. Which, again, was very, it was even more concerning. Uh, because people don't do this when we contact them unless we believe they have a gun. Or they're armed.[71]

---

[66] *Id*. ¶ 15 at 8 (citing Cruz Bodycam Video; 7-Eleven Video; Cruz Declaration ¶ 13; Sylleloglou Declaration ¶ 9); *see also* Response ¶ 32 at 55 (citing Sylleloglou Deposition at 33:16-34:1; Cruz Interview at SLCC 001370).

[67] Motion for Summary Judgment ¶ 16 at 8 (citing Sylleloglou Declaration ¶ 9).

[68] *Id*. ¶ 17 at 8 (citing Cruz Bodycam Video; Cruz Bodycam Photos; 7-Eleven Video; 7-Eleven Photos; Cruz Declaration ¶ 14; Sylleloglou Declaration ¶ 10); *see also* Response ¶ 33 at 55 (citing Cruz Bodycam Video; Cruz Interview at SLCC 001370; Sylleloglou Deposition at 29:20-23).

[69] Response ¶ 50 at 59 (citing Cruz Deposition at 45:4-7, 13).

[70] *Id*. ¶ 34 at 55 (citing Cruz Interview at SLCC 001370).

[71] *Id*. ¶ 35 at 55 (citing Cruz Interview at SLCC 001375).

49.     Officer Downes stated in his deposition that in his experience the presence of officers makes people put their hands up "a lot of the time."[72]

50.     Jerrail and Adam acknowledged that they both saw the marked police vehicles approaching from opposite directions and uniformed police officers approaching the three men and giving commands to stop and show their hands.[73]

51.     The third man, wearing a white shirt and later identified as Mr. Taylor, looked at the officers, but did not stop, and instead turned and walked in the opposite direction away from the officers and Jerrail and Adam, moving back towards the entrance of the 7-Eleven.[74]

52.     When Jerrail was asked if he thought there was any possible way that Mr. Taylor could not have seen the three police vehicles and the officers approaching with their guns drawn, he stated: "I don't know how he didn't see them."[75]

53.     Immediately upon his arrival, Officer Sylleloglou exited and ran around the front of his vehicle in a south/west diagonal in pursuit of Mr. Taylor, who was walking away.[76]

---

[72] *Id*. ¶ 36 at 56 (citing Downes Deposition at 39:21-40:13).

[73] Motion for Summary Judgment ¶ 18 at 9 (citing Video Recording of Jerrail Taylor Interview ("Jerrail Taylor Interview") at 11:04, docket no. 45, filed conventionally Nov. 28, 2016, attached as Exhibit A to Declaration of Joe Sutera ("Sutera Declaration"), docket no. 44-9, filed Nov. 28, 2016; Video Recording of Adam Thayne Interview ("Adam Thayne Interview") at 11:43, docket no. 45, filed conventionally Nov. 28, 2016, attached as Exhibit A to Hermansen Declaration); *see also* Response ¶ 40 at 56 (citing Jerrail Taylor Interview at 11:03:55).

[74] Motion for Summary Judgment ¶ 19 at 9 (citing Cruz Bodycam Video; Cruz Bodycam Photos; 7-Eleven Video; 7-Eleven Photos; Cruz Declaration ¶ 15; Sylleloglou Declaration ¶ 11); *see also* Response ¶ 44 at 57 (citing Jerrail Taylor Interview at 11:05:06; Cruz Bodycam Video; 7-Eleven Photos).

[75] Motion for Summary Judgment ¶ 22 at 9 (citing Jerrail Taylor Interview at 11:10-11:11).

[76] Response ¶ 31 at 55 (citing 7-Eleven Photos; Cruz Bodycam Photos); ¶ 58 at 61 (citing 7-Eleven Video; 7-Eleven Photos).

54.     Officer Sylleloglou stated in his interview that he could not see Mr. Taylor clearly at first:

> [Mr. Taylor] was kinda covered by the red truck . . . cause he was kind of, sort of, behind it.[77]
>
> ***
>
> I didn't, I don't remember seeing anything in his hands. Like I said, he was partially obstructed by the red truck.[78]

55.     Mr. Taylor was already walking away from Officer Cruz before Officer Cruz had fully exited his vehicle and cleared its door.[79]

56.     Officer Cruz initially followed some distance behind Mr. Taylor and Officer Sylleloglou.[80]

57.     After turning his attention to Mr. Taylor, Officer Cruz "wish[ed he] had another couple guys to watch the other two [men,]" except that "their eyes looked harmless."[81]

58.     Mr. Taylor can be seen on the 7-Eleven surveillance video and still photos walking back toward the 7-Eleven, and around the front of a red truck before heading west along the front of the store.[82]

59.     As Mr. Taylor walked away, Officer Sylleloglou shouted several times: "Hey, you in the white shirt, stop." Mr. Taylor did not stop or show his hands.[83]

60.     Jerrail saw that Mr. Taylor was walking away and told him to "stop."[84]

---

[77] *Id*. ¶ 88 at 67 (citing Sylleloglou Interview at 4:35)

[78] *Id*. (citing Sylleloglou Interview at 5:18).

[79] *Id*. ¶ 56 at 61 (citing Cruz Bodycam Video; Cruz Bodycam Photos).

[80] *Id*. ¶ 58 at 61 (citing 7-Eleven Video; 7-Eleven Photos).

[81] *Id*. ¶ 68 at 63 (citing Cruz Interview at SLCC 001370).

[82] *Id*. ¶ 57 at 61 (citing 7-Eleven Video; 7-Eleven Photos).

[83] Motion for Summary Judgment ¶ 24 at 10 (citing Sylleloglou Declaration ¶ 12).

[84] *Id*. ¶ 20 at 9 (citing Jerrail Taylor Interview at 11:18-11:19).

61.     When Jerrail saw Mr. Taylor walking away, he figured that Mr. Taylor was avoiding contact with the officers. He stated in his interview: "I don't know if he was ignoring the cops, like, 'Fuck it, I'm gonna cut through here and walk to the Trax.'"[85]

62.     Jerrail described the situation:

> In my head, I'm thinking, my, my head's, my adrenaline's running, I'm thinking, "What the fuck did I just do? I can't walk in America and buy a goddamn drink and a beer?" like, "What am I doing wrong here." I'm all, "What the hell?" And [Dillon] was like, "Ah shit," you know what I'm saying? Like, "What the fuck did we do." So he was, "alright, y'all, fuck this." He put his headphones in, walked away, the next thing you know the cop was all, "Hey, stop, stop." But he's got his headphones in, he can't hear him.[86]

63.     Jerrail saw Mr. Taylor's headphones were in and was concerned Mr. Taylor could not hear what the officers were saying behind him as he walked away. He stated in his interview: "I was like, 'What the fuck,' and as I'm getting on the ground, I see [Dillon] walking, I'm like, 'Oh fuck, here we go.' I'm like, 'Dude, just fuck stop,' but he had his headphones in."[87]

64.     As Officer Downes arrived on the east side of the 7-Eleven parking lot, he saw Jerrail and Adam standing by the police vehicles and that Officers Cruz and Sylleloglou were pursuing Mr. Taylor as he walked away along the sidewalk next to the 7-Eleven.[88]

65.     Officer Downes approached Jerrail and Adam where they were stopped and detained them.[89]

---

[85] Response ¶ 42 at 57 (citing Jerrail Taylor Interview at 11:04:20).

[86] *Id*. ¶ 41 at 57 (citing Jerrail Taylor Interview at 11:03:55-11:04:34); *see also* Motion for Summary Judgment ¶ 21 at 9 (citing Jerrail Taylor Interview at 11:04).

[87] Response ¶ 43 at 57 (citing Jerrail Taylor Interview at 11:05:06); Motion for Summary Judgment ¶ 23 at 10 (citing Jerrail Taylor Interview at 11:05).

[88] Motion for Summary Judgment ¶ 52 at 14 (citing Downes Declaration ¶ 8).

[89] *Id*. ¶ 53 at 14 (citing Downes Declaration ¶ 9).

66.     Jerrail and Adam began arguing with Officer Downes, asking him what was happening and why the police were "hassling" them. The "back and forth" continued until Officer Downes heard Officer Cruz fire his weapon.[90]

67.     Officer Downes did not draw his gun on the two men. He explained in his deposition: "Because I could see their hands, and they were – those two individuals were essentially compliant. They were not fighting with me. We were just investigating. So, at that point, it was not a threat."[91] He noted further:

> For me, the factors were we had information there was a possible weapon. The two that I was dealing with did not present as an initial threat. They were not playing with their waistband. They didn't take a fighting stance. They stopped as if I were to stop you, kind of questioning why. So that doesn't register to me as an initial threat.

> Still we know there was a possible weapon. We don't know if it was them or not because a lot of criminals will hide that fact and act like everyone else. So there was still caution.

> I wanted to be close enough where I would be able to control the situation better because [Officer] Cruz was going towards the other individual, and there were civilians all around us, non-law enforcement personnel. So if they decided to produce a weapon, there is no telling where those rounds are going to go. If I'm standing too far back, I cannot maintain positive control.[92]

68.     As Mr. Taylor walked away with Officers Cruz and Sylleloglou in pursuit, Officer Downes remained with Jerrail and Adam. As the "backing officer," he directed 20% of his attention toward Officer Cruz and 80% of his attention toward Jerrail and Adam.[93]

69.     Officer Downes continued to bounce back and forth between the two men and looking in the direction of Officer Cruz, but with his focus on Mr. Taylor.[94]

---

[90] Response ¶ 37 at 56 (citing Downes Deposition at 41:24-42:7).

[91] *Id*. ¶ 38 at 56 (citing Downes Deposition at 39:5-9), ¶ 67 at 63 (citing Downes Deposition at 39:5-9).

[92] *Id*. ¶ 38 at 56 (citing Downes Deposition at 59:17-60:10), *see also id*. ¶ 39 at 56 (citing Downes Deposition at 44:19-21).

[93] *Id*. ¶ 66 at 63 (citing Downes Deposition at 45:5-9).

[94] *Id*. ¶ 69 at 63 (citing Downes Deposition at 45:5-6, 17-18, 46:12-13).

70.     Based on his understanding that one of the three men had a gun, Officer Cruz believed that the gun was very likely in the possession of Mr. Taylor, who was walking away and, unlike Jerrail and Adam, was not complying with the officers' commands to stop.[95]

71.     In his deposition, Officer Cruz explained: "I was maintaining distance at that – yeah, I was not trying to close on somebody that I believed had a gun."[96]

72.     Officer Cruz stated that closing the distance would not "make any sense."[97]

73.     Officer Cruz's body camera shows that Mr. Taylor was wearing a baggy t-shirt and baggy pants.[98]

74.     As Mr. Taylor walked along the side of the 7-Eleven away from Officers Cruz and Sylleloglou with his back to them, he can be seen raising his hands to the sides of his waist.[99]

75.     Mr. Taylor then put his hands inside the front waistband of his pants, and made digging motions with his hands, at which point Officer Cruz began training his weapon on Mr. Taylor.[100]

76.     Officer Cruz believed Mr. Taylor's hands were concealed in his waistband area due to the position of his elbows when viewed from behind.[101]

77.     As Mr. Taylor continued walking along the sidewalk in front of the 7-Eleven, Officer Cruz followed directly behind him, and Officer Sylleloglou walked south and west

---

[95] Motion for Summary Judgment ¶ 30 at 10-11 (citing Cruz Declaration ¶ 16).

[96] Response ¶ 60 at 61-62 (citing Cruz Deposition at 55:8-13).

[97] *Id*. ¶ 61 at 62 (citing Cruz Deposition at 55:8-13).

[98] *Id*. ¶ 82 at 66 (citing Cruz Bodycam Video; Cruz Bodycam Photos).

[99] *Id*. ¶ 81 at 65-66 (citing Cruz Bodycam Video).

[100] Motion for Summary Judgment ¶ 33 at 11 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 19; Sylleloglou Declaration ¶ 19); *see also* Response ¶ 89 at 67-68 (citing Cruz Interview at SLCC 001370).

[101] Response ¶ 83 at 66 (citing Cruz Deposition at 49:7-14).

towards him, both shouting commands to "stop, you in the white shirt," and "get your hands out."[102]

78.    Mr. Taylor did not stop but continued walking west along the sidewalk.[103]

79.    In his interview, Officer Cruz stated:

> That was when I knew something was gonna be bad. Um, cause he looked right at me, um, with complete, total defiance in his eyes. Um, and when his hands disappeared that's when I drew my gun. Because I knew his hands, they were like this through his waistband.

> And the way he looked at me? And then turned around? There was no doubt in my mind what he was doing with his hands.[104]

80.    Mr. Taylor's "look," combined with his turning around and walking away led Officer Cruz to conclude that when Mr. Taylor's hands went to his waistband:

> I was 100%, 100% convinced when I saw him turn around that it was gonna be a gunfight. I know he had that gun that he'd be trying to kill us there was nothing else he could be doing than going for a gun.[105]

81.    Mr. Taylor "calmly walk[ing] away" and "creating distance" also heightened Officer Cruz's distress at the situation:

> Um, and it scared me even more that he wasn't running away. He was buying time. He was buying time and he was creating distance. That's all he was doing. Very calmly walked away. With his hands right in his waist band.[106]

82.    Officer Sylleloglou also began training his gun on Mr. Taylor when he saw that Mr. Taylor appeared to put his hands inside the front waistband of his pants.[107]

---

[102] Motion for Summary Judgment ¶ 31 at 11 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 17; Sylleloglou Declaration ¶ 18; Adam Thayne Interview at 11:44; Downes Declaration ¶ 10).

[103] *Id*. ¶ 32 at 11 (citing Cruz Declaration ¶ 18).

[104] Response ¶ 47 at 58 (citing Cruz Interview at SLCC 001370).

[105] *Id*. ¶ 54 at 60 (citing Cruz Interview at SLCC 001370-71).

[106] *Id*. ¶ 59 at 61 (citing Cruz Interview at SLCC 001370; 7-Eleven Video; 7-Eleven Photos).

[107] Motion for Summary Judgment ¶ 26 at 10 (citing Sylleloglou Declaration ¶ 14).

83. Officer Sylleloglou was north of Mr. Taylor in the 7-Eleven parking lot and walked in Mr. Taylor's direction but staying perpendicular to Mr. Taylor as he walked westward, while shouting repeated commands to Mr. Taylor to stop and show his hands.[108]

84. Mr. Taylor looked directly at Officer Sylleloglou with a "mean mug" look on his face, meaning that it appeared he heard Officers Sylleloglou and Cruz shouting commands and was deliberately ignoring their commands. Officer Sylleloglou described the look on Mr. Taylor's face as hostile and defiant.[109]

85. At this point, Mr. Taylor was no more than 15 feet in front of Officer Sylleloglou, looking at him, but still walking away.[110]

86. Officer Sylleloglou was 100% certain that Mr. Taylor saw him, heard his commands, and deliberately chose to ignore them.[111]

87. Jerrail recalled hearing Mr. Taylor say something along the lines of "what did we do" in response to the officers' commands.[112]

88. At some point during the interaction, Mr. Taylor said something to Officer Sylleloglou about "shooting him." When asked if he remembered exactly what Mr. Taylor said, Officer Sylleloglou responded: "He said, 'What are you gonna do, shh, I think it was – this is as close to verbatim as I can get – 'What are you gonna do, shoot me? What are you gonna do? You gonna shoot me? You gonna shoot me?'"[113]

---

[108] *Id.* ¶ 35 at 11 (citing Cruz Declaration ¶ 21; Sylleloglou Declaration ¶ 18).

[109] *Id.* ¶ 25 at 10 (citing Sylleloglou Declaration ¶ 13).

[110] *Id.* ¶ 28 at 10 (citing Sylleloglou Declaration ¶ 16).

[111] *Id.* ¶ 29 at 10 (citing Sylleloglou Declaration ¶ 16).

[112] *Id.* ¶ 41 at 12 (citing Jerrail Tayler Interview at 11:06); *see also* Response ¶ 65 at 62-63 (citing Jerrail Taylor Interview at 11:05:42, 11:16:10).

[113] Response ¶ 62 at 62 (citing Sylleloglou Interview at 6:00:00); *see also* Motion for Summary Judgment ¶ 27 at 10 (citing Sylleloglou Declaration ¶ 15).

89.     Officer Cruz never reported hearing this exchange. Instead, he only reported hearing Mr. Taylor saying something about, "Make me," after he turned around just before he was shot.[114]

90.     Officer Cruz continued to yell repeated commands to Mr. Taylor. "get your hands out now, get your hands out, get your . . . get 'em out!"[115]

91.     Officer Sylleloglou stated in his interview, "[a]nd then I know I yelled at him too . . . 'let me see your . . . I think I may have just said, 'Hands! Hands! Hands!'" When the interviewer asked whether he remembered anything else Officer Cruz said, Officer Sylleloglou responded: "No, I couldn't, you know, I just . . . we were both kinda, I was just listening to him, and then I would say something, I would say 'hands,' and he would yell 'hey, hey, get your hands! Get your hands out of your pock' . . . I mean he was yelling at him to get his hands out of there."[116]

92.     Mr. Taylor did not respond and continued walking away from Officers Cruz and Sylleloglou with his hands remaining inside the front waistband of his pants.[117]

93.     As Mr. Taylor reached the end of the sidewalk and began walking across the parking lot of the 7-Eleven with Officer Cruz telling him to "get your hands out," Mr. Taylor turned around to directly face Officer Cruz, and Officer Cruz trained his weapon directly at Mr. Taylor.[118]

---

[114] Response ¶ 63 at 62 (citing Cruz Interview at SLCC 001371).

[115] Motion for Summary Judgment ¶ 34 at 11 (citing Cruz Bodycam Video; Cruz Declaration ¶ 20); *see also* Response ¶ 84 at 66 (citing Sylleloglou Interview at 2:34).

[116] Response ¶ 85 at 66 (citing Sylleloglou Interview at 2:34).

[117] Motion for Summary Judgment ¶ 36 at 12 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 22; Sylleloglou Declaration ¶ 19).

[118] *Id*. ¶ 37 at 12 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 23; Sylleloglou Declaration ¶ 20); *see also* Response ¶ 86 at 66 (citing Cruz Deposition at 55:14-17).

94.     Officer Downs heard Officer Cruz give Mr. Taylor the command, "Show me your hands," and saw Mr. Taylor continuing to walk backward.[119]

95.     As Mr. Taylor faced Officer Cruz, he continued to walk backwards with both hands inside the loose waistband of his pants, concealing his hands down to his wrists, and moving them in a digging motion.[120]

96.     When asked to describe the action of Mr. Taylor's hands, Officer Cruz remarked about Mr. Taylor's "baggy" pants. The investigator asked, "Baggy?" and Officer Cruz responded:

> Like they usually are with people that we deal with when they're concealing things. But, ah, his hands were buried like this in his pants. Buried. . . . And when they're buried way, wrists deep and his sh – you know, he's clawing at something then he's this. This is what I see. This is what I see in his baggy pants. This.
>
> They're not just sitting there. They're just digging, digging and he has this look on his face like, you, "Come and get me. I'm gonna fricken kill you."[121]

97.     While facing Officer Cruz, and as Officer Cruz continued to shout repeated commands to "get your hands out," Mr. Taylor said something which sounded like "what fool" or "nah fool" on Officer Cruz's bodycam video.[122]

98.     Officer Cruz's recollection was that Mr. Taylor said something at that moment along the lines of "come and make me."[123]

---

[119] Response ¶ 70 at 63 (citing Downes Deposition at 49:1-6).

[120] Motion for Summary Judgment ¶ 38 at 12 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 24; Sylleloglou Declaration ¶ 21).

[121] Response ¶ 91 at 68-69 (citing Cruz Interview SLCC 001376-77).

[122] Motion for Summary Judgment ¶ 39 at 12 (citing Cruz Bodycam Video); *see also* Response ¶ 64 at 62 (citing Cruz Bodycam Video).

[123] Motion for Summary Judgment ¶ 40 at 12 (citing Cruz Declaration ¶ 25); *see also* Response ¶ 90 at 68 (citing Cruz Interview at SLCC 001375).

99.     When asked in his deposition how Mr. Taylor responded to his commands, Officer Cruz recounted:

> He didn't. He responded by continually showing me that he was manipulating or retrieving something from his pants, from his waistband. That is how he responded. . . . And he – sorry. He also responded with the look of defiance. He also responded verbally.[124]

100.    Suddenly and without warning, while facing Officer Cruz, Mr. Taylor quickly raised his left hand from inside the loose waistband of his pants, lifting his shirt and exposing his lower torso.[125]

101.    Mr. Taylor simultaneously brought his right hand out of his loose waistband of his pants, but lower than his left hand.[126]

102.    At that moment, Mr. Taylor was approximately 10 to 12 feet away from Officer Cruz and 12 to 15 feet away from Officer Sylleloglou.[127]

103.    Officer Downes saw Mr. Taylor lifting up his shirt but could not make anything out.[128]

104.    In Officer Cruz's interview, the investigator asked whether Mr. Taylor had manipulated his shirt. Officer Cruz responded:

> I mean yeah, his shirt was you know eh, you know, his shirt was raising with his pants. You know? It was this, this tugging motion. This drawing motion, whatever . . . you know, I'm not sure what to call it.[129]

---

[124] Response ¶ 87 at 67 (citing Cruz Deposition at 57:4-8,11-12).

[125] Motion for Summary Judgment ¶ 43 at 13 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 26; Sylleloglou Declaration ¶ 22).

[126] *Id*. ¶ 44 at 13 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 26; Sylleloglou Declaration ¶ 22).

[127] *Id*. ¶ 45 at 13 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 27; Scene Photos; Scaled Drawing of Scene, attached as Exhibit B to Cruz Declaration; Sylleloglou Declaration ¶ 23).

[128] Response ¶ 71 at 63 (citing Downes Deposition at 49:7-11).

[129] *Id*. ¶ 92 at 69 (citing Cruz Interview at SLCC 001379-80).

105.    Believing that Mr. Taylor's movements indicated he was "drawing" or reaching for a gun, and that Mr. Taylor intended to fire on the officers, Officer Cruz acted in self-defense by firing two shots in rapid succession, striking Mr. Taylor in the torso.[130]

106.    According to the medical examiner, two rounds hit Mr. Taylor. one in his "upper central chest" and a second one in the "right upper quadrant of [the] abdomen" which also grazed the third and fourth fingers of his left hand.[131]

107.    When asked by the investigator if Mr. Taylor's hand ever came toward him, Officer Cruz responded, "I could not – no, it didn't because I could not wait that long."[132]

108.    When the investigator asked Officer Cruz if he thought Mr. Taylor might have had a gun that could have caused harm to him or another, Officer Cruz responded:

> I was convinced, 100% there was nothing else he was doing. Nothing else he could have been doing then getting a gun t-t-to try and kill one of us. To try and kill somebody. Nothing else. There was zero; nothing else made sense. Nothing else.[133]

109.    The investigator then asked how that made Officer Cruz feel. Officer Cruz responded:

> I was scared to death. The last thought I had go through my mind when I pulled the trigger; and I'll never forget this. Was uh, was that "I was too late. I was too late. And because of that I was gonna get killed. Worse, my officer was gonna get killed" . . . . And that was the shittiest feeling. . . . And I was like, "I'm gonna get us killed."[134]

---

[130] Motion for Summary Judgment ¶ 46 at 13 (citing Cruz Bodycam Video; Cruz Bodycam Photos; Cruz Declaration ¶ 28); *see also* Response ¶ 96 at 69 (citing Cruz Deposition at 60:12-17).

[131] *Id*. ¶ 57 at 15 (citing Office of the Medical Examiner State of Utah Report of Investigation ("Medical Examiner's Report") at 1, 5-6, docket no. 44-10, filed Nov. 28, 2016).

[132] Response ¶ 97 at 70 (citing Cruz Deposition at 60:1-3, 7-8).

[133] *Id*. ¶ 93 at 69 (citing Cruz Interview at SLCC 001377).

[134] *Id*. ¶ 94 at 69 (citing Cruz Interview at SLCC 001377).

110.     Officer Cruz described the events to investigators:

I heard [Officer Sylleloglou], five to seven feet off to my right, I could see him in my peripheral. He was yelling at him too. "Show us your hands. Stop. Show us your hands."

Um, and he turned around. He didn't stop. He never stopped. He turned around. Um, and it was only worse because his hands they were dove in his pants. They were just completely wrist-deep in his pants and he wasn't just warming up his pants, his hands on a cold day. It wasn't even cold.

Um, he wasn't just hiding his hands. He was, he was digging at something. He was manipulating something. I knew there was a gun in those pants. And, ah, at that point I mean, my gun I've had it center-massed, trained on him and I was yelling at him and he was looking directly at me, directly at my eyes. And I looked directly in his eyes. And he looked at me like, "You're not gonna. You're not gonna stop me." Um, and, "I'm gonna kill you guys."

And I think he said something. I don't remember what he was saying. He was yelling, "You make me." Or, "you can't make me," or some crap. I, I can't remember. But we yelled at him. I yelled at him with every, as loud as I could. "Let me see your hands. Let me see your hands." And he looked down the barrel of my gun. It just felt like an eternity. Um, and he, he didn't. He kept digging. He kept digging. Digging. Manipulating something in his pants.

And I knew he, he was ju – he'd already made up his mind and he just – I was just giving him time to just kill one of us. I don't know if the gun was caught or it if was falling down? Or I, I don't know. He was taking off the safety? I don't know what he was manipulating, something.

And I knew it was a deadly force situation. No doubt in my mind, no doubt in my mind. I needed to see his damn hands. I couldn't take the chance of him shooting my officer or shooting me.

And, ah, and after I yelled at him for what felt like an eternity with my gun trained right on him he did nothing but keep digging at that gun in his pants or whatever the hell it was. Without any hesitation. Without any reservation in the world I fired at him. And I would have kept firing until that deadly threat had stopped.[135]

111.     After firing his weapon, Officer Cruz called "shots fired" over the radio and immediately requested medical attention.[136]

---

[135] *Id*. ¶ 89 at 67-68 (citing Cruz Interview at SLCC 002371-72).

[136] Motion for Summary Judgment ¶ 48 at 14 (citing Cruz Bodycam Video; Dispatch Recording; Cruz Declaration ¶ 29).

112.     Officer Cruz then handcuffed Mr. Taylor, searched his pockets looking for a gun, and rendered first aid.[137]

113.     No gun was found.[138]

114.     Mr. Taylor died at the scene.[139]

115.     From the time Mr. Taylor turned around and came face-to-face with the officers until he was shot is approximately four seconds.[140]

116.     Minutes after Mr. Taylor was shot, Officer Sylleloglou explained to another officer what had happened:

> And uh, what happened was we found these two guys that are in our cars. The dude in the white over here, he kept walking, and then he ignored us. So [Officer Cruz] and I went up to him kind of, kind of cornered him like this. And he starts doing this and he starts backing up like digging into his pock – like this, and then he, and then he's like, "get your hands out of your, get your hands out, get your hands out, get your hands out," and then as soon as he made an overt movement to, to pull something we didn't see it, and he just – he got a couple shots on him. And he's got his camera on.[141]

117.     Officer Sylleloglou indicated that if Officer Cruz had not fired his weapon, he likely would have fired his weapon in self-defense under the circumstances.[142]

118.     From his position, Officer Downes heard gunshots but he did not see who fired the shots. Officer Downes was more than 50 feet away from Officers Cruz and Sylleloglou at that moment.[143]

---

[137] *Id*. ¶ 49 at 14 (citing Cruz Declaration ¶ 30).

[138] *Id*. ¶ 50 at 14 (citing Complaint ¶ 60).

[139] *Id*. ¶ 51 at 14 (citing Complaint ¶ 54).

[140] Response ¶ 95 at 69 (citing Cruz Bodycam Video).

[141] *Id*. ¶ 98 at 70 (citing Sylleloglou Bodycam Video at 3:09).

[142] Motion for Summary Judgment ¶ 47 at 14 (citing Sylleloglou Declaration ¶ 25).

[143] *Id*. ¶ 54 at 14 (citing Downes Declaration ¶¶ 11-12; Scene Photos; Scaled Drawing of Scene).

119.     Jerrail was already on the ground when he heard the two gunshots and did not see

what happened.[144]

120.     When Jerrail was asked what he saw just before Mr. Taylor was shot, he

commented:

> [A]s I was going down on the ground, I seen [Dillon] grab his pants like this, and
> pull them up, you know pull his pants up, you know . . . we, we wear baggy ass
> clothes, you can see that. He's pullin' his pants up, like, 'shit what's up nigga,
> what'd we do?' Or something to that effect.[145]

121.     When Adam was asked what he saw just before Mr. Taylor was shot, he stated:

> We went to 7-Eleven. We went in, we came out, the cops pulled their guns and
> um, [Dillon] started walking away and I look over and I seen him get shot. I see
> him, I see him, I think he tried to pull up his shorts or something, and they thought
> he was reaching for a gun and so, all I know is I heard two gun shots and then the
> officer screaming at me to get down.[146]

122.     Adam also stated to officers that based on Mr. Taylor's movements, he could see

why the officers thought that Mr. Taylor might have had a gun.[147]

123.     When asked by investigators why Mr. Taylor failed to respond and what he might

have been doing with his hands, Jerrail responded that Mr. Taylor had a cell phone he used to

listen to music, and that "maybe [his hands were] in his pockets to get his damn phone, to change

the song on his phone." When asked if Mr. Taylor had headphones, Jerrail answered, "Yeah,

that's what he had when the cops were pulling their guns out and shot him."[148]

---

[144] *Id*. ¶ 55 at 15 (citing Jerrail Taylor Interview at 11:06).

[145] Response ¶ 99 at 70 (citing Jerrail Taylor Interview at 11:05:42).

[146] *Id*. ¶ 100 at 70 (citing Adam Thayne Interview at 11:38:30).

[147] Motion for Summary Judgment ¶ 56 at 15 (citing Adam Thayne Interview at 11:58).

[148] Response ¶ 72 at 64 (citing Jerrail Taylor Interview at 11:03:06).

124.    Mr. Taylor's cell phone can be seen protruding from his pocket in a photo taken during the investigation following the shooting.[149]

125.    After Mr. Taylor was shot, he initially fell to the ground on his left side and back. Earbuds were still in his ears. After Officer Cruz had handcuffed Mr. Taylor and rolled him to his back, the earbuds were visible next to Mr. Taylor's head.[150]

126.    During this process, for approximately the first three minutes after Officer Cruz shot Mr. Taylor, Officer Cruz did not place on or otherwise wear any gloves.[151]

127.    Officer Cruz straddled Mr. Taylor's body looking north. In this position, Officer Cruz bent his right knee forward, and reached his right arm behind his knee. His right arm and hand appear to manipulate Mr. Taylor's right pocket, where Mr. Taylor's phone and earbud cord were located.[152]

128.    In this position which partially blocked the body camera view of Officer Cruz's right arm reaching, Officer Cruz appears to have laid or thrown the earbuds onto the ground next to Mr. Taylor's body.[153]

129.    When Officer Cruz was asked during his interview if he saw the earbuds, he stated: "I never saw any during the whole time when I was kneeling down by him I never once say any kind of headphones."[154]

---

[149] *Id*. ¶ 80 at 65 (citing Photo, attached as Ex. 15 to Cummings Declaration).

[150] *Id*. ¶ 73 at 64 (citing Cruz Bodycam Video).

[151] *Id*. ¶ 74 at 64 (citing Cruz Bodycam Video).

[152] *Id*. ¶ 75 at 64 (citing Cruz Bodycam Video; Still Bodycam Photos, attached as Ex. 14 to Cummings Declaration).

[153] *Id*. ¶ 76 at 64-65 (citing Cruz Bodycam Video; Still Bodycam Photos).

[154] *Id*. ¶ 77 at 65 (citing Cruz Interview at SLCC 001374).

130.    In his deposition, Officer Cruz was asked about the earbuds, and stated:

Q:    When you first pulled up, had you seen the white cord, the earphones anywhere on him?

A:    No.

Q:    And maybe I can limit the number of questions. At any point–

A:    No. I did not.[155]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[156] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way"[157] or "if a reasonable jury could return a verdict for the nonmoving party."[158] A fact is material if "it is essential to the proper disposition of [a] claim."[159] And in ruling on a motion for summary judgment, the factual record and all reasonable inferences drawn therefrom are viewed in a light most favorably to the nonmoving party.[160]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[161] The movant "need not negate the nonmovant's claim, but need only point out . . . that there is an absence of evidence to support the nonmoving party's case."[162] If the moving party carries this

---

[155] *Id*. ¶ 78 at 65 (citing Cruz Deposition at 50:6-17).

[156] Fed. R. Civ. P. 56(a).

[157] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[158] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

[159] *Adler*, 144 F.3d at 670.

[160] *Id*.

[161] *Id*. at 670-71.

[162] *Universal Money Ctrs., Inc.*, 22 F.3d at 1529 (internal quotations omitted).

initial burden, the nonmoving party "may not rest upon mere allegations or denials of [the] pleading[s], but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[163] "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[164]

## DISCUSSION

### Officer Cruz is entitled to qualified immunity on Plaintiffs' excessive force claim because his use of deadly force in the August 11, 2014 encounter with Mr. Taylor did not violate a statutory or constitutional right

Plaintiffs claim Officer Cruz used excessive force when he employed deadly force during the August 11, 2014 encounter with Mr. Taylor.[165] Office Cruz argues he is immune from suit under the qualified immunity doctrine.[166]

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."[167] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[168] "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[169]

---

[163] *Id.* (internal quotations and citations omitted; emphasis in original).

[164] *Id.* (internal quotations omitted).

[165] Complaint ¶¶ 105-113.

[166] Motion for Summary Judgment at 21-34.

[167] *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotations omitted).

[168] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[169] *Id*. (internal quotations omitted).

Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal question," and "protects all but the plainly incompetent or those who knowingly violate the law."[170]

"Because qualified immunity is an immunity from suit rather than a mere defense to liability it is effectively lost if a case is erroneously permitted to go to trial."[171] "[T]he driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery."[172] And for this reason, the U.S. Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."[173]

"[A] plaintiff seeking to avoid summary judgment on qualified immunity grounds must satisfy a 'heavy' two-part burden."[174] The plaintiff must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."[175] The two prongs of qualified immunity may be analyzed in any sequence based on the circumstances of the particular case.[176] In this case, it is necessary to address only the first prong, *i.e.*, whether Officer Cruz's use of deadly force in the August 11, 2014 encounter with Mr. Taylor violated a statutory or constitutional right.

Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard "judged from the perspective of a reasonable officer on the scene, rather

---

[170] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotations omitted).

[171] *Pearson*, 555 U.S. at 231 (internal quotations and punctuation omitted).

[172] *Id.* (internal quotations and punctuation omitted).

[173] *Id.* at 232 (internal quotations omitted).

[174] *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007).

[175] *Ashcroft*, 563 U.S. at 735 (internal quotations omitted).

[176] *Pearson*, 555 U.S. at 236.

than with the 20/20 vision of hindsight."[177] The objective reasonableness standard applies to any use of force by a law enforcement officer "in the course of an arrest, investigatory stop, or other seizure."[178]

"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."[179] "[I]ts proper application requires careful attention to the facts and circumstances of each particular case"[180] to determine "whether the totality of the circumstances justified the use of force."[181] "[R]elevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest."[182] And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[183] Where the material facts are not in dispute, the objective legal reasonableness of the officer's use of force is a question of law.[184]

**Officer Cruz's use of deadly force was objectively reasonable in light of the dispatch report of a man with a gun and the unknown motivations of the suspects**

The first factor to consider in determining whether an officer's use of force was objectively reasonable is the crime's severity.[185] Officer Cruz's August 11, 2014 encounter with

---

[177] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[178] *Id*. at 395 (internal quotations omitted).

[179] *Id*. at 396 (internal quotations omitted).

[180] *Id*.

[181] *Estate of Larsen ex rel. Studivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2009) (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)).

[182] *Mecham*, 500 F.3d at 1204 (internal quotations omitted).

[183] *Graham*, 490 U.S. at 396-97.

[184] *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003).

[185] *Mecham*, 500 F.3d at 1204.

Mr. Taylor arose from a dispatch "report of a man with a gun."[186] The dispatcher informed officers the "suspect flashed a gun at the complainant but no threat was made;" no shots had been fired; no one was in danger; the complainant was not cooperative and hung up on the call taker; and the complainant refused to provide her identifying information.[187]

The nature of the dispatch report could have led to a number of potential crimes, ranging from misdemeanor to felony.[188] In Utah, the crimes of carrying a concealed firearm, including an unloaded firearm, and openly carrying a loaded firearm on a public street are class B misdemeanors.[189] But if the individual in possession of the firearm is a Category I or II restricted person, the crime is a second or third degree felony.[190] The dispatch report could have also led to no crime being committed because in Utah, individuals may openly transport unloaded firearms.[191] This wide range of possibilities necessitated the dispatcher asking for any officers "coming clear" to "check" the situation.[192]

Officer Cruz mistakenly believed the dispatch report was for a group of men, one of whom had "brandished" a weapon.[193] But he ultimately responded to ensure the suspect was not a threat to public safety and to determine whether any laws had been or were being violated, including a possible brandishing.[194] This necessarily required Officer Cruz, and the other

---

[186] *Supra* Undisputed Facts ¶ 1.

[187] *Id.* ¶¶ 1-2.

[188] Utah Code Ann. §§ 76-10-500 through -532.

[189] *Id.* § 76-10-504(1), -505(1)(b), (4).

[190] *Id.* § 76-10-503(2)(a), (3)(a).

[191] *Id.* § 76-10-500(1).

[192] *Supra* Undisputed Facts ¶ 3.

[193] *Id.* ¶¶ 4, 10.

[194] *Id.* ¶ 5.

responding officers, to determine whether any of the suspects were armed, and if so, whether their reason for carrying a firearm was innocent or nefarious.

Officer Cruz's response to the unknowns of these circumstances was heightened caution.[195] When he arrived in the area, he observed three men—Mr. Taylor, Jerrail, and Adam—two of whom generally matched the descriptions provided by the dispatcher.[196] He requested backup and decided to wait for that backup to arrive before approaching the suspects.[197] He asked the dispatcher whether the report identified which of the three men flashed the gun, and was told that the log did not indicate,[198] which added another unknown to the situation. Officer Cruz also observed the three men and ran scenarios through his mind to be as prepared as possible for the encounter with them.[199]

While observing the three men, Officer Cruz saw Mr. Taylor walk up to a car stopped at a red light and interact with the driver, while Jerrail and Adam were "throwing their hands in the air, kind of making a big scene."[200] Officer Cruz was unsure of what occurred in the exchange and described it as "some kind of distraction or disturbance," possibly "harassing the driver," and "not typical" and "unusual" since "you don't just walk up to people in a crosswalk, somebody that maybe you don't know, and start engaging them while they are sitting in their car in traffic."[201] The exchange further heightened Officer Cruz's caution regarding the three suspects.

---

[195] Officers Sylleloglou and Downes also approached the situation with heightened caution because the suspect was reportedly armed. *Id.* ¶¶ 45, 67.

[196] *Id.* ¶ 13.

[197] *Id.* ¶¶ 9, 14.

[198] *Id.* ¶ 15.

[199] *Id.* ¶¶ 14, 16-17, 20-21.

[200] *Id.* ¶ 17.

[201] *Id.* ¶ 18.

A witness also viewed the exchange and indicated that it appeared Mr. Taylor gave the car's driver a high-five.[202] This differing description of the exchange does not create a genuine issue of material fact or render Officer Cruz's reaction to the exchange unreasonable. The witness observed the exchange from an obstructed vantage point[203] that was different than Officer Cruz's view. The witness also did not describe the actions of Jerrail and Adam during the exchange. And the witness was not viewing the exchange from the prospective of an officer responding to a dispatch report of a man with a gun. Moreover, what actually occurred during the exchange is not material. Rather, it is Officer Cruz's observation of and reaction to the exchange that are material to determining whether his conduct was objectively reasonable.

Viewing the undisputed material facts in a light most favorable to Plaintiffs, the dispatch report was for a minor crime or no crime at all. The complainant, being unidentified and non-cooperative with the call taker,[204] also casts doubt regarding whether a crime had been committed.[205] And prior to making contact with the suspects, Officer Cruz did not observe anything suggestive of a more serious crime. But even so, a reasonable officer in the same circumstances would approach the situation with heightened caution—just as Officer Cruz did— based on the potential threat to safety posed by a firearm's presence and a suspect's unknown motivations. When this heightened caution is considered in the totality of the circumstances— and particularly in light of Mr. Taylor's conduct after the officers made contact—the severity of

---

[202] *Id.* ¶ 19.

[203] *Id.*

[204] *Id.* ¶ 2.

[205] *Florida v. J.L.*, 529 U.S. 266, 270 (1999) ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated . . . an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity[.]") (internal citations and quotations omitted).

the crime factor weighs in favor of a finding that Officer Cruz's use of deadly force was objectively reasonable.

**Officer Cruz's use of deadly force was objectively reasonable in light of the potential threat of serious physical harm posed by Mr. Taylor**

The second factor to consider in determining whether an officer's use of force was objectively reasonable is the potential threat posed by the suspect to the officer and others' safety.[206] Specific to the use of deadly force, a defendant's conduct is justified if a reasonable officer in the defendant's position would have probable cause to believe that the suspect poses a potential threat of serious physical harm, either to the officer or to others.[207] "[E]ven if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back the officer would be justified in using more force than in fact was needed."[208] "A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'"[209]

In assessing the degree of threat facing an officer in deadly force cases, the following nonexclusive factors are considered: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[210] Each of these factors supports a finding that a reasonable officer on the scene would have probable cause to believe that Mr. Taylor posed a potential threat of serious physical harm to the officer or others.

---

[206] *Mecham*, 500 F.3d at 1204.

[207] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Murr*, 511 F.3d at 1260.

[208] *Murr*, 511 F.3d at 1260 (internal quotations and punctuation omitted).

[209] *Id*. (quoting *People v. Morales*, 603 N.Y.S.2d 319, 320 (N.Y. App. Div. 1993)).

[210] *Id*.

*Mr. Taylor refused to comply with the officers' repeated commands that he stop and show his hands*

Plaintiffs argue that material issues of fact exist regarding whether Mr. Taylor was aware of the officers' interest in him and whether he could hear their commands because he was wearing headphones.[211] Plaintiffs' argument lacks merit. Viewing the undisputed material facts in a light most favorable to Plaintiffs, it cannot be reasonably questioned that Mr. Taylor was aware of the officers' presence; that he heard and verbally responded to the officers' commands; and that he deliberately refused to comply with their commands. And regardless, the qualified immunity analysis does not focus on Mr. Taylor's subjective understanding of the situation. Nor does it turn on whether Officer Cruz was aware that Mr. Taylor was wearing headphones.[212] Rather, the focus of the inquiry is whether a reasonable officer under the circumstances would believe that Mr. Taylor was aware of the officers' presence, heard their commands, and refused to comply.[213]

Officers Cruz, Sylleloglou, and Downes never saw a firearm in Mr. Taylor's possession,[214] and no gun was found at the scene.[215] However, the officers were responding to a dispatch "report of a man with a gun."[216] The suspects—Mr. Taylor, Jerrail, and Adam—were in the area of the report and two of them generally matched the descriptions provided by the

---

[211] Response at 83-84; *supra* Undisputed Facts ¶¶ 62-63, 123-125.

[212] Officer Cruz indicated that he did not see Mr. Taylor wearing headphones, but the video and photographic evidence shows that after Mr. Taylor was shot, Officer Cruz appeared to have laid or thrown the headphones onto the ground while he searched Mr. Taylor. *Supra* Undisputed Facts ¶¶ 124-130. This potential inconsistency is not material.

[213] *Garner*, 471 U.S. at 11; *Murr*, 511 F.3d at 1260.

[214] *Supra* Undisputed Facts ¶¶ 54, 103, 107, 110, 116.

[215] *Id*. ¶ 113.

[216] *Id*. ¶ 1.

dispatcher.[217] When the officers made contact, Jerrail and Adam immediately stopped and raised their hands.[218] Mr. Taylor, on the other hand, turned around, put his headphones in, and began walking away from the officers towards the entrance of the 7-Eleven.[219]

Officer Cruz believed that Mr. Taylor looked directly at him and the other officers when they approached in their police vehicles as he exited the 7-Eleven.[220] But Officer Cruz was wearing dark-tinted sunglasses,[221] which arguably might have obscured his ability to determine whether Mr. Taylor looked at him as Officer Cruz approached in his vehicle. However, the video and photographic evidence show that Mr. Taylor appeared to look directly at Officer Cruz's police vehicle as it approached—with its red and blue emergency lights flashing—and blocked his path.[222] Mr. Taylor also appeared to look directly at Officer Sylleloglou's police vehicle as it moved in front of the three men.[223] And when Jerrail was asked if he thought there was any possible way that Mr. Taylor could not have seen the police vehicles and the officers approaching with their guns drawn, he stated: "I don't know how he didn't see them."[224]

By immediately turning and walking away when the police vehicles blocked his path,[225] Mr. Taylor's conduct would suggest to a reasonable officer that Mr. Taylor was aware of the police presence, and that he was attempting to evade the officers. Officers Cruz and Sylleloglou

---

[217] *Id*. ¶ 13.

[218] *Id*. ¶¶ 40, 42, 47.

[219] *Id*. ¶¶ 39-40, 42, 51, 58, 62-63.

[220] *Id*. ¶¶ 37, 39-42.

[221] *Id*. ¶ 36.

[222] *Id*. ¶¶ 32-33, 35, 38.

[223] *Id*. ¶ 43.

[224] *Id*. ¶ 52.

[225] *Id*. ¶¶ 39-40, 42, 51, 58, 62-63.

pursued Mr. Taylor,[226] shouting repeated commands that he stop and show his hands.[227] But Mr. Taylor continued walking away from the officers and placed his hands "wrist-deep" inside the front waistband of his pants, moving them in a digging motion.[228]

Then, as Mr. Taylor continued walking away from the officers while they shouted commands for him to stop and show his hands,[229] he looked directly at Officer Sylleloglou with a "mean mug" look on his face and verbally responded.[230] It is unknown exactly what Mr. Taylor said. But it is undisputed that he was speaking to Officer Sylleloglou and said something along the lines of "what did we do?"[231] and "what are you gonna do, shoot me? What are you gonna do? You gonna shoot me? You gonna shoot me?"[232] Officer Sylleloglou described the look on Mr. Taylor's face as hostile and defiant.[233] Mr. Taylor also later turned around to directly face Officer Cruz,[234] indicating that he was aware of Officer Cruz's presence behind him. Officer Cruz described the look on Mr. Taylor's face as defiant, like "come and get me. I'm gonna fricken kill you."[235]

Plaintiffs argue that Officer Cruz's description of Mr. Taylor's look is not credible because Officer Cruz was looking in the direction of the sun.[236] But this argument lacks merit

---

[226] *Id.* ¶¶ 53, 56, 64.

[227] *Id.* ¶¶ 50, 59, 77; 83, 90-91, 93-94, 97, 110, 116.

[228] *Id.* ¶¶ 59, 70, 75, 78, 92, 94-96, 99, 110, 116.

[229] *Id.* ¶¶ 59, 77, 83.

[230] *Id.* ¶¶ 84, 87-88.

[231] *Id.* ¶ 87.

[232] *Id.* ¶ 88.

[233] *Id.* ¶ 84.

[234] *Id.* ¶¶ 89, 93-94, 97-98.

[235] *Id.* ¶¶ 96, 99.

[236] Response at 76; Cruz Bodycam Video.

based on the undisputed material facts. Officer Cruz was wearing dark-tinted sunglasses,[237] which would have ameliorated the effect of the sun. Moreover, Officer Sylleloglou described the look on Mr. Taylor's face as being hostile and defiant just seconds before Mr. Taylor turned to face Officer Cruz.[238] And after turning to face Officer Cruz, while continuing to walk backwards away from the officers, Mr. Taylor verbally responded to Officer Cruz in a defiant tone.[239] It is undisputed that he said something to Officer Cruz which sounded like "what fool" or "nah fool."[240] It is also undisputed that during the verbal exchanges with Officers Sylleloglou and Cruz, Mr. Taylor continued walking away from the officers with his hands concealed in the front waistband of his pants, moving them in a digging motion.[241]

Officers Cruz and Sylleloglou both believed that Mr. Taylor heard their commands and deliberately chose to ignore them.[242] A reasonable officer under these circumstances would also believe that Mr. Taylor was aware of the officers' presence, heard their commands, and refused to comply. This supports a finding that a reasonable officer would have probable cause to believe that Mr. Taylor posed a potential threat of serious physical harm to the officer or others.

> *Mr. Taylor made a sudden and hostile "draw stroke motion" with his hands while refusing to comply with the officers' commands, and while directly facing Officer Cruz*

Plaintiffs argue that material issues of fact exist regarding whether Mr. Taylor made a hostile motion towards the officers.[243] Plaintiffs rely on Jerrail and Adam's statements that they

---

[237] *Supra* Undisputed Facts ¶ 36.

[238] *Id*. ¶ 84; Cruz Bodycam Video.

[239] *Supra* Undisputed Facts ¶ 97; Cruz Bodycam Video.

[240] *Supra* Undisputed Facts ¶ 97.

[241] *Id*. ¶¶ 75, 78, 84, 86, 92, 94-99, 110, 116.

[242] *Id*. ¶¶ 84, 86, 99, 110.

[243] Response at 82-83.

believed Mr. Taylor was pulling up his pants,[244] or that Mr. Taylor's hands could have been in his pockets manipulating his phone.[245] Plaintiffs also argue that Mr. Taylor could have been attempting to comply with the officers' commands that he show his hands.[246] However, the focus of the inquiry is not on what Jerrail and Adam believed Mr. Taylor was doing with his hands, or what Mr. Taylor subjectively intended with his hand movements. Rather, the focus is whether a reasonable officer under the circumstances would believe that Mr. Taylor was making a hostile motion with a weapon towards the officers.[247] The undisputed material facts and video and photographic evidence of the moments when Mr. Taylor was shot demonstrate that a reasonable officer would believe that Mr. Taylor made a hostile motion with a weapon towards the officers.

Based on his understanding that one of the three men had a gun, Officer Cruz reasonably believed that the gun was very likely in the possession of Mr. Taylor, who was walking away from the officers and, unlike Jerrail and Adam, was not complying with the officers' commands to stop.[248] As Mr. Taylor walked along the side of the 7-Eleven away from Officers Cruz and Sylleloglou with his back to them, he raised his hands to the sides of his waist.[249] It is clear from the video and photographic evidence that when Mr. Taylor did this, he was pulling up his baggy pants.[250]

---

[244] *Supra* Undisputed Facts ¶¶ 120-121, 123.

[245] *Id*. ¶ 123.

[246] Response at 78, 82-83.

[247] *Garner*, 471 U.S. at 11; *Murr*, 511 F.3d at 1260.

[248] *Supra* Undisputed Facts ¶ 70.

[249] *Id*. ¶ 74.

[250] *Id*. ¶¶ 73-74.

However, Mr. Taylor then made a separate, distinct movement with his hands: he put his hands inside the front waistband of his pants, and made digging motions with them.[251] Officer Cruz reasonably believed Mr. Taylor's hands were concealed in his waistband area due to the position of his elbows as he viewed Mr. Taylor from behind.[252] It was not until this point—when Mr. Taylor concealed his hands in the front waistband of his pants—that Officers Cruz and Sylleloglou began training their weapons on Mr. Taylor.[253] It was also at this point that Officer Cruz was convinced that Mr. Taylor had a gun, and that Mr. Taylor was "buying time" by "calmly walk[ing] away" and "creating distance" before a "gunfight" ensued.[254] But instead of firing his weapon at Mr. Taylor, Officer Cruz continued to shout commands, along with Officer Sylleloglou, for Mr. Taylor to stop and show his hands.[255]

Mr. Taylor continued walking away from the officers with his hands "wrist-deep" in the front waistband of his pants, moving them in a digging motion.[256] Viewing the undisputed material facts in a light most favorable to Plaintiffs, Mr. Taylor's hands could have been manipulating his phone at this time.[257] But the officers were responding to a dispatch report of a man with a gun.[258] And they were faced with a suspect that was aware of their presence and interest in him, and who was not complying with their commands that he stop and show his hands.[259] Under these circumstances, a reasonable officer would believe that Mr. Taylor was in

---

[251] *Id.* ¶ 75.

[252] *Id.* ¶ 76.

[253] *Id.* ¶¶ 75, 79, 82.

[254] *Id.* ¶¶ 79-81.

[255] *Id.* ¶¶ 77; 83, 90-91, 93-94, 97, 110, 116.

[256] *Id.* ¶¶ 92, 95-96, 99.

[257] *Id.* ¶¶ 123-124.

[258] *Id.* ¶ 1.

[259] *Supra* Discussion at 37-41.

possession of a weapon and a reasonable officer would take measures to be prepared to act in self-defense or the defense of others—just as Officers Cruz and Sylleloglou did by training their weapons on Mr. Taylor.[260] As Officer Downes noted, "there were civilians all around us, non-law enforcement personnel. So if they decided to produce a weapon, there is no telling where those rounds are going to go."[261]

Mr. Taylor's conduct at this point further escalated the situation. He looked at Officer Sylleloglou with a "mean mug" look on his face, which Officer Sylleloglou described as hostile and defiant.[262] He also verbally responded to Officer Sylleloglou in a defiant manner.[263] He then turned around to directly face Officer Cruz and, with a hostile look on his face, verbally responded to Officer Cruz in a defiant tone.[264]

While facing Officer Cruz, Mr. Taylor suddenly and without warning quickly raised his hands in a "draw stroke" motion.[265] His left hand moved from inside the waistband of his pants, lifting his shirt and exposing his lower torso,[266] while simultaneously he brought his right hand out of his waistband but lower than his left hand.[267] It was at this point, believing that Mr. Taylor's movements indicated he was "drawing" or reaching for a gun, and that Mr. Taylor intended to fire on the officers, Officer Cruz acted in self-defense by firing two shots in rapid succession, striking Mr. Taylor in the torso.[268]

---

[260] *Supra* Undisputed Facts ¶¶ 75, 79, 82

[261] *Id.* ¶ 67.

[262] *Id.* ¶ 84.

[263] *Id.* ¶¶ 87-88.

[264] *Id.* ¶¶ 93, 96-97, 99; Cruz Bodycam Video.

[265] *Supra* Undisputed Facts ¶¶ 100-101, 104-105, 116.

[266] *Id.* ¶ 100.

[267] *Id.* ¶ 101.

[268] *Id.* ¶¶ 105, 110.

It is clear from the video and photographic evidence that the "drawing" motion of Mr. Taylor's hands is not similar to when Mr. Taylor earlier put his hands on his waist to pull up his pants.[269] That one of Officer Cruz's rounds struck Mr. Taylor in the "right upper quadrant of [the] abdomen" also grazing the third and fourth fingers of his left hand is also inconsistent with the theory that Mr. Taylor was pulling up his pants.[270] Moreover, although Jerrail suggested Mr. Taylor was pulling up his pants,[271] it is undisputed that Jerrail was already on the ground when he heard the two gunshots and did not see what happened.[272] Adam also stated to officers that based on Mr. Taylor's movements, he could see why the officers thought Mr. Taylor might have had a gun.[273] And Officer Sylleloglou indicated that he likely would have fired his weapon in self-defense under the circumstances, if Officer Cruz had not fired.[274]

The undisputed material facts also do not reasonably suggest that Mr. Taylor abruptly decided to become compliant with the officers' commands that he stop and show his hands. To the contrary, the undisputed material facts demonstrate that less than four seconds before he was shot,[275] Mr. Taylor turned to directly face Officer Cruz and, with a hostile look on his face, verbally responded to Officer Cruz in a defiant tone.[276] He then made a sudden motion with his

---

[269] *Compare id.* ¶ 74, *with id.* ¶ 100; Cruz Bodycam Video.

[270] *Id.* ¶ 106.

[271] *Id.* ¶ 120.

[272] *Id.* ¶ 119.

[273] *Id.* ¶ 122.

[274] *Id.* ¶ 117.

[275] *Id.* ¶ 115.

[276] *Id.* ¶¶ 93, 96-97, 99.

hands that from the video and photographic evidence is consistent with a "draw stroke."[277] And when he was shot, Mr. Taylor was continuing to walk backwards away from the officers.[278]

Although Mr. Taylor's hand did not ever come toward Officer Cruz,[279] and no gun was found in Mr. Taylor's possession,[280] the confirmed presence of a weapon is not required before a reasonable officer takes self-protective action.[281] Given all the facts now known, it could be assumed that Mr. Taylor was pulling up his pants, manipulating his phone with his hands, or attempting to comply with the officers' commands that he show his hands. But "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[282] Officers are "justified in using more force than in fact was needed" if the officers "reasonably, but mistakenly, believed that a suspect was likely to fight back[.]"[283]

A reasonable officer under the circumstances of this case would believe that Mr. Taylor's sudden "draw stroke" motion with his hands was a hostile motion made with a weapon towards the officers. And this supports a finding that a reasonable officer would have probable cause to believe that Mr. Taylor posed a potential threat of serious physical harm to the officer or others.

---

[277] *Id.* ¶¶ 100-101, 104-105, 116.

[278] *Id.* ¶ 95.

[279] *Id.* ¶ 107.

[280] *Id.* ¶ 113.

[281] *Murr*, 511 F.3d at 1260 (quoting *Morales*, 603 N.Y.S.2d at 320).

[282] *Graham*, 490 U.S. at 396-97.

[283] *Murr*, 511 F.3d at 1260 ("[E]ven if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back the officer would be justified in using more force than in fact was needed.") (internal quotations and punctuation omitted).

*Mr. Taylor and Officers Cruz and Sylleloglou were in close proximity during the encounter*

Officers Cruz and Sylleloglou arrived at the scene in their police vehicles forming a barricade or "V" in the 7-Eleven parking lot blocking the path of Mr. Taylor, Jerrail, and Adam.[284] Officer Sylleloglou immediately exited and ran around the front of his vehicle in a south/west diagonal in pursuit of Mr. Taylor, who was walking away.[285] Officer Cruz initially followed some distance behind Mr. Taylor and Officer Sylleloglou, but was closing the distance.[286] This was because Mr. Taylor was already walking away from Officer Cruz before he had fully exited his vehicle and cleared its door.[287] Officer Cruz then maintained his distance from Mr. Taylor after Mr. Taylor concealed his hands in the font waistband of his pants.[288]

When Mr. Taylor looked at Officer Sylleloglou with a "mean mug" look on his face and verbally responded to Officer Sylleloglou, the distance between the two was no more than 15 feet.[289] Officers Cruz and Sylleloglou were five to seven feet apart when Mr. Taylor turned around to face Officer Cruz.[290] And at the moment he was shot, Mr. Taylor was approximately 10 to 12 feet away from Officer Cruz, and 12 to 15 feet away from Officer Sylleloglou.[291] Officer Downes was detaining Jerrail and Adam in the parking lot in front of the 7-Eleven approximately 50 feet away from Officers Cruz and Sylleloglou.[292]

---

[284] *Supra* Undisputed Facts ¶ 35.

[285] *Id*. ¶ 53.

[286] *Id*. ¶ 56; Cruz Bodycam Video.

[287] *Supra* Undisputed Facts ¶ 55.

[288] *Id*. ¶ 71; Cruz Bodycam Video.

[289] *Supra* Undisputed Facts ¶ 85

[290] *Id*. ¶ 110.

[291] *Id*. ¶ 102.

[292] *Id*. ¶¶ 65, 118.

The close proximity of Mr. Taylor and Officers Cruz and Sylleloglou further demonstrates that a reasonable officer would believe that Mr. Taylor was aware of the officers' presence and could hear their commands that he stop and show his hands.[293] The close proximity also demonstrates that Officers Cruz and Sylleloglou were close enough to Mr. Taylor to observe his movements and facial expressions as they pursued him. And the close proximity demonstrates that Officer Cruz was faced with a split-second decision when Mr. Taylor made the sudden "draw stroke" motion with his hands.[294] In that split-second, Officer Cruz fired his weapon,[295] and Officer Sylleloglou likely would have fired his weapon had Officer Cruz not fired.[296] Given these circumstances, the close proximity of Mr. Taylor and Officers Cruz and Sylleloglou supports a finding that a reasonable officer would have probable cause to believe that Mr. Taylor posed a potential threat of serious physical harm to the officer or others.

*Mr. Taylor manifested hostile and defiant intentions in relation to the officers*

From the moment the officers arrived at the 7-Eleven parking lot until the time he was shot, Mr. Taylor's conduct demonstrated an intention to be hostile and defiant in relation to the officers. He immediately turned and walked away when the police vehicles blocked his path.[297] He then continued to walk away while Officers Cruz and Sylleloglou pursued him shouting commands that he stop and show his hands.[298] Despite being aware of the officers' presence and interest in him, and hearing their commands, Mr. Taylor refused to comply.[299] He defiantly

---

[293] *Supra* Discussion at 37-41.

[294] *Id*. at 41-47.

[295] *Supra* Undisputed Facts ¶¶ 105, 110.

[296] *Id*. ¶ 117.

[297] *Id*. ¶¶ 39-40, 42, 51, 58, 62-63.

[298] *Id*. ¶¶ 50, 59, 70, 77-78, 83, 90-95, 99, 110, 116.

[299] *Supra* Discussion at 37-41.

concealed his hands in the front waistband of his pants, moving them in a digging motion;[300] he looked at the officers with a hostile and defiant look on his face while the officers pursued him;[301] he verbally responded to the officers in a defiant manner and tone;[302] and he continued walking away from the officers.[303] Finally, when directly facing Officer Cruz, being no more than 12 feet away and with Officer Cruz's weapon trained on him, Mr. Taylor made a sudden and hostile "draw stroke" motion with his hands.[304]

A reasonable officer under these circumstances would believe that Mr. Taylor's manifest intentions were hostile and defiant in relation to the officers. This supports a finding that a reasonable officer would have probable cause to believe that Mr. Taylor posed a potential threat of serious physical harm to the officer or others.

*Conclusion: Mr. Taylor posed a potential threat of serious physical harm to the officers or others*

A reasonable officer on the scene of the August 11, 2014 encounter with Mr. Taylor would believe that: (1) Mr. Taylor was aware of the officers' presence and interest in him, heard the officers' commands that he stop and show his hands, and refused to comply;[305] (2) Mr. Taylor's sudden "draw stroke" motion with his hands was a hostile motion made with a weapon towards the officers;[306] (3) the close proximity of Mr. Taylor and Officers Cruz and Sylleloglou necessitated a split-second decision by the officers when Mr. Taylor made the sudden "draw

---

[300] *Supra* Undisputed Facts ¶¶ 75-76, 79-82, 84, 86, 92, 95-65, 99, 110, 116.

[301] *Id*. ¶¶ 84, 96, 99, 110.

[302] *Id*. ¶¶ 87-88, 97, 99, 110.

[303] *Id*. ¶¶ 92, 94-95.

[304] *Id*. ¶¶ 93, 100-102, 104-105, 116.

[305] *Supra* Discussion at 37-41.

[306] *Id*. at 41-46.

stroke";[307] and (4) Mr. Taylor's manifest intentions were hostile and defiant in relation to the officers.[308] Because of this, a reasonable officer under the circumstances would have probable cause to believe that Mr. Taylor posed a potential threat of serious physical harm to the officer or others. Therefore, this factor weighs in favor of a finding that Officer Cruz's use of deadly force was objectively reasonable.

**Officer Cruz's use of deadly force was objectively reasonable in light of Mr. Taylor's attempts to resist or evade arrest**

The third factor in determining whether an officer's use of force was objectively reasonable is the suspect's attempts to resist or evade arrest.[309] Plaintiffs argue that material issues of fact exist regarding whether Mr. Taylor was resisting or evading arrest.[310] Plaintiffs argue that Mr. Taylor could not hear the officers' commands that he stop and show his hands because he was wearing headphones.[311] Plaintiffs also argue that Mr. Taylor was not threatening or actively resisting arrest because he was slowly and calmly walking away from the officers.[312] But these facts cannot be viewed in isolation. They must be considered in the totality of the circumstances "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[313]

Viewing the undisputed material facts in a light most favorable to Plaintiffs, it cannot be reasonably questioned that Mr. Taylor was aware of the officers' presence; that he heard and verbally responded to the officers' commands; and that he deliberately refused to comply with

---

[307] *Id*. 46-47.

[308] *Id*. 48-49.

[309] *Mecham*, 500 F.3d at 1204.

[310] Response at 83-85.

[311] *Id*.; *supra* Undisputed Facts ¶¶ 62-63, 123-125.

[312] Response at 84; *supra* Undisputed Facts ¶ 81.

[313] *Graham*, 490 U.S. at 396; *Murr*, 511 F.3d at 1259.

their commands.[314] A reasonable officer under the circumstances would believe that Mr. Taylor was aware of the officers' presence, heard their commands, and refused to comply.[315] Mr. Taylor immediately walked away from the officers when the police vehicles blocked his path.[316] When Jerrail saw Mr. Taylor walking away, he told Mr. Taylor to "stop," and figured that Mr. Taylor was avoiding contact with the officers.[317] Mr. Taylor continued walking away from the officers despite their pursuit and commands that he stop and show his hands, even when directly facing Officer Cruz with Officer Cruz's weapon trained on him.[318] Mr. Taylor's manifest intentions were hostile and defiant in relation to the officers throughout the encounter.[319] And Mr. Taylor made a sudden and hostile "draw stroke" motion with his hands while directly facing Officer Cruz in close proximity.[320] A reasonable officer under these circumstances would believe that Mr. Taylor was attempting to resist or evade arrest. Therefore, this factor weighs in favor of a finding that Officer Cruz's use of deadly force was objectively reasonable.

**Officer Cruz's use of deadly force was objectively reasonable under the totality of the circumstances**

Viewing the totality of the circumstances, Officer Cruz's use of deadly force during the August 11, 2014 encounter with Mr. Taylor was objectively reasonable. He approached the situation with heightened caution based on the dispatch report of a man with a gun and the unknown motivations of the suspects.[321] He reasonably believed that Mr. Taylor was in

---

[314] *Supra* Discussion at 37-41.

[315] *Id*.

[316] *Supra* Undisputed Facts ¶¶ 39-40, 42, 51, 58, 62-63.

[317] *Id*. ¶¶ 60-61.

[318] *Id*. ¶¶ 50, 59, 70, 77-78, 83, 90-95, 99, 110, 116.

[319] *Supra* Discussion at 48-49.

[320] *Id* at 41-47.

[321] *Id*. at 32-36.

possession of a firearm, and that Mr. Taylor posed a potential threat of serious physical harm to the officers or others.[322] And he reasonably believed that Mr. Taylor was attempting to resist or evade arrest.[323]

Plaintiffs argue that Officer Cruz unreasonably believed and acted as though the dispatch report was for a more serious crime; was overly fearful before and during the encounter; and that rather than taking cover or creating distance, Officer Cruz's conduct exacerbated the situation.[324] But Plaintiffs' argument relies on statements Officer Cruz made after the encounter and their own selected facts,[325] while ignoring the totality of the circumstances. Viewing the undisputed material facts in their totality, and in a light most favorable to Plaintiffs, Officer Cruz's conduct before and during the encounter did not recklessly or deliberately create the need for his use of deadly force.

The undisputed material facts demonstrate that Officer Cruz requested backup, and waited for backup to arrive before approaching Mr. Taylor, Jerrail, and Adam.[326] He asked the dispatcher whether the report identified which of the three men flashed the gun, and he ran scenarios through his mind to prepare himself for the encounter.[327] And upon initiating contact, Officer Cruz ensured the three men were aware of the police presence and interest in them by activating the emergency lights on his police vehicle, blocking the men's path with his vehicle, and giving commands that the men stop and show their hands,[328].

---

[322] *Id.* at 36-48.

[323] *Id.* at 48-50.

[324] Response at 74-83.

[325] *Supra* Undisputed Facts ¶¶ 6, 10, 18, 21, 29, 32-33, 37, 41-42, 48, 56-57, 71, 79-81, 96, 107-110.

[326] *Supra* Undisputed Facts ¶¶ 9, 14.

[327] *Id.* ¶¶ 15, 21.

[328] *Id.* ¶¶ 32-33, 35, 38, 44.

Then, as Mr. Taylor walked away, Officer Cruz pursued while continually shouting commands that Mr. Taylor stop and show his hands.[329] He initially followed some distance behind Mr. Taylor, but was closing the distance.[330] However, after Mr. Taylor concealed his hands in the front waistband of his pants, Officer Cruz maintained his distance from Mr. Taylor and readied himself to take self-protective measures by drawing his weapon and training it on Mr. Taylor.[331]

Officer Cruz was convinced at this point that Mr. Taylor was armed and "creating distance" before engaging in a "gunfight," but he continued shouting commands for Mr. Taylor to stop and show his hands.[332] It was not until after Mr. Taylor turned around to directly face him, verbally responded in a defiant tone and with a hostile look on his face, and made an sudden "draw stroke" motion with his hands, that Officer Cruz employed deadly force.[333] It is neither helpful nor relevant to undergo a "retrospective inquiry" to suggest that "[p]erhaps the situation might have been more peacefully resolved" had Officer Cruz acted differently.[334] Officer Cruz's conduct must be evaluated "from the on-scene perspective, not with the advantage of 20/20 hindsight."[335] And the totality of the circumstances demonstrate that Officer Cruz adequately performed his duties as a reasonable law enforcement officer by taking steps to prevent a potentially armed suspect from causing serious physical harm to the officers or others.

---

[329] *Id.* ¶¶ 50, 90-91, 93-94, 97, 110, 116.

[330] *Id.* ¶ 56; Cruz Bodycam Video.

[331] *Supra* Undisputed Facts ¶¶ 71, 75, 79; Cruz Bodycam Video.

[332] *Supra* Undisputed Facts ¶¶ 78-81, 90-91, 93-94, 97, 110, 116.

[333] *Id.* ¶¶ 93, 96-97, 99, 100-101, 104-105, 100, 116; Cruz Bodycam Video.

[334] *Jiron v. City of Lakewood*, 392 F.3d 410, 418 (10th Cir. 2004).

[335] *Id.*

Ultimately, Officer Cruz was in close proximity and directly facing Mr. Taylor—an individual whom a reasonable officer on the scene would believe is a potentially armed suspect that is noncompliant, hostile, and defiant.[336] Officer Cruz was then forced to make a spit-second decision to take self-protective action when Mr. Taylor made a sudden and hostile "draw stroke" motion with his hands.[337] Although it is now clear that Mr. Taylor was not armed,[338] Officer Cruz's decision to employ deadly force was objectively reasonable under the totality of the circumstances. Therefore, Officer Cruz's use of deadly force in the August 11, 2014 encounter with Mr. Taylor did not violate a statutory or constitutional right as a matter of law. Officer Cruz is entitled to summary judgment on Plaintiffs' excessive force claim.

### Salt Lake City cannot be held liable on Plaintiffs' municipal liability claim relating to Officer Cruz's conduct

"A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff."[339] Rather, "[t]o establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged."[340] "But [a municipality] cannot 'be held liable where there was no underlying constitutional violation by any of its officers.'"[341] Therefore, "a finding of qualified immunity . . . based on a conclusion that the officer has committed no constitutional violation . . . preclude[s] the imposition of municipal liability."[342]

---

[336] *Supra* Discussion at 33-51.

[337] *Id*. at 41-47.

[338] *Supra* Undisputed Facts ¶ 113.

[339] *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).

[340] *Jenkins v. Wood*, 81 F.3d 988, 993-94 (10th Cir. 1996) (citing *city of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Hinton*, 997 F.2d at 782).

[341] *Allen v. Lang*, 738 Fed. App'x 934, 943 (10th Cir. 2018) (quoting *Hinton*, 997 F.2d at 782).

[342] *Jiron*, 392 F.3d at 419 n. 8 (citing *Hinton*, 997 F.2d at 782-83).

Because Officer Cruz's use of deadly force in the August 11, 2014 encounter with Mr. Taylor did not violate a statutory or constitutional right, Salt Lake City cannot be held liable on Plaintiffs' municipal liability claim relating to Officer Cruz's conduct as a matter of law. Salt Lake City is entitled to summary judgment on Plaintiffs' municipal liability claim relating to Officer Cruz's conduct.

## ORDER

IT IS HEREBY ORDERED that Officer Cruz and Salt Lake City's Motion for Summary Judgment[343] is GRANTED. Plaintiffs' first cause of action[344] against Officer Cruz and Plaintiffs' fourth causes of action[345] against Salt Lake City relating to Officer Cruz's conduct are DISMISSED WITH PREJUDICE.

The Clerk is directed to close the case.

Signed May 17, 2019.

BY THE COURT

David Nuffer
United States District Judge

---

[343] Docket no. 44, filed Nov. 28, 2016.

[344] Complaint ¶¶ 105-113.

[345] *Id.* ¶¶ 129-137.